## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, Plaintiff, <br><br> v. <br><br> **REY JADIEL RAMÍREZ-MEDINA**, Defendant. | **CRIMINAL NO. 22-107 (PAD)** <br> **CRIMINAL NO. 17-073 (PAD)** |

### RESPONSE IN OPPOSITION TO THE GOVERNMENT'S SENTENCING MEMORANDUM REQUESTING A 51-MONTH SENTENCE

TO THE HONORABLE PEDRO A. DELGADO
U.S. DISTRICT COURT JUDGE
FOR THE DISTRICT OF PUERTO RICO

COME NOW, Rey Jadiel Ramírez-Medina, ("Mr. Ramírez"), represented by the Federal Public Defender for the District of Puerto Rico through the undersigned attorney, and very respectfully states, alleges, and prays as follows:

### Introduction

The paramount focus of Monday's sentencing proceeding is to arrive at an individualized sentence tailored for Rey Jadiel Ramírez-Medina, a young man who has accepted responsibility for the nonviolent public order offense of unauthorized firearm possession. The parties agree Rey Jadiel accepted full responsibility for the offense and agreed on a lower end of the guideline sentence recommendation. What remains is the careful evaluation of the facts and Mr. Ramírez's history and characteristics to sentence him *as an individual*, so that the punishment "fit[s] the offender and not merely the crime."2 *Pepper v. United States*, 562 U.S. 476, 488 (2011). The principle of individualized assessment "has been uniform and constant in the federal judicial tradition," requiring sentencing judges "to consider every convicted person *as an*

1

*individual."* *Koon v. United States*, 518 U.S. 81, 113 (1996) (emphasis added). Congress has "acknowledg[ed] the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances," rather than mechanistically sentencing based on the crime and little else. *Id.* at 92. Put simply: "Fair sentencing is individualized sentencing." U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 113 (2004). Such an approach is essential to "promote the perception of fair sentencing." *Gall v. United States*, 552 U.S. 38, 50 (2007).

The government's sentencing memorandum, however, promotes an unacceptable approach that must be rejected. This approach jettisons any focus on the human being before the Court and instead asks the Court punish Rey Jadiel for crimes in the Puerto Rico population. The government's memorandum labels these unrelated crimes "community factors," mistakenly alleging that First Circuit sees the "value of community-based factors" to scapegoat an in-court defendant for crimes in his community. **U.S. Sentencing Memorandum 4** (docketed at ECF No. 33).

This Court must repel this attempt to punish Mr. Ramírez more harshly just because he lives amongst a Puerto Rico population that some have labeled as being "plagued with reports of firearms violence." **U.S. Sentencing Memorandum 6**. The government's advocacy begs the Court to commit reversible error by basing a sentence on invidious prejudice. It begs the Court to reversibly err by ignoring caselaw demanding a case-specific nexus to a judge's community-based worries. And it neither supports nor justifies its recommendation, which is not permitted under the plea agreement. These reasons alone warrant striking the government's memorandum.

But the government's submission has further deficiencies. The government's Puerto Rico-population-targeting recommendation relies on one far-away judicial officer's social science summary to argue that higher sentences cause deterrence and prevent recidivism. This is unquestionably wrong. While the government cites District of New Mexico Judge James O. Browning from 2015 (the "Browning Memorandum"), the USAO-PR memorandum ignores mainstream social sciences observations and ignores the policies of the broader U.S. Department of Justice. We show below that social scientists — and the U.S. Department of Justice itself — agree that marginal punishment increases do little to deter crime. *See, e.g.*, *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y May 23, 2017). And while the Browning Memorandum references many criminological papers available in 2015, it focuses on an immigration charge and its conclusions neither benefited from expert analysis nor faced under-oath adversarial testing. And even the Browning Memorandum's conclusion don't support what the government tries to convince this Court to believe about deterrence. We, therefore, encourage this Court to enter findings of fact adopting the findings presented in the *Lawrence* case. This pleading takes these points in turn.

I. **The government's advocacy begs the Court to commit reversible error by basing a sentence on invidious prejudice toward the Puerto Rico population.**

The government's advocacy — if followed by the Court or allowed to remain unaddressed in the official case record — would lead a neutral observer to think the sentence was based on Mr. Ramírez's being Puerto Rican. As the government tells us when seeking a 51-month upwardly variant sentence: Mr. Ramírez "was born in Manatí, Puerto Rico," **U.S. Sentencing Memo 3**; he was arrested and convicted for having a

3

unauthorized gun in Manatí, **U.S. Sentencing Memo 1-3**; and (says the government) the Puerto Rico population is "plagued with reports of firearms violence." **U.S. Sentencing Memorandum 6.** Gluing together its Puerto Rico-population-targeting narrative, the government injects a message-sending narrative into this Court's public docket: "Given Puerto Rico's particular problems with firearms and violence, an appropriate sentence is warranted to deter this Defendant and others from committing similar offenses." **U.S. Sentencing Memo 6**. And while Mr. Ramírez — a U.S. Citizen living in Puerto Rico — is part of a nation that enshrined gun ownership in the U.S. Constitution, the USAO-PR's memorandum invokes the specter of "murders," "gangs and transnational criminal organizations," and the appearing prosecutor's generalized societal fears of "violence or succumbing to the next disaster." **U.S. Sentencing Memorandum 6.**

But an accused person's race, national origin, or ethnicity may play no adverse role in the administration of justice, including at sentencing. *See United States v. Kaba*, 480 F.3d 152, 156 (2d Cir. 2007). Under the common law, under the Sentencing Reform Act of 1984, and under the U.S. Constitution, factors such as race, national origin, ancestry and socioeconomic status "are not relevant in the determination of a sentence." USSG § 5H1.10. As the First Circuit has noted: "Congress says that sentencing must be 'entirely neutral as to … national origin.'" *United States v. Guzmán*, No. 21-1325, 2021 WL 7286956, at *1 (1st Cir. Dec. 14, 2021) (citing 28 U.S.C. § 994(d)). So, a court errs if it rests a sentence decision in any part on national origin. *Id*.

To be sure, the United States' memorandum does not expressly single out Mr. Ramírez for the fact that he is Hispanic, that he is of Puerto Rican ancestry, that he resides in Puerto Rico, that his native language is Spanish, and that he has lived in harsh

4

economic conditions. And we do not suggest that the United States harbors any bias against Mr. Ramírez. Sadly, the United States has for half a decade addressed courts in this District with fever-pitch-level advocacy aimed at promoting what the U.S. Department of Justice has called "high-crime area" sentencing. Supp. Br. for the United States, No. 19-2204, ECF No. 00117935247, *33 (1st Cir. Oct. 21, 2022).[1] The inherent problem in this approach is it overtly targets Puerto Rico alone and aims sentences at improper factors under the U.S. Constitution, under applicable sentencing jurisprudence and congressional statutes, and under the U.S. Sentencing guidelines. *See Kaba*, 480 F.3d at 156; *Guzmán*, 2021 WL 7286956, at *1; 28 U.S.C. § 994(d); USSG § 5H1.10.

**A.** If relied on by the Court, the government's Puerto Rico-targeting higher sentence request would the leave the impression that the Court is sentencing Mr. Ramírez based on an anti-Puerto Rico-defendant bias. For it is well-established that singling out of people from Puerto Rico amounts to a determination "based on national origin, ancestry, and race" and must "withstand the strictest constitutional scrutiny." *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 36 (1st Cir. 2001); *see, e.g., López v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) (Puerto Ricans may not be discriminated against based on either their national origin or ancestry.).

---

[1] As discussed below, the U.S. Department of Justice, does not condone sentences aimed to send group-specific deterrence messages. *See United States v. Vásquez-Drew*, No. 20-3195, 2023 WL 2359966 (2d Cir. March 2, 2023) (conceding error where district court imposed higher sentence to send a message to people in Bolivia. The USAOR-PR, however, parts with the mainstream Department of Justice agenda, and has engaged on an extended campaign of Puerto Rico-specific punishment increases. What the United States government is trying to do to Mr. Ramirez here is the same thing it perpetrated against myriad defendants for no other reason than their being from Puerto Rico and their living here. *See, e.g., United States v. Gabriel Rivera-Nieves*, D.P.R. No. 17-125 (DRD), ECF No. 41, at *6 (asking for a higher sentence for "Defendant Rivera-Nieves [who] has reflected on the violence affecting Puerto Rico … [,] [b]ut rather than breaking the chain of violence, he has chosen to perpetuate it."). Like here, in *Rivera-Nieves*, the United States has refused to accept binding case law requiring a case-specific nexus to violent crime to even mention violent crime at sentencing. *See id.*

Race and other points of discrimination cannot ever be part of a sentencing court's rationale, especially as an adverse consideration. Even the 1883 Supreme Court, in *Pace*, realized — despite the entrenched racism evident in *Pace*'s now-overruled workaround — that equal protection, at a minimum, "prevent[s] hostile and discriminating ... legislation against any person or class of persons ... , whatever his race," such that "in the administration of criminal justice he shall not be subjected, for the same offense, to any greater or different punishment." *Pace v. State*, 106 U.S. 583, 584 (1883), *overruled by Loving v. Virginia*, 388 U.S. 1 (1967). Yet, the government's claims that Puerto Rico suffers an enhanced violent-crime propensity would openly invite that consideration.

The test for an impermissible sentencing rational is whether "the district court improperly considered the defendant's" protected characteristic of race, national origin, etcetera. *Kaba*, 480 F.3d at 156-57. And "even the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing." *Id.* at 156 (quoting *United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994)).

Last month's Second Circuit decision in *United States v. Vásquez-Drew*, No. 20-3195, 2023 WL 2359966 (2d Cir. March 2, 2023), is instructive, and reflects the same conclusion reached in by the First Circuit in late-2021 in *Guzmán*, 2021 WL 7286956. Percy Vasquez-Drew is from Bolivia, and was convicted in the Southern District of New York for a drug-trafficking offense. The district court stated it was "'going to impose a very long sentence on the defendant, principally motivated by concerns about appropriate punishment, but also general deterrence.... 'It is important,' the court continued, 'that the people in Bolivia understand the kind of sentences that are potentially imposed here from engagement in activity to send cocaine into America.'" *Id.* at *1.

Though the Second Circuit was confident that the sentencing judge harbored no actual bias against the defendant, it vacated and remanded because there was "'a sufficient risk that a reasonable observer, hearing or reading" the district court's remarks, 'might infer, however incorrectly' that Vasquez's nationality played a role in determining his sentence." *Id.* at *2 (citing *Leung*, 40 F.3d at 586-87).

*Vásquez-Drew* reflects the prevailing United States precept in law that "[a] defendant's race or nationality may play no adverse role … at sentencing." *Leung*, 40 F.3d at 586. "'[E]ven the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing.'" *Vásquez-Drew* at *1 (citation omitted).

In *Guzmán*, the unpublished judgment of the panel — made up of Judges Lynch, Thompson, and Barron — was to remand as the record was "unclear about whether the judge actually based the incarcerative term even in part on national origin." *Guzmán*, 2021 WL 7286956, at 1. The district court there had stated that, in sentencing Guzmán, who was from Baní, Dominican Republic, he hoped to send a message to other people from Baní.

Here, the government seeks a "sentence of imprisonment of 51 *months*," **U.S. Sentencing Memorandum 1,** a significant upward variance, for reasons inextricably linked to Mr. Ramírez's membership in the Puerto Rico community, his presence in Puerto Rico, and his ancestry and ethnicity. This Court should order the government's sentencing memorandum stricken and make clear for the public record that Mr. Ramírez's race, ethnicity, ancestry, and national origin will play no adverse role in the Court's selection of its sentence.

**B.** Even without overt references, any pursuit of high-crime area sentences effectively discriminates against Mr. Ramírez's race, ethnicity, ancestry, national origin, and socioeconomic status. This proposition was overwhelmingly established in October 2022, in the Brief of Amicus Curiae NAACP Legal Defense and Educational Fund, Inc. in Support of Appellant in Favor of Reversal, *United States v. Flores-González* (1st Cir. en banc, oral arg. Nov. 18, 2022, decision pending). Available at 2022 WL 16833192, the NAACP Legal Defense and Education Fund brief illustrates the perils of trying to sentence based on claims that a particular neighborhood or area the government perceives in particular jurisdiction. *See* 2022 WL 16833192, at *15-26. The very notion that a rate of crime is high in a particularly geographic region is driven by biases of law enforcement and communities generally.

"Racial bias contributes to perceptions of crime that far exceed actual crime rates in Black and Latinx neighborhoods. These perceptions lead to increased policing and inflated crime rates, which in turn lead to perverse confirmation biases--creating a cycle of racial discrimination and 'high-crime' designations. Presumptions of dangerousness and criminality assigned to Black communities and other communities of color shape perceptions of 'high-crime areas,' leading to changes in policing patterns. Disparate policing in turn leads to actual disparities in arrest, prosecution, and conviction rates, which then serve as further justification for labeling an area 'high-crime.'" *Id.* at *15-16.

"In other words, because racial bias shapes law enforcement activity, even actual crime rates are not reliable proxies for criminal conduct. An enhanced sentence based on community crime characteristics cannot be free from racial bias." *Id.* at 16.

The government's focus on Puerto Rico reflects biases against communities of color, which have been established for some time in the United States. As the Legal

8

Defense Fund Brief notes: "Americans consistently overestimate the proportion of violent crimes committed by Black and Latinx people by more than 30 percent. That overestimation is the result of stereotyping. When asked in a survey about the extent to which various racial groups 'tend to be violence-prone,' a majority of white respondents ranked Latinx and Black people as significantly more prone to violence." *Id.* at *17 (footnotes omitted).

"'African Americans and Hispanic Americans make up almost all of the population in most of the neighborhoods the police regard as high crime areas.' Since the perceived 'high crime' in an area shapes policing patterns, '[m]inority neighborhoods experience higher levels of field interrogation and surveillance activity, controlling for crime and other social factors.' As a result, by 'sanctioning investigative stops on little more than the area in which the stop takes place, the phrase 'high crime area' has the effect of criminalizing race.'" *Id.* at *18 (footnotes omitted).

Despite this unrebutted briefing in *Flores-González*, the USAO-PR insists, a-contextually, that "[t]he First Circuit has recognized the value of the community-based factors in fixing a sentence." **U.S. Sentencing Memorandum 4.** While we explain below why this assertion misreads the law, it suffices to say that community factors — as presented by the government here — cannot play an adverse role in sentencing Mr. Ramírez's unauthorized simple possession offense. "Since community crime characteristics all too often serve as a proxy for race, to allow an upward variance from the sentencing guidelines based on these characteristics is to allow a more severe punishment on the basis of race." 2022 WL 16833192, at *23. As the Legal Defense Fund brief noted: the Supreme Court affirmed in *Buck v. Davis* that imposing harsher penalties on the basis of race is 'odious in all aspects' and represents a 'disturbing departure from

9

a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are.'" 137 S. Ct. 759, 778 (2017) (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)); *see also* briefs of additional amicus curiae in *Flores-González*, including Brief of Amicus Curiae Puerto Rico Association of Criminal Defense Lawyers in Support of Appellant, 2022 WL 16833194, Brief of Amicus Curiae Office of the Federal Defender for the Districts of Massachusetts, New Hampshire, and Rhode Island in Support of Appellant, 2022 WL 16833188, 2022 WL 16833185, Brief of Amici Curiae Roderick & Solange Macarthur Justice Center, the American Civil Liberties Union Foundation, and the Puerto Rico Chapter of the American Civil Liberties Union Foundation in Support of Defendant-Appellant, 2022 WL 16833185.

Thus, whether as directly targeting Mr. Ramírez's race, national origin, ethnicity, and socioeconomic status, or targeting those characteristics by proxy, the government's advocacy cannot be accepted or tolerated.

## II. The government's advocacy begs the Court to reversibly err by ignoring caselaw demanding a case-specific nexus to a judge's community-based worries.

If more were needed, we note that the government's memorandum misreads the First Circuit test it failed to describe and failed to meet. Binding First Circuit case laws says the Court of Appeals has never tolerated the government's proposed abstract resort to population-demeaning beliefs as the government proposes. *See* **U.S. Sentencing Memorandum 4-8.**

While caselaw has tacitly tolerated some consideration of crimes among a population, it demands proof a case-specific nexus. *See United States v. Ortiz-Rodríguez*, 789 F.3d 15 (1st Cir. 2015) (quoting *United States v. Flores-Machicote*, 706 F.3d 16 (1st Cir. 2013). To even reference a particular community's gun-tragedy tally, the inquiry is

10

whether the court has done so "'in case-specific terms,'" which the government memorandum does not do and cannot do because this case was for non-violent possession unlinked to any facts related to intentional gun injuries. *Ortiz-Rodríguez*, 789 F.3d at 19; *Flores-Machicote*, 706 F.3d at 23.

Not only does the government supply no nexus, it omits the requirement in favor of an unsupported blanket assertion that the court charged with reviewing District of Puerto Rico sentences "allow[s] … the [use of] community-based factors in fixing a sentence." **U.S. Sentencing Memorandum 4.** The reality couldn't be further from the truth. The First Circuit has relentlessly reversed courts for unexplained sentences driven by reliance on advice like the government promotes here. *See Ortiz-Rodríguez*, 789 F.3d at 19; *United States v. Rivera-Berríos*, 968 F.3d 130, 136 (1st Cir. 2020); *United States v. García-Pérez*, 9 F.4th 48, 54 (1st Cir. 2021); *United States v. Flores-González*, 34 F.4th 103 (1st Cir. 2022), reh'g en banc granted, opinion withdrawn (1st Cir. Aug. 22, 2022); *United States v. Díaz-Díaz*, No. 19-1274, 2020 WL 12575067 (1st Cir. Aug. 21, 2021). The Court of Appeals has only tacitly affirmed sentences laced with rhetorical flourishes about a given community if their espoused in case specific terms with a relevant nexus to the case at hand.

No studied, or even superficial, review of *Flores-Machicote* or any other First Circuits case even remotely stands up the government's assertion that the First Circuit — betrothed jurisprudentially to the pursuit of fair, constitutional, and accurate decision making — has recognized the "value" of high-crime-area sentencing. Indeed, the First Circuit differentiates rhetorical flourishes from reliable information by demanding submission of "information [that] has sufficient indicia of reliability to support its

11

probable accuracy." *United States v. Rivera-Ruiz*, 43 F.4th 172, 181-82 (1st Cir. 2022) (citation and quotation marks omitted).

Nothing in the government's Puerto Rico-targeting-sentence-request memo can be held to be reliable information about gun possession or violent crime in Puerto Rico or any link to the subject non-violent offense here. The face of the government's pleading asserts that what it's really concerned about is not some measurable difference between jurisdiction but rather with media "reports about firearm violence and murders in broad daylight." **U.S. Sentencing Memorandum at 5**. In the *Flores-González* matter, amici and the appellant debunked claims that violent crime is higher in Puerto Rico or that violent crime can be per se linked to a simple unauthorized gun possession. *See* Appellant's Corrected En Banc Brief, 2022 WL 16962258, at *23-27, 33-37; *see also* Brief of Amici Curiae Roderick & Solange Macarthur Justice Center, the American Civil Liberties Union Foundation, and the Puerto Rico Chapter of the American Civil Liberties Union Foundation in Support of Defendant-Appellant, 2022 WL 16833185, at *19-21, 24-29.

**III. The government's advocacy neither supports nor justifies its recommendation, which is not permitted under the plea agreement.**

When Mr. Ramírez entered into the government-drafted plea agreement, the agreement endowed Mr. Ramírez with a constitutional right to performance by the prosecutor. After all, he bargained away the exercise of his constitutional trial rights for the promised exercise of "the prestige of the government and its potential to influence the district court." *United States v. Vélez Carrero*, 77 F.3d 11, 12 (1st Cir. 1996).

**A.** The government's memorandum — which recommends a 51-month sentence — fails to perform as promised in the plea agreement. The parties' agreement at page 4 spells

12

out the parties' obligations. The government must recommend an aggregate 34-month sentence. **Plea Agreement 4** (docketed at ECF No. 25). That's the low-end sentence in 22-107, which begins at a TOL of 17. From there, with CHC III, Mr. Ramírez has a GSR of 30 to 37 months. In 17-73, the range is 4 to 10 months. The parties must recommend a 34-month sentence. **Plea Agreement 4.**

The government therefore is facially breaching the plea agreement, with a sentence significantly more severe that it agreed to recommend. Likewise, the government memorandum's substantive content asks for a far more severe sentence than that contemplated by the guidelines. After all, the prosecutor's "overall conduct must be reasonably consistent with making such a recommendation, rather than the reverse." *United States v. Canada*, 960 F.2d 263, 268 (1st Cir. 1992). By saying that Puerto Rico defendants deserve higher sentences, the government, substantively speaking, is saying the GSR is not sufficient. The government has observed the impact of such substantive upward-variance arguments. The sentencing memorandum, however, contains material that the government has used to seek and defendant sentences that vary outside of the guideline sentence range. The cases cited by the government's memorandum are examples of such variances. **U.S. Sentencing Memorandum 5-7**.

In *United States v. Carmona-Alomar*, No. 20-309, ECF No. 30, 4-10 (D.P.R. Aug. 18, 2021), a substantively identical memorandum resulted in an upwardly variance sentence. Given the content of the government's memorandum — suggesting higher sentences because of unrelated violent crime within the Puerto Rico population and based on a selective and controversial argument on deterrence and recidivism reports — "no fair reading of the" memorandum "would lead an impartial observer to think that he thought a guideline sentence was an adequate sentence." *United States v. Gonczy*, 357 F.3d 50, 54

13

(1st Cir. 2004) (cleaned up). Thus, to achieve specific performance, *see United States v. Kurkculer*, 918 F.2d 295, 302 (1st Cir. 1990), this Court should strike the government's memorandum and order the government to submit advocacy consistent with its obligations. *See also See* Justice Manual § 9-27.730 (The "government should make sentencing recommendations based on an individualized assessment of the facts and circumstances of each case and the history and characteristics of the defendant, without improper consideration of the defendant's race, religion, gender, ethnicity, national origin, sexual orientation, or political association, activities, or beliefs."); *see also* Justice Manual § 9-27.745 (The "government should oppose attempts by the court to impose any sentence that is: … based on a prohibited factor, such as race, religion, gender, ethnicity, national origin, sexual orientation, or political association, activities, or beliefs.").

**B.** The government's arguments regarding deterrence and recidivism aim for a higher sentence, too, and the must rejected as unsupported and unreliable. The government's position terminates in a misleading quotation by District Judge James Browning in his 2015 District of New Mexico sentence for violation of 8 U.S.C. § 1326. *See* D.N.M. No. 15-cr-568-JB, ECF No. 41 (**"the Browning Memo"**). In it, District Judge Browning states, again, in 2015 during a § 1326 sentencing, that "research strongly indicates that increases in sentence length have at least some general deterrent effect -- especially for criminals facing shorter sentences." **Browning Memo 42**.

Judge Browning's analysis is based in large part on his reading of Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice 199, 201 (2013). And Judge Browning notes at the start that he believed "research indicates that incarceration -- imposing it at all or increasing the amount imposed -- has little to no significant correlation to recidivism." D.N.M. No. 15-cr-568-JB, ECF No. 41 at 32. Yet, Judge

14

Browning walked away from Professor Nagin's 2013 article with the impression that even if "'lengthy prison sentences' may not deter a particular defendant, increasingly longer prison sentences serve a general deterrent function, thereby deterring others from committing a similar crime." **Browning Memo 34**.

So, reasoned Judge Browning, a heightened sentence for a repeat-illegal-entry defendant was still justified "[e]ven if the specific deterrence may be negligible." **Browning Memo 35**. Judge Browning — who did not take research submissions or hear expert testimony — ultimately relied on a very hedged view that he could increase individual sentences based on his prior conclusion, that "severity of punishment continues to have some deterrent effect...." **Browning Memo 38**.

Respectfully, the government's push for adoption of Judge Browning's general conclusion in 2015 lacks empirical support. As briefing in *United States v. Flores-González*, 1st Cir. No. 19-2204 (en banc), explains: "for decades, researchers have attempted, and failed, to document the intuitive causal relationship between sentence length and general deterrence — the idea that we can 'send a message' by imposing higher sentences." Appellant's Corrected En Banc Brief, 2022 WL 16962258, at *28.

Even the U.S. Department of Justice, National Institute of Justice, has acknowledged publicly that "[i]ncreasing the severity of punishment does little to deter crime." DOJ, NIJ, Five Things About Deterrence (2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence. This comes from the NIJ's "Five Things" Series, which "distills what we know from years of rigorous scientific inquiry." NIJ "Five Things Series, https://nij.ojp.gov/library/nij-fivethings-series. It explained: "Laws and policies designed to deter crime by focusing mainly on increasing

15

the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id*.

This is the consensus position not only with respect to crime generally, but also for gun crimes specifically. *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y May 23, 2017). In *Lawrence*, after expressing the need to impose a relatively long prison term to achieve general deterrence, the district court continued sentencing in a gun case to hear an expert witness on the question whether increasing the length of incarceration had a general deterrent effect. At that hearing, Professor Jeffrey Fagan, Ph.D., Isidor and Seville Sulzbacher Professor of Law at Columbia Law School and a Professor in the Department of Epidemiology at the Mailman School of Public Health at Columbia University, concluded — ***without contradiction from the government*** — that "the deterrent effect of criminal sanctions for gun violence are specific to the risks of detection, not to the severity of punishments." *Id*. at 443; *see also* Addendum to Appellant's Supp. En Banc Br., 1st Cir. No. 19-2204, at 1-15 (Def's Exh. B (Report of Jeffrey Fagan, Ph.D.); Add. 16-114 (Reporter's Transcript, Sentencing, February 28, 2017))).

Professor Fagan explained that there is little evidence that longer sentences have a deterrent effect on crime, and studies have shown that there is no marginal effect on the crime rate for each additional year of incarceration in felony cases. Addendum to Appellant's Supp. En Banc Br., 1st Cir. No. 19-2204, at 3, 6-8, 27.

Additional consideration of empirical research was presented in the *Flores-González* briefing and went unchallenged by the U.S. Department of Justice, who replied to en banc briefing together with prosecutors from District of Puerto Rico U.S. Attorney's Office. *See* Supp. Br. In Reply, 1st Cir. No. 19-2204, at 12-13. We have attached the record from the *Lawrence* case and respectfully ask the Court to adopt the expert submissions

as findings of fact for this case's sentencing record. *See* **Appendix 1 (Addendum to Appellant's Supp. En Banc Br., 1st Cir. No. 19-2204)**.

The government memorandum provides inflammatory rhetoric targeting Mr. Ramírez for a higher sentence in ways that violate sentencing jurisprudence, statutory authority, the sentencing guidelines, and norms rejecting discrimination. In so doing, the government advocates against what "has been uniform and constant in the federal judicial tradition," which calls "for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

Mr. Ramírez's sentencing memorandum is a lens into his challenges, his failures, his sensitivities, and his potential. **Mr. Ramírez's Memorandum 1-6** (docketed at ECF No. 30). A sentence must consider his history and characteristics, which involve severe issues with the functioning of his heart, **Mr. Ramírez's Memorandum 2,** ongoing progress in staying drug-free after suffering substance-use disorder, **Mr. Ramírez's Memorandum 3,** and the ongoing rebuilding of family ties to his children despite incarceration for most of his adult life, **Mr. Ramírez's Memorandum 3-5.** Mr. Ramírez accepts responsibility for what was a grave error in having a firearm when his prior conviction disenfranchised him from any gun possession. *See* **Plea Agreement 1, 9, 12**. He continues to pray that the Court will consider all of his life circumstances and follow the parties' joint recommendation of an aggregate 34-month sentence, and asks the Court to strike the government's sentencing memorandum, adopt the submission in Appendix 1, and instruct the government to advocate consistent with its plea agreement and the attendant ethical requirements.

**WHEREFORE**, it is respectfully requested that this Honorable Court note this opposition to the government's Sentencing Memorandum, and grant the relief requested herein.

**I HEREBY CERTIFY** that on this date I electronically filed the present **Opposition** with the Clerk of Court using the CM/ECF system, which will send electronic notification of said filing to all parties of record.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, this 28th of April of 2023.

HECTOR L. RAMOS-VEGA
Interim Federal Public Defender

S/ SULAY RIOS-FUENTES
Sulay Rios-Fuentes
USDC-PR222901
Assistant Federal Public Defender
Patio Gallery Building
241 Franklin D. Roosevelt Ave.
San Juan, PR 00918-2441
787.281.4922
Email: sulay_rios@fd.org
