Appendix to Response to Government Memo A1

# In the United States Court of Appeals for the First Circuit

---

UNITED STATES OF AMERICA,
*Appellee,*

v.

EMILIANO EMMANUEL FLORES-GONZÁLEZ,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Puerto Rico
Crim. Case No. 19-cr-335-FAB
Hon. Francisco A. Besosa, U.S. District Judge

---

### ADDENDUM TO APPELLANT'S SUPPLEMENTAL EN BANC BRIEF

---

ERIC ALEXANDER VOS
Federal Public Defender
District of Puerto Rico

Patio Gallery Building
241 F.D. Roosevelt Ave.
San Juan, Puerto Rico 00918
T. (787) 281-4922
F. (787) 281-4899
E. Kevin_Lerman@fd.org

FRANCO L. PÉREZ-REDONDO
AFPD, Supervisor, Appeals Section

ALEJANDRA BIRD-LÓPEZ
Research & Writing Attorney

KEVIN E. LERMAN
Research & Writing Attorney

*Attorneys for Defendant-Appellant*
*Emiliano Emmanuel Flores-González*

# Appendix to Response to Government Memo A2

### INDEX

Report of Jeffrey Fagan, Ph.D., Entered as Defendant's Exhibit B,
*United States v. Lawrence*, E.D. N.Y. Case No. 16-CR-243,
*see* ECF No. 65 (minute entry)............................................................1-15

Reporter's Transcript, Sentencing, Feb. 28, 2017, *United States v. Lawrence*, E.D. N.Y. Case No. 16-CR-243,
*see* ECF No. 65 (minute entry)........................................................16-114

# Appendix to Response to Government Memo A3

**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16-CR-243 |
| v. ) | Judge Jack B. Weinstein |
| ) | |
| MURRAY LAWRENCE, ) | |
| also known as "Shawnie Pooh," ) | |
| ) | |
| Defendant. ) | |

**REPORT OF JEFFREY FAGAN, Ph.D.**

## I.  OVERVIEW

**A.  Qualifications**

1.  I am the Isidor and Seville Sulzbacher Professor of Law at Columbia Law School and a Professor in the Department of Epidemiology at the Mailman School of Public Health at Columbia University. My curriculum vitae are attached in Exhibit A.

2.  I am an elected Fellow of the American Society of Criminology. I am a former member and past Vice Chair of the Committee on Law and Justice of the National Research Council. I was a former member of the National Consortium on Violence Research at Carnegie Mellon University. I was a founding member of the MacArthur Research Network on Adolescent Development and Juvenile Justice. I am past Chair of the National Policy Committee of the American Society of Criminology. I served as Executive Council (elected) to the American Society of Criminology. I served on peer review panels for the National Institute of Mental Health and the National Science Foundation. I have served on two Scientific Review Committees of the National Research Council.

3.  My research has been published in the leading journals in criminal law, sociology and criminology, including the *Journal of Empirical Legal Studies*, the *Columbia Law Review*, the *University of Chicago Law Review*, the *Journal of Quantitative Criminology*, the *Fordham Urban Law Journal*, *Criminology*, *Criminology & Public Policy*, the *American Sociological Review*, the *Lancet*, and *PLOS One*.  I have

# Appendix to Response to Government Memo A4

published over 100 articles in peer reviewed journals, and numerous chapters in edited volumes.

4. I am past editor of the *Journal of Research in Crime and Delinquency.* I currently serve on the editorial board of the *Journal of Criminal Law and Criminology,* and have served on the editorial boards of numerous professional and academic journals in criminology including *Crime & Justice*, the *Journal of Quantitative Criminology* and *Criminology.* My research has been supported by the National Institute of Justice, the National Institute of Mental Health, the National Institute on Drug Abuse, the National Science Foundation, the Office of Juvenile Justice and Delinquency Prevention, the Centers for Disease Control, the Rockefeller Foundation, the John D. and Catherine T. MacArthur Foundation, the Annie E. Casey Foundation, the Russell Sage Foundation, the Robert Wood Johnson, the Open Society Foundations, and the Russell Sage Foundation

## B. Issues and Questions Addressed

### 1. Issues to be addressed

In this Report, I provide analysis of the empirical research evidence on deterrence to address two principal claims by the Government.

   a. The Government claims that lengthening the sentence imposed on Murray Lawrence will have a specific deterrent effect on Mr. Lawrence that will reduce the likelihood that he will engage in violent crime and gun violence upon his release from incarceration.

   b. The Government also claims that lengthening the sentence imposed on Murray Lawrence by including additional years in prison will deter other persons from engaging in gun crimes and violence in the future.

### 2. Specific questions to be addressed

To address these issues, I provide analysis of the theory and research on the following questions:

   a. What is the theory of general deterrence?

   b. What are the components and processes in general deterrence?

   c. What is the theory of specific deterrence?

# Appendix to Response to Government Memo A5

    d.   What are the elements and processes of specific deterrence?

    e.   Is there a consensus in empirical research on the effectiveness of general and specific deterrent effects of lengthy periods incarceration on future criminal behavior?

    f.   Is there a consensus that lengthy sentences for gun crimes have a deterrent effect on crime generally or on gun crime?

    g.   How do the theories and evidence apply to Murray Lawrence and other members of the community?

    h.   What interventions are available in New York to prevent future crime by Murray Lawrence and others in the community?

## C. Summary of Opinions

    a.   The deterrent effect of criminal sanctions are specific to the risks of detection, not to the severity of punishments.

    b.   There is little evidence that longer sentences have a deterrent effect on crime, and studies have shown that there is no marginal deterrent effect on the crime rate for each additional year of incarceration in felony cases.

    c.   Specifically in cases involving enhanced federal sentences for gun crimes, the evidence shows that there is no general deterrent effect from additional years of incarceration.

    d.   The imposition of a longer sentence in Mr. Lawrence's case will have no marginal general deterrent effect beyond the incarceratory period he has already served.

## II. RESPONSES

## 1. What is general deterrence?

    a.   Together with retribution, incapacitation and rehabilitation, deterrence is one of the essential justifications for criminal punishment.[1]

    b.   General deterrence, as opposed to specific deterrence, is the threat or use of punishment intended to discourage others from committing crimes. "The theory of deterrence is predicated on the idea that if state-imposed sanction costs are

---

[1] Schulhofer, Stephen A., et al., Criminal Law and Its Processes, 10th ed. (2017).

# Appendix to Response to Government Memo A6

sufficiently severe, criminal activity will be discouraged, at least for some."[2]
General deterrence, then, is the imposition of sanctions on one person to
demonstrate to the rest of the public that there are costs to criminal acts that they
can expect to receive, thereby to discourage criminal behavior among the general
population and especially among would-be offenders.[3]

c.  The main components of general deterrence are the likelihood of punishment and
the severity of punishment.

d.  In the federal criminal justice system, judges are obligated to consider general
deterrence in their sentencing, alongside the other basic purposes of criminal
punishment.[4]

**2. What are the components of general deterrence?**

a.  A "rational offender" will decide whether or not to commit a crime by weighing
the benefit of not committing a crime with the benefit of committing the crime
without being caught and the benefit of committing a crime that results in being
caught and punished.[5]

b.  "In such a formulation, the individual chooses to commit a crime if and only if the
following condition holds: … [the] crime is worthwhile so long as its expected
utility exceeds the utility from abstention." [6]

---

[2] Apel, R. and Nagin, D., "Deterrence," In *Emerging Trends in the Social and Behavioral Sciences* (Robert Scott and Stephen Kosslyn, eds.) 1,1 (2015).

[3] *See* Blumstein, A., Cohen, J., and Nagin, D, "Report of the Panel on Research on Deterrent and Incapacitive Effects," In *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates* (Washington D.C.: National Academy of Sciences, 1978); Nagin, Daniel S., "Crime rates, sanction levels, and constraints on prison population," 12 *Law and Society Review* 341-366 (1978).

[4] *See* S. 668 (98th): Sentencing Reform Act of 1984 (Title II of the Comprehensive Crime Control Act of 1984). The Act created the U.S. Sentencing Commission, and it directed the Commission to establish sentencing policies that meet "the purposes of sentencing as set forth in section 3553(a)(2) of Title 18, United States Code," 28 U.S.C. § 991(b)(1), including "to afford adequate deterrence to criminal conduct."

[5] Becker, Gary, "Crime and Punishment: An Economic Approach," 76 Journal of Political Economy 169-217 (1968).

[6] Chalfin, Aaron and McCrary, Justin, "Criminal Deterrence: A Review of the Literature," *Journal of Economic Literature 1,1* (2014).

# Appendix to Response to Government Memo A7

   c.   Becker concludes that: "(1) the supply of offenses will fall as the probability of apprehension rises, (2) the supply of offenses will fall as the severity of the criminal sanction increases and (3) the supply of offenses will fall as the opportunity cost of crime rises."[7]

   d.   Robinson and Darley show that deterrence requires knowledge by a would-be offender of the law that prohibits an act (legal knowledge), and that the offender understands the risks of detection and the risks of punishment.  Their formulation also requires that an actor be rational in weighing the benefits of crime compared to the costs of punishment and the risks of detection (rational choice), and that the perceived benefits outweigh the costs (perceived net benefit hurdle).[8]

   e.   While Robinson and Darley are generally optimistic about the prospects of deterrence for most crimes, they find that there is no deterrent effect for murder. And with respect to felony murder, they report that a felony-murder rule may inhibit non-fatal robberies, the presence of a felony murder statute tends to increase the incidence of fatal robbery-murders.[9]

## 3. What is the theory of specific deterrence?

   a.   Where general deterrence refers to the effect of criminal punishment on potential offenders, specific deterrence refers to the effects of criminal punishment on those who have committed crimes and received punishment. The goal of specific deterrence is to persuade persons through the actual experience of punishment who experience punishment to desist from further criminal behavior.[10]

   b.   Offenders are thought to be deterred from further crime if the punishment they receive is swift (celerity), certain (highly likely) and severe (lengthy periods of confinement and attenuated liberty.[11]

---

[7] *Id*. at 7.

[8] Robinson, Paul and Darley, John M. "Does the Law Deter?  A Behavioral Science Investigation," 24 *Oxford Journal of Legal Studies* 173-205 (2004).

[9] *Id*. at 203.

[10] Andenaes, Johannes, Punishment and Deterrence, University of Michigan Press, Ann Arbor (1974).

[11] Marchese di Beccaria, Cesare, *An Essay on Crimes and Punishments*, Philip H. Nicklin, 1819.

# Appendix to Response to Government Memo A8

4. **What are the elements and processes of specific deterrence?**

   a. Specific deterrence requires that the offender perceive sanction threats in response to her or his criminal activity.

   b. Sanction threat perceptions include both the risk or certainty (threat) of punishment and the consequences of that punishment. These perceptions and evaluations of threat and severity are modified in response to an offender's punishment experiences relative to his criminal activity. Specifically, an offender's involvement in criminal activity will depend on the consequences that may or may not follow from this criminal activity. The model is premised on the idea of "belief updating." That is, rather than being static, sanction threat perceptions continuously evolve in response to ongoing experiences of the actor.[12]

5. **Is there a consensus in empirical research on the deterrent effects of lengthy periods incarceration on future criminal behavior?**

   a. Two factors complicate efforts to estimate the general deterrent effects of incarceration. First, it is difficult to disentangle the effects of incapacitation from the deterrent effects of incarceration. Changes in the risks of detection and punishment may will have a mixture of deterrence and incapacitation effects that complicate isolating the unique contribution of either.[13] And, updating processes that shape learning of risks and punishment contingencies may also be mixed up by simultaneous incapacitation and deterrence effects.

   This consensus among researchers has been repeated across decades. A National Academy of Sciences review panel on criminal sanctions and deterrence concluded in the 1970s that "[B]ecause the potential sources of error in the estimates of the deterrent effect of these sanctions are so basic and the results sufficiently

---

[12] Pogarsky Greg et al., "Modeling Change in Perceptions about Sanction Threats," 20 *Journal of Quantitative Criminology* 343 (2004); McCrary, Justin, and Lee, David S, "The Deterrence Effect of Prison: Dynamic Theory and Evidence," *Berkeley Program in Law & Economics, Working Paper Series* (2009).

[13] Chalfin and McCrary, *supra*.

# Appendix to Response to Government Memo A9

divergent, no sound, empirically based conclusions can be drawn about the existence of the effect, and certainly not about its magnitude."[14]

In 1998, Steven Levitt reviewed the literature on deterrence and concluded that "few of the empirical studies [regarding deterrence of adults] have any power to distinguish deterrence from incapacitation and therefore provide only an indirect test of the economic model of crime."[15]

b. Second, experiments on incarceration effects are not feasible, for obvious ethical, legal and policy considerations. The alternatives to experiments, including panel studies comparing offenders in different eras or different locales, all offer contributions to the general and specific deterrence literature, but are unable to account for differences both criminal records in offenders assigned to alternate incarceration conditions.  And given the importance of updating of risk preferences and crime utilities, failure to randomize can lead to confounding of correctional experience with risk preference, making a "clean" estimate unavailable.

c. Recent reviews[16] conclude that the deterrent effect of criminal sanctions are specific to the risks of detection, not to the severity of punishments, net of any incapacitation effects.  Specifically, studies on general deterrence have shown that people are *more motivated* by the probability of being caught than by the severity of the punishment,[17] and that "increased sanctions do not substantially reduce future recidivism but instead produce only a small deterrent[18] or incapacitation effect[19] on recidivism.

d. Laboratory experiments simulating deterrence conditions confirm the primacy of

---

[14] Blumstein, Alfred, Cohen, Jacqueline, and Nagin, Daniel S., "Report of the Panel on Research on Deterrent and Incapacitative Effects," *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates* (Washington D.C.: National Academy of Sciences 42 (1978).

[15] Levitt, Steven A., "Juvenile Crime and Punishment," 106 *Journal of Political Economy* 1156, 1158 at n2 (1998).

[16] Nagin, Daniel S., "Deterrence in the Twenty-First Century," 42 *Crime & Justice* 199 (2013); Chalfin and McCrary, *supra*.

[17] Tyler, Tom R., "Legitimacy and Criminal Justice: The Benefits of Self-Regulation," *Ohio State Journal of Criminal Law* 307, 308 (2009).

[18] Bhati, Avinash Singh, and Piquero, Alex R., "Estimating the Impact of Incarceration on Subsequent Offending Trajectories: Deterrent, Criminogenic, or Null Effect?" 98 *The Journal of Criminal Law and Criminology* 207 (2007).

[19] Piquero, Alex R., and Blumstein, Alfred, "Does Incapacitation Reduce Crime?" 23 *Journal of Quantitative Criminology* 267 (2007).

# Appendix to Response to Government Memo A10

punishment certainty over punishment severity. For example, random samples of college students were asked to estimate how likely they were to drive with a blood-alcohol level above the legal limit under varying conditions of certainty and severity of punishment.[20] The researchers reported that the certainty of punishment had a significantly greater influential in deterring students from driving drunk compared to the severity of the punishment.

e.  Nor is there evidence that longer sentences have a deterrent effect on crime.  At the individual level, it is both obvious and logical that sentences that may lead to deterrence also typically lead to incapacitation.  The incapacitated person has no window in which to commit crimes that would "prove" or establish a deterrent effect.  Even if deterrence is possible, the fact that prison generates simultaneous incapacitation effects makes it likely that any deterrent effect would be small.[21]

## 6.  Is there a consensus that lengthy sentences for gun crimes have a deterrent effect on crime generally or on gun crime?

a.  Two studies specifically examined the general deterrent effects of enhanced and lengthy sentences on gun crimes. The studies evaluated the effects of Project Exile, a prosecution effort that aimed to enhance the penalties for "felon in possession of a firearm" cases,[22] drugs/guns cases,[23] and domestic violence/gun cases.[24]  There also was an advertising campaign designed to inform potential offenders of the risk of swift, certain and severe sentences for gun crimes.[25] These cases were diverted from state court into federal court, where prison sentences are typically more

[20] Nagin, Daniel S. and Pogarsky, Greg, "Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence," 39 *Criminology,* 865 (2001).

[21] Chalfin and McCrary, *supra* at 20.

[22] U.S. Code Title 18, 922(g) (1).

[23] U.S. Code Title 18, 924 (c).

[24] In principle, the local U.S. Attorney for Richmond also had the option of prosecuting those who sell a handgun or ammunition to juveniles under U.S. Code Title 18, 924 (x), although federal prosecutors rarely take such cases, in part because the penalty for the first conviction of this offense is simply probation.  See, Raphael, Steve and Ludwig, Jens, "Do Prison Sentence Enhancements Reduce Gun Crime? The Case of Project Exile," in Evaluating Gun Policy (Jens Ludwig and Philip J. Cook, eds.) 251-86 (2003).

[25] For a detailed description of Project Exile, see the summary statement of the U.S. Attorney's Office for the Eastern District of Virginia, *available at* http://www.vahv.org/Exile/Richmond/PE-R005.html.

# Appendix to Response to Government Memo A11

severe than those found in most state sentencing statutes.  Each study concluded that there is no evidence of a general deterrent effect of lengthy sentencing enhancements that impose additional years of incarceration for crimes committed with a firearm.

b.  The first study was published in 2003.  Researchers compared gun homicide rates in Richmond, Virginia, the originating federal court for Project Exile, before and after the implementation of Project Exile prosecutions.[26]  Gun homicides declined sharply in Richmond in 1997-8, following a 40% increase in gun homicides in the preceding two-year period.  However, comparing Richmond to other cities that also has large increases in homicide in the 1996-7 period, the subsequent decline in Richmond and elsewhere suggested that the decline in Richmond would have occurred in the absence of the program.  The researchers noted parallel results for other felony crimes in the same period, crimes that were not prosecuted under Project Exile.  In a second comparison, which used juvenile homicides as a benchmark,[27] the researchers show that in Richmond, the ratio of adult homicide arrests to juvenile homicide arrests grew larger during the exile period and after, whereas in other cities, the ratio remained constant.  The researchers conclude that "[t]hese findings, taken together, call into question the empirical evidence commonly offered as evidence of Exile's impact."[28]

c.  The researchers then extended their analysis to examine the effects of federal "felon in possession" gun crime prosecutions in other cities.  The regressions in this part of the analysis showed that for the period 1994-1999, there was no statistically significant relationship between the number of federal firearm prosecutions and city-level murder rates.[29]

d.  The second study[30] compared three cities with different strategies for reducing gun violence: New York, Boston and Richmond.  The authors compared homicide trends in each of these three cities with 92 other cities with populations greater than 175,000 residents for a 10 year period from 1992-2001.  This period spans the shorter time frame for the Raphael-Ludwig study.  These researchers estimate a

---

[26] Raphael and Ludwig, *supra*.

[27] Juvenile homicides are not eligible for prosecution in the adult courts in the federal system, whereas adult homicides by definition are eligible.

[28] Raphael and Ludwig, *supra*.

[29] *Id*.

[30] Rosenfeld, Richard, Fornango, Robert, and Baumer, Eric, "Did *Ceasefire*, *Compstat*, and *Exile* Reduce Homicide?" 4 *Criminology and Public Policy* 419-50 (2005).

# Appendix to Response to Government Memo A12

series of regressions that identify the slope or rate of change over time.  They report no statistically significant differences in the slope of the homicide trends for New York and Boston compared to a national average that includes Richmond.[31] They report a small but statistically significant downward trend for Richmond.[32] However, an inspection of Figure 1[33] shows that after the initial period of decline from 1997-98, the homicide rates remained constant through 2001.

e.  The comparisons, however, are not a conclusive test of general deterrence of gun homicides.  While Exile relied on prosecutions to create a general deterrent effect, the other two cities employed non-prosecution methods based largely on preventive police tactics in New York[34] and a program of targeted police-probation-community interventions in Boston.[35]  As a result, the comparative theories of these three interventions were quite different, and only the Richmond case study offered a test of general deterrence of gun crimes through prosecution and enhanced sentences.  The correct comparison for estimating the Exile effect, and in turn, the effect of sentence enhancements, is to compare prosecutions in federal court with other prosecutions in the same place in state court.  This was the design of Raphael and Ludwig.

f.  There are other differences in the two Exile studies that render the comparisons unreliable.  The Rosenfeld et al. study examined all homicides, while the Raphael and Ludwig study examined only gun homicides.[36]  The point of Exile was to deter gun crimes, as is the point of the federal sentencing statute at issue in this case.[37]  The Raphael and Ludwig study included measures of the actual number of federal prosecutions that took place in Richmond during the Exile period, and also federal prosecutions in other cities during the same time.  This created a measure of "dosage" that is critical to understanding and measuring the effects of a

---

[31] Id. at 433-436 and Table 1.

[32] Id. at 436-8 and Table 1.

[33] Id at 433.

[34] See id. for a description of the Compstat program and the program of investigative street stops and frisks by police in New York.

[35] See id. for a description of the Ceasefire program in Boston where probation officers and clergy combined to intervene with youths thought to be at risk for gun violence, and offered youths intensive social services at the same time that the probation-clergy teams delivered strong threats of harsh sentences for any further criminal violations.

[36] Neither study asked whether Exile's focus on prosecution of FIP cases might have led offenders to substitute other weapons for firearms in felony crimes or murders.

[37] Supra note 4.

# Appendix to Response to Government Memo A13

"treatment" such as Project Exile. The Raphael and Ludwig study also excluded the 1997 peak homicide year, a strategy that avoids the influence or undue leverage of the unusually high gun homicide rate in that year, and removes the threat of over-estimating the Exile effect through what may more likely be simply a regression to the mean in Richmond.

g.  These differences in the two studies are important when considering the issues in this case: whether enhanced sentences have a marginal deterrent effect on gun homicide rates.  The narrow question here suggests that the Raphael and Ludwig research has greater probative value in considering the sentencing options for this Court.

h.  The absence of a general deterrent effect is consistent with several earlier studies that considered sentence enhancements for specific crimes, including gun crimes. They all found little reliable evidence of deterrence.[38]  A 2009 review of the literature on general deterrence based on incarceration for felony crimes, including gun crimes, concluded much the same: there was no marginal deterrent effect for each additional year of a prison sentence on the overall crime rate.[39]

i.  A study of specific deterrence among 1,354 felony offenders ages 16-24 examined recidivism rates following conviction in criminal court or a delinquency adjudication in juvenile court.[40]  Several of these offenders were convicted of gun crimes, others convicted of felony violent or property crimes. About half were placed on probation and the remainder placed in correctional confinement. Recidivism rates after four years showed that there were no differences in recidivism rates between those placed and those who remain in their community

---

[38] Loftin, Colin and McDowall, David, "'One with a Gun Gets You Two': Mandatory Sentencing and Firearms Violence in Detroit," 455 *Annals of the American Academy of Political and Social Science* 150–67 (1981);  Loftin, Colin, Heumann, Milton, and McDowall, David, "Mandatory Sentencing and Firearms Violence: Evaluating an Alternative to Gun Control." 17 *Law and Society Review* 287–318 (1983); Loftin, Colin and McDowall, David (1984), "The Deterrent Effects of the Florida Felony Firearm Law," 75 *Journal of Criminal Law and Criminology* 250–59 (1984). McDowall, David, Loftin, Colin, and Wierseman, B, "A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crime," 83 *Journal of Criminal Law and Criminology* 378-394 (1992).

[39] Donohue, John J. III, "Assessing the Relative Benefits of Incarceration: Overall Changes and the Benefits on the Margin," in *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom* (Steven Raphael and Michael Stoll, eds.) 269-342 (2009).

[40] Loughran, Thomas A., Mulvey, Edward P., Schubert, Carol A., Fagan, Jeffrey, Piquero, Alex R., and Losoya, Sandra H., "Estimating a dose-response relationship between length of stay and future recidivism in serious juvenile offenders," 47 *Criminology* 699-740 (2009).

# Appendix to Response to Government Memo A14

on probation. The analysis also estimated a dose-response effect for the marginal value of additional years in confinement among those placed in correctional institutions, and found no net marginal benefits of additional months of confinement.

### 7. How do the theories and evidence apply to Murray Lawrence?

a. Because the strongest general deterrent effect derives from the certainty as opposed to severity of punishment, any additional term of incarceration beyond what Mr. Lawrence has already served will provide little if any marginal effect on the deterrence of gun crimes by other individuals in the community.

b. Under the economic model of crimes, general deterrence requires knowledge by a would-be offender of the law that prohibits an act, as well as the risks of detection and the risks of punishment. Even if a rational offender knew what sentence was ultimately imposed by the Court in Mr. Lawrence's case, the rational offender would also need to have an understanding of the likelihood of detection, the likelihood and factors determining prosecution in federal as opposed to state court, and a knowledge of the operation of the federal sentencing guidelines as they would be applied in the rational offender's case.

c. The economic model also requires that an actor be rational in weighing the benefits of crime compared to the likelihood and costs of punishment—assuming, first, that the actor is able to assess those costs. To the extent that individuals are rationally engaging in this calculus,[41] the literature does not suggest that the cost-benefit analysis would be responsive to the punishment imposed in Mr. Lawrence's case.

d. The severity of the punishment in Mr. Lawrence's case will have no marginal deterrent effect on gun crime if rational potential offenders are unaware of the sentences imposed in this and other similar cases.[42] Furthermore, any significant gain in deterrence requires community-based interventions such as those discussed below, including informing high-risk offenders of the consequences of illegal conduct, positioning the consequences of offending in the context of choice, creating collective accountability and reducing peer dynamics that promote

---

[41] See "Five Things About Deterrence," National Institute of Justice, U.S. Department of Justice (May 2016); see also Patton, D. E. "Guns, Crime Control, and a Systemic Approach to Federal Sentencing," 32 Cardozo Law Review 1427 (2011).

[42] See Patton, D. E. "Guns, Crime Control, and a Systemic Approach to Federal Sentencing," 32 Cardozo Law Review 1427 (2011).

# Appendix to Response to Government Memo A15

violence, and offering group members an "honorable exit" and supported path from gun crime.[43]

8.  **What interventions are available to prevent future crime by Murray Lawrence and others in the community?**

a.  "Research on procedural justice and legitimacy suggests that compliance with the law is best secured not by mere threat of force, but by fostering beliefs in the fairness of the legal systems and in the legitimacy of legal actors."[44] This theory was substantiated by "using a unique survey of active offenders called the Chicago Gun Project (CGP). The CGP was designed to understand how the social networks of offenders influence their perceptions of the law and subsequent law-violating behavior."[45] Programs such as Operation Ceasefire in Boston, Project Safe Neighborhoods (PSN) in Chicago and the Drug Market Initiative in North Carolina incorporate "the principles of procedural justice, a precursor to legitimacy, into what has traditionally been the exclusive domain of deterrence theory. Initiatives such as these relied upon two inter-related strategies: (1) informing high-risk offenders of the consequences of illegal conduct consistent with theories of deterrence, and (2) promoting legitimacy by simultaneously positioning the consequences of offending in the context of choice and by recasting the tone and quality of law enforcement interactions with offenders."[46] Wallace et al. concluded in their examination of these programs that they reduce the risk of recidivism.

b.  Such alternatives do exist in New York, though not necessarily in the jurisdiction at issue here.  David Kennedy at the National Network for Safe Communities, through John Jay College, began the Group Violence Intervention (GVI) program,

---

[43] *See* Section 8, *infra*.

[44] Papachristos, A. V., Meares, T. L., and Fagan, J. "Why Do Criminals Obey the Law? The Influence of Legitimacy and Social Networks on Active Gun Offenders," *Journal of Criminal Law and Criminology,* 397-98 (2012); *see also* Papachristos, A. V., Meares, T. L., and Fagan, J. "Attention Felons: Evaluating Project Safe Neighborhoods in Chicago." *Journal of Empirical Legal Studies* 223 (2007).

[45] Papachristos, A. V., Meares, T. L., and Fagan, J. "Why Do Criminals Obey the Law? The Influence of Legitimacy and Social Networks on Active Gun Offenders," *Journal of Criminal Law and Criminology,* 397-98 (2012).

[46] Wallace, D., Papachristos, A. V., Meares, T., and Fagan, J, "Desistance and Legitimacy: The Impact of Offender Notification Meetings on Recidivism among High Risk Offenders," *Justice Quarterly* 1, 2 (2015).

# Appendix to Response to Government Memo A16

"designed to reduce street group-involved homicide and gun violence."[47] It was modeled after Boston's Project Ceasefire and has been implemented in cities across the country. Notably, in Stockton, California, Operation Peacekeeper was implemented and the city saw a 42 percent reduction in gun homicide from 1997-2002. The implementation of programs such as the GVI would reduce gun violence by implementing strategies that aim to "reduce peer dynamics in the group that promote violence by creating collective accountability, to foster internal social pressure that deters violence, to establish clear community standards against violence, to offer group members an "honorable exit" from committing acts of violence, and to provide a supported path for those who want to change."[48]

---

[47] "Strategy: Group Violence Intervention," *National Network for Safe Communities*, John Jay College, *available at* https://nnscommunities.org/our-work/strategy/group-violence-intervention.

[48] *Id.*

# Appendix to Response to Government Memo A17

**DECLARATION**

I have been compensated for this work at the rate of $400 per hour.  My compensation is not dependent on my opinions or the outcome in this matter.

Jeffrey Fagan, Ph.D.
New York, NY

February 16, 2017

# Appendix to Response to Government Memo A18

*1*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :  16-CR-243(JBW)
                            :
                            :
                            :
        -against-           :  United States Courthouse
                            :  Brooklyn, New York
                            :
                            :
                            :
MURRAY LAWRENCE,            :  Tuesday, February 28, 2017
                            :  11:15 a.m.
        Defendant.          :
                            :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE JACK B. WEINSTEIN
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:      ROBERT L. CAPERS, ESQ.
                         United States Attorney
                         Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York 11201
                         BY: ALLON LIFSHITZ, ESQ.
                             MATHEW MILLER, ESQ.
                             Assistant United States Attorneys

For the Defendant:       FEDERAL DEFENDERS OF NEW YORK
                         Attorneys for the Defendant -
                         Murray Lawrence
                             One Pierrepont Plaza
                             16th Floor
                             Brooklyn, New York  11201
                         BY: SAMUEL I. JACOBSON, ESQ.

Appendix to Response to Government Memo A19

*2*

A L S O   P R E S E N T:

UNITED STATES PROBATION DEPARTMENT
Eastern District of New York
75 Clinton Street
Brooklyn, New York 11201
BY: MICHELLE MURPHY, U.S.P.O.

Vivienne Guevara, Federal Defenders Social Worker

Ms. Rose Graham, Murray Lawrence's mother.

Isadora Ruyter-Harcourt, Federal Defenders Paralegal

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter
Telephone: (718) 613-2487
Facsimile: (718) 613-2694
E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

# Appendix to Response to Government Memo A20

*Sentencing*                                                                    3

1        (In open court.)

2        (Defendant present in open court.)

3        COURTROOM DEPUTY:  All rise.  The United States

4   District Court for the Eastern District of New York is now in

5   session.  The Honorable Jack B. Weinstein is now presiding.

6        (Honorable Jack B. Weinstein takes the bench.)

7        COURTROOM DEPUTY:  Calling criminal cause for

8   sentencing in Docket No. 16-CR-243, *United States of America*

9   *against Murray Lawrence*.

10        Counsel, please note your appearances for the

11   record.

12        MR. LIFSHITZ:  For the United States of America,

13   Assistant United States Attorney Allon Lifshitz.

14        Good afternoon, your Honor.

15        MR. JACOBSON: Samuel I. Jacobson for Murray

16   Lawrence.

17        Good afternoon, your Honor.

18        (Defendant enters the courtroom at 12:01 p.m.)

19        THE COURT:  Sorry to have kept everybody waiting.

20        MR. JACOBSON:  Good afternoon, your Honor.

21        COURTROOM DEPUTY:  Criminal cause for sentencing,

22   case 16-CR-243, United States versus Murray Lawrence.

23        Counsel, state your name for the record.

24        MR. LIFSHITZ:  Allon Lifshitz and Mathew Miller.  We

25   are joined by Probation Officer Michelle Murphy.

# Appendix to Response to Government Memo A21

*Sentencing*                                                              *4*

1          MR. MILLER:  Matthew Miller, your Honor, for the
2     United States.
3          MR. JACOBSON:  Sam Jacobson Federal Defenders on
4     behalf of Murray Lawrence who is present in court today.  We
5     are joined today by Isadora Harcourt, a paralegal in our
6     office; Ms. Rose Graham, Murray Lawrence's mother.  And a
7     number of members of Mr. Lawrence's family who are in the back
8     of the courtroom.
9          THE COURT:  What school are you from?
10         THE WITNESS:  I graduated from Barnard College.  I'm
11    a paralegal.
12         MR. JACOBSON:  She's a paralegal in our office.
13         THE COURT:  Are you calling a witness?
14         MR. LIFSHITZ:  We are, your Honor, on the subject of
15    the weight that should be accorded general deterrence as a
16    statutory sentencing factor.
17         THE COURT:  You objected to the witness and I
18    overruled your objection.
19         MR. LIFSHITZ:  Yes, your Honor.
20         THE COURT:  Have you provided a report?
21         MR. JACOBSON:  We have, your Honor.  It was produced
22    to the Government a little over a week ago, and it has been
23    provided to the Court in the defendant's exhibit binder.
24         THE COURT:  Fine.  Thank you.
25         You may proceed.

# Appendix to Response to Government Memo A22

*Sentencing*                                                        *5*

 1          MR. JACOBSON:  Defense calls Professor Jeffrey

 2   Fagan.

 3          (Witness takes the witness stand.)

 4          MR. JACOBSON:  Where would you like the witness to

 5   sit, your Honor?

 6          THE COURT:  Probably if everybody moves over here

 7   and you moved over right in front, then the court reporter

 8   wouldn't have to move.

 9          Swear the witness, please.

10          COURTROOM DEPUTY:  Please raise your right hand.

11   **JEFFREY FAGAN**, called by the Defendant, having been first

12          duly sworn, was examined and testified as

13          follows:

14          THE WITNESS:  Yes.

15          COURTROOM DEPUTY:  State your name for the record.

16          THE WITNESS:  Jeffrey Fagan.

17          COURTROOM DEPUTY:  Have a seat.

18          THE COURT:  I'm sorry to have kept you, Professor,

19   but the last case was very vexing.

20          MR. JACOBSON:  I think we started right on time,

21   your Honor.

22          THE WITNESS:  We understand.

23          MR. JACOBSON:  With the Court's permission,

24   Professor Fagan could have the Defense Exhibit binder in front

25   of him.

# Appendix to Response to Government Memo A23

*J. Fagan - Direct/Mr. Jacobson*                    **6**

1          THE COURT:  Yes.

2          MR. JACOBSON:  I apologize, it's an a little bit

3   awkward to ask you questions sitting next to you side by side.

4          THE WITNESS:  I know.

5   DIRECT EXAMINATION

6   BY MR. JACOBSON:

7   Q    Good afternoon.

8   A    Do you want me to speak into a mic?

9          THE COURT:  Yes, it would probably be better.

10  Q    Professor Fagan, if I could direction to you Defense

11  Exhibit A in the binder marked for identification.

12  A    Yes.

13  Q    Do you recognize this document?

14  A    This is my CV, curriculum vitae.

15         MR. JACOBSON:  Your Honor, I'd off Exhibit A into

16  evidence.

17         MR. MILLER:  No objection.

18         THE COURT:  You may.

19         (Defendant's Exhibit A was marked in evidence as of

20  this date.)

21  Q    I would like to ask you a few questions about your

22  résumé, Professor Fagan.

23         What's educational back?

24  A    I have a Bachelor's Degree in Engineering from New York

25  University.  I have a Masters Degree in Human Factors

# Appendix to Response to Government Memo A24

*J. Fagan - Direct/Mr. Jacobson*                    *7*

1    Engineering from State University of New York at Buffalo, and

2    a Ph.D. in a public policy program in the Civil Engineering

3    Program at State University of New York at Buffalo.

4    Q    And what is your current professional position?

5    A    I am a professor of law at Columbia Law School, and a

6    Professor of Epidemiology at the Melman School of Public

7    Health at Columbia University.

8    Q    Can you describe your prior professional background?

9    A    I was a professor for several years, I don't remember

10   exactly the number, six or seven, at Rutgers University in the

11   School of Criminal Justice.  Before that, I taught for a year

12   at John Jay College of Criminal Justice.  Before that, I was a

13   Senior Research Fellow at the New York City Criminal Justice

14   Agency in Manhattan.  And before that, I was in private

15   business.

16   Q    And what does your scholarly research focus on?

17   A    Policing, capital punishment, juvenile justice, drug

18   policy and drug law; firearms, firearms research, firearms

19   control.

20   Q    And are you involved in any relevant professional

21   organizations?

22   A    I am a member and an elected fellow of the American

23   Society of Criminology.

24   Q    Have you written articles or other writings for peer

25   reviewed journals on these subjects?

*J. Fagan - Direct/Mr. Jacobson*                                    **8**

1    A    A lot, yes.  I lost count, actually.

2    Q    And were any of these articles you've authored on the

3    topic of deterrence?

4    A    Yes.

5    Q    What were those articles?

6    A    I wrote -- I've written articles on the deterrent effects

7    of execution, capital punishment, on general deterrent effect

8    of execution on murder rates.  I've written on deterrent

9    effects of waiving adolescent offenders to the criminal court

10   to the juvenile court.  The deterrent effects of lengthy

11   sentences for adolescents.  Very serious, young adult and

12   somewhat adolescent offenders.  Deterrent effects of criminal

13   sanctions on drug offenders.  Deterrent effects of criminal

14   sanctions on a person who is charged with domestic violence.

15   Q    And have you authored any books on criminal law?

16   A    No.  I'm not a book writer, I'm an article writer.

17   Q    And have you taught any relevant courses at Columbia Law

18   School?

19   A    I've taught criminal law.  I've taught seminars in

20   criminology; seminars on drug control policy; seminars on

21   firearm regulation and control.  Seminars on courses on

22   juvenile justice, courses on the death penalty.

23   Q    Have you been admitted as an expert in federal court

24   before?

25   A    Yes.

# Appendix to Response to Government Memo A26

*J. Fagan - Direct/Mr. Jacobson*                    **9**

1  Q    Have you been admitted as an expert before this

2  particular court?

3  A    Yes.

4        MR. JACOBSON:  Your Honor, I move to qualify

5  Dr. Fagan as an expert in the general deterrent effect of

6  punishment on gun crime.

7        MR. MILLER:  No objection.

8        THE COURT:  Admitted.

9  EXAMINATION BY

10 MR. JACOBSON:

11 (Continuing.)

12 Q    If I could refer you, Professor Fagan, to Defense Exhibit

13 B.

14 A    Okay.

15 Q    Are you familiar with this document?

16 A    Yes, I am.

17 Q    What is it?

18 A    This is a report that I prepared for this case on general

19 deterrent facts, and specific deterrent effects, of lengthy

20 sentences on gun offenders.

21 Q    And does it include your affidavit pursuant to the Civil

22 Rules?

23 A    Yes.

24        MR. JACOBSON:  I'd offer Defense Exhibit B into

25 evidence, your Honor.

# Appendix to Response to Government Memo A27

*J. Fagan - Direct/Mr. Jacobson*                    **10**

1      MR. MILLER:  No objection.

2      THE COURT:  Admitted.

3      (Defendant's Exhibit B was marked in evidence as of

4  this date.)

5  Q    If I could direct you now to Defense Exhibit C through J.

6  A    Yes.

7  Q    Briefly flip through them.  Do you recognize these

8  materials?

9  A    Yes.  These are materials that are reviewed in

10  preparation in preparing the affidavit for this case.

11      MR. JACOBSON:  Your Honor, I'd offer Defense

12  Exhibits C through J in evidence.

13      MR. MILLER:  No objection.

14      THE COURT:  You may.

15      (Defendant's Exhibits C through J were marked in

16  evidence as of this date.)

17  Q    Professor Fagan, I'd like to ask you some questions about

18  general deterrence.

19      Can you summarize the theory for the Court and what

20  it is?

21  A    Well, succinctly, general deterrence --

22      THE COURT:  Excuse me, you're all here, I take it,

23  in connection with this case, are you?

24      MR. JACOBSON:  They're all family members.

25      THE COURT:  They can't hear back there.  Do you want

# Appendix to Response to Government Memo A28

*J. Fagan - Direct/Mr. Jacobson*                    **11**

1    to come up here and sit in the jury box so you can see what's

2    going on?

3              THE WITNESS:  We're okay.

4              THE COURT:  Okay.

5    A    Okay.  The question was?

6    Q    If you could briefly describe the theory of general

7    deterrence?

8    A    The theory of general deterrence is fairly simple.  That,

9    by heightening the risks of detection and conviction and

10   punishment for an offender that other offenders, having

11   observed these risks and costs of punishment, will decide not

12   to engage in crime.

13   Q    And what are the components of general deterrence?

14   A    There are three.  Perceptions of risk of detection and

15   apprehension.  Well, apprehension and detection.  The risk of

16   punishment having been apprehended, and the length and cost of

17   punishment.

18              The other components of it are consideration of the

19   rewards or benefits of crime, and consideration of the costs

20   or rewards of forgoing crime.

21   Q    Can you describe for the Court the rational offender

22   economic approach to deterrence?

23   A    Deterrence relies very heavily on rational offenders, and

24   the assumption is that they will make an accurate perception

25   and calculation of those costs.  They would engage in an

# Appendix to Response to Government Memo A29

1  accurate decision-making process that rationally weighs those

2  costs, costs of punishment against benefits of doing the

3  crime.  They will arrive at a net cost benefit calculation

4  that would persuade them not to engage in the crime.

5  Q     And is there a consensus, according to your research, as

6  to the empirical studies on the effectiveness of general

7  deterrence?

8  A     Most of the studies agree that there is very little

9  deterrent effect associated with lengthy costs of punishment.

10  That if there is a deterrent effect from criminal justice

11  activity, from enforcement activity, it's in raising the risk

12  of apprehension.  In other words, the detection of the crime

13  and, therefore, ultimately, assuming one is convicted, a

14  conviction for the crime.

15          But the consensus of the literature is that

16  deterrence effects really stop there; that lengthy sentences

17  don't add much to the cost benefit calculation.  Most

18  offenders have a hard time seeing, really, the difference

19  between 3 years, 5 years, 10 years, or 20 years.  It really

20  all kind of telescopes inward.

21  Q     And is there a consensus as to general deterrence as it

22  relates gun crimes specifically?

23  A     There have been a very small number of studies that have

24  looked at general deterrence and gun crimes.  Both of those

25  studies, in particular, looked at federalization under

# Appendix to Response to Government Memo A30

*J. Fagan - Direct/Mr. Jacobson*                    **13**

1  programs like Trigger Lock.  And both of those studies

2  concluded that they were very limited if no -- actually, one

3  study concluded no effects of deterrent -- no deterrent

4  effects.

5         THE COURT:  If you would just slow down so the

6  reporter can make an accurate record.

7  A    One study concluded there was no -- there were no

8  deterrent effects, general deterrent effects, of pursuing gun

9  cases in federal court.  The other study compared three

10 different law enforcement regimes one involving a kind of a

11 joint probation/policing/religious sector effort.  They found

12 dramatic reductions in crime including gun crimes and murders.

13        The other involved a New York City policing

14 experiment which was very strong street-level enforcement

15 using stop and risk and border maintenance policing.  They

16 found no deterrent effects there.

17        The third study looked at the effects of Trigger

18 Lock, or Project Exile, which it was called, in Richmond,

19 Virginia.  And they looked at the effects of murders.  They

20 didn't distinguish gun crimes from other crimes.  They

21 concluded there was a short-term deterrent effect, but they

22 did not -- were not able to identify a specific deterrent

23 effect related to gun crimes or gun murders.

24 Q    Did they he studies look at federalizing those particular

25 gun offenses?

*J. Fagan - Direct/Mr. Jacobson*          **14**

1    A    The one in Richmond did.  That was a program that

2    federalized some gun offenses, not all.  One of the issues

3    that seems to come up in a study like that is the uncertainty,

4    or really, the fact that it is unknown among would-be

5    offenders as to which cases would likely to be federalized

6    and, therefore, running the risk of a lengthy prison sentence.

7    There's no way for that information will get communicated down

8    on the street because, generally, it's a random selection

9    process.

10   Q    So how does that interact with the economic approach, or

11   rational offender, model of general deterrence?

12   A    Well, if you don't know what the sanctions are going to

13   be -- let's assume for the moment that we think that there

14   might be some effect of lengthy sentences.  And if you don't

15   know whether or not you're going to get the kind of lengthy

16   sentences, then it's very hard to make a rational calculation.

17        There's also -- it's not clear at all that among

18   would-be offenders in communities where there are considering

19   the possibility of crime that they have any knowledge at all

20   with respect to what the likely risk is of apprehension, and

21   if apprehended what the sentencing risks will be, the length

22   of punishment.  This information is just generally not

23   circulated.

24   Q    And just to clarify your answer.

25        Is there an issue both with the knowledge that the

# Appendix to Response to Government Memo A32

*J. Fagan - Direct/Mr. Jacobson*                     **15**

1   rational offender has about the repercussions as well as

2   whether someone is a rational offender to begin with?

3   A     Yes.  There is very little data to show the rationality

4   of an offender in making these kinds of calculations, sort of,

5   on the spot when one is considering doing a crime.  Of course,

6   you can imagine doing the difficulty of doing that kind of

7   research.  There have been simulations of it in laboratories

8   under varying conditions, and they generally seem to think

9   that the costs of punishment are much less salient to

10  deterrence than other risks of possibility of detection and of

11  the length of punishment.

12          In other words, much of deterrence, and I think it's

13  a very strong consensus in the theoretical and empirical

14  literature on this relies on the perceptions of the risks of

15  apprehension, and the risk of detection.  Less so than the

16  risk of punishment, and certainly, not on the costs of

17  punishment.

18  Q     And, Professor Fagan, I'd like to ask you in particular

19  about Mr. Lawrence's case.

20          Have you reviewed any documents in his case?

21  A     I reviewed the complaint from the Government, and I

22  reviewed the presentence report from the probation office.

23  Q     And applying the studies and your research on general

24  deterrence, in general, what are some of the factors that make

25  it difficult to be a rational offender, specifically, with

*J. Fagan - Direct/Mr. Jacobson*                          **16**

1  regards to the federal offense that Mr. Lawrence is charged

2  with?

3  A    Well, one would be knowledge of what the sentencing

4  regime would be.  I don't know that there's any way for a

5  person in a community contemplating the possibility of a crime

6  to know whether or not there was a -- what the risks of the

7  case would be if tried in state court versus federal court

8  would be.  There's no way of that knowledge to be disseminated

9  through a community.

10             Decision making on the spot is probably more

11  contingent on the circumstances on the spot.  I think

12  rationality is sacrifice at that moment for a calculation that

13  has to do with events as they're unfolding.  There is a kind

14  of a net benefit issue.  I think the net benefit is where

15  somebody would make that kind of a calculation that, well,

16  here's the cost and here's the benefits.  And if the costs are

17  too great, then benefits are not sufficient, or don't match up

18  to the costs.  So I'm unlikely to do the crime because I

19  perceive -- we have not much evidence outside of the

20  laboratory context that that rationality or net benefit

21  calculation is made in the midst of a criminal activity.

22  Q    And one of the factors that you just mentioned is that

23  there's a great deal of uncertainty about where an individual

24  would be prosecuted; is that right?

25  A    They have no idea whether a case is going to be

*J. Fagan - Direct/Mr. Jacobson*                    **17**

1  propertied if they're caught.  If not, they probably have

2  little realistic estimate of the likelihood of being caught.

3  But, if caught, they have no way of estimating whether that

4  case is going to be tried in federal court with a longer

5  state, or in a state court with a somewhat shorter sentence.

6  Q    Now, assuming that an individual is prosecuted in federal

7  court, is there any uncertainty about a future offender about

8  what that punishment might be?

9  A    There's been no study about whether or not that

10  information is communicated widely whether it's understood,

11  whether there's knowledge of it in different communities.  One

12  can -- you might make an inference of it if there seems to be

13  some deterrent effect.  But we don't seem to observe deterrent

14  effects so it's hard to say.

15  Q    And it sounds like what you're saying is that general

16  deterrence requires that that be communicated?

17  A    Yes.  Without knowing that the costs are greater under

18  one regime than the other, then we can't assume that there's a

19  deterrent effect of that regime.

20  Q    Within a particular regime like the federal regime, an

21  offender, a future offender, would have to know how the

22  guidelines worked, for example; is that right?

23  A    Yes, they would have to know what the risk -- what the

24  risk of detection would be, and so they would have to have

25  some clearance of the clearance rate for a particular crime.

# Appendix to Response to Government Memo A35

*J. Fagan - Direct/Mr. Jacobson*                        **18**

1    In other words, the rate of which offenders are arrested

2    relative to the number of crimes that are done.  Then they

3    would have to get some sense of the risk of being convicted

4    having been punished, or being convicted of the crime for

5    which they are arrested.  We often know that there are plea

6    bargains.

7            And then they would have to know what the sentencing

8    risks would be.  In other words, they have to know what the

9    punishment is that they could expect and that information is

10   just not widely shared or widely communicated.  And even if it

11   is communicated, I'm not sure that it's communicated

12   accurately we don't really have that much evidence about that,

13   but my guess would be there is myth and rumor than there is

14   actual knowledge being passed around.

15   Q    From your research, Professor Fagan, do you have a you

16   sense of whether most gun offenses are prosecuted in the state

17   versus federal regimes?

18   A    I believe that the majority of them, at least in

19   New York, are punished in the state regime.

20   Q    And does that affect which courts would be best situated,

21   if there could be a general deterrent effect, would be best

22   situated to provide that effect?

23   A    I can't say, actually.  I don't know the answer to that.

24   Q    And based on what you've discussed in your research and

25   your review of the empirical literature, do you have a

# Appendix to Response to Government Memo A36

*J. Fagan - Direct/Mr. Jacobson*                  **19**

1   conclusion about how all of these factors affect

2   Mr. Lawrence's case?

3   A    I think it's unlikely that either if Mr. Lawrence,

4   specifically, under the theory of specific deterrence; or in

5   general for people in the communities, community in which

6   Mr. Lawrence lives, that being given a sentence with, or an

7   extend the sentence, an enhanced sentence, under the federal

8   guidelines, under federal statute, would have much of a

9   deterrent effect either for him or in general in the

10  community.

11          Only were there to be extraordinary measures to

12  disseminate that information would there be the possibility of

13  deterrence.  But all of the research that we've done including

14  on gun crimes suggest that even where there's knowledge of

15  lengthy sentences that's not the key to deterrence.  The key

16  to deterrence is the risk of punishment.

17  Q    And you did just touch on knowledge of what those

18  punishments might be.  Can you briefly discuss how that, how

19  community based interventions should or do play a role in

20  that.

21  A    Well, they can.  I mentioned --

22          MR. MILLER:  Objection, your Honor.  Community based

23  interventions don't have anything to do with the deterrent

24  effect of this sentence in this case.

25          THE COURT:  Does it have any relevance?

Appendix to Response to Government Memo A37

*J. Fagan - Direct/Mr. Jacobson*                    **20**

1   A    Well, there are ways to deter gun offenders, we've

2   observed them.  I've participated in experimental research

3   along those lines.  So we could say there are alternatives

4   which do bear on how we think about deterrence.

5   Q    And --

6           THE COURT:  What if a community decided that guns

7   was the biggest problem they had, and decided to advertise

8   that anyone with a gun is going to go to prison because of

9   unproved apprehension and speeded up time.

10           THE WITNESS:  Right.

11           THE COURT:  And whether you're in the federal or the

12   state court, the punishments -- of incarceration -- are going

13   to be great.

14           Let's assume they even said what they would be.

15   Could that have any impact?

16           THE WITNESS:  We, in Project Exile, there was fairly

17   strong advertising about -- through, I think, there were tall

18   billboards that were posted in the neighbors or communities

19   that had the highest rates of gun crimes.  And they didn't

20   seem to, at least the research that I've reviewed, really were

21   only a couple of studies on this, and they were very well done

22   studies, took notice to reach any conclusions about the effect

23   of advertising.  And, in fact, both of those studies had --

24   one of those studies said there wasn't any general deterrent

25   effect of the Exile Program and the other was sort of

# Appendix to Response to Government Memo A38

J. Fagan - Direct/Mr. Jacobson                    21

1   inconclusive.

2          So if even with an advertising component there was

3   no deterrent effect, then it's possible that that

4   information -- the information could be put out there whether

5   it's internalized and used in the decision-making process I

6   think is really quite a different matter.  And from the lab

7   experiments, we seem to think that those elevated risks seem

8   to get internalized.

9          THE COURT:  You couldn't do, for example, what the

10  cigarette companies did in projecting some of the special

11  advertising to so of the ghetto communities, which seemed to

12  have an effect on the usage of the cigarettes they were

13  pushing.  That wouldn't affect what happened in the

14  gun-carrying group.

15  A     I could only speculate, your Honor.  My sense is that

16  cigarette smoking is a much more widespread behavior.  The act

17  of smoking a cigarette is not in itself inherently dangerous.

18  The risk of cancer and illness are somewhat remote, they're

19  down the road.  So I think it's -- just simply the people who

20  smoke are probably quite a -- much closer to the general

21  profile of a community than would be people who are involved

22  in violent crimes.

23         THE COURT:  Go ahead.

24         MR. JACOBSON:  Nothing further, your Honor.  Thank

25  you.

# Appendix to Response to Government Memo A39

*J. Fagan - Examination by the Court*                    **22**

1    THE COURT:  How prevalent is the carrying of guns,

2    and has it changed with respect to age groups or ethnic groups

3    or educational groups or however you want to strategize.

4         THE WITNESS:  There are different estimates

5    depending on the way the research is conducted.  Research is

6    conducted by doing face-to-face interviews shows a somewhat

7    higher rate of gun caring than research done by, say, a

8    telephone survey or something like that.  Whether it's legal

9    gun carrying or illegal gun carrying?

10        THE COURT:  Illegal.

11        THE WITNESS:  It seems to be more prevalent.  Well,

12   we don't really know about -- we only know gun carrying

13   behaviors in communities where there's higher rates of both

14   nonfatal and fatal injuries.

15        THE COURT:  What.

16        THE WITNESS:  Fatal and nonfatal injuries.  That's

17   where the research seems to focus.  One thing that's happened

18   in the last few years is that gun carrying varies very much by

19   community.  In Chicago, it seems to be very common based on

20   what the community surveys have shown there.  In New York,

21   it's a little bit less common because of there seems to be a

22   more of a norm of using shared guns in certain areas.  There

23   being one gun that would be shared by different people.  It's

24   generally left at home and carried only when there's a

25   situation that somebody might feel is a situation that would

# Appendix to Response to Government Memo A40

*J. Fagan - Cross/Mr. Miller*                          **23**

1    require somebody to carry a gun.  But the evidence again is

2    really hard to get an of good, solid point estimate of gun

3    carrying.

4              THE COURT:  Go ahead.

5              (A brief pause in the proceedings was held.)

6              MR. MILLER:  Thank you, your Honor.

7              THE COURT:  You may.

8    CROSS-EXAMINATION

9    BY MR. MILLER:

10   Q    Professor, you agree that one of the essential

11   justifications of punishment, criminal punishment, is

12   deterrence; right?

13   A    Yes.

14   Q    And you agree that the principle that harsher sentences

15   deter crime --

16             THE COURT:  You're talking about when you use the

17   terms.  You're using it with respect to general deterrence on

18   persons not before the court, or deterrence on the defendant?

19             MR. MILLER:  I'll break it down, Judge.  I meant

20   both.

21   Q    But you agree that general deterrence is one of the

22   essential justifications of criminal conduct?

23   A    Yes.

24   Q    And that specific deterrence is one of the essential

25   justifications of criminal punishment?

# Appendix to Response to Government Memo A41

*J. Fagan - Cross/Mr. Miller*                     **24**

1   A     Depending on the texts that you read, specific deterrence

2   is much closer to the essential justifications for punishment

3   than is general deterrence.

4   Q     But both specific and general deterrence are among the

5   essential justifications for criminal punishment?

6   A     Yes.

7              THE COURT:  And what we're dealing with within the

8   statute, there isn't any question that, is there, §3553(a) of

9   Title 18 factors to be considered in imposing a sentence 2(V)

10  "to afford adequate deterrence to criminal conduct that that

11  encompasses both general and specific deterrence."

12             THE WITNESS:  Yes.

13             THE COURT:  That's what Congress had in mind.

14             THE WITNESS:  Okay.

15             THE COURT:  I don't think anyone doubts that.  So we

16  start with the congressional finding that it must have some

17  relevance.

18             THE WITNESS:  Okay.

19  EXAMINATION BY

20  MR. MILLER:

21  (Continuing.)

22  Q     You agree that the harsher sentences deter crime at least

23  to some extent has a long history in the academic literature,

24  right?

25  A     Well, it was in the early formulations of deterrence

# Appendix to Response to Government Memo A42

J. Fagan - Cross/Mr. Miller                 25

1  theory where they did emphasize harsher sentences.  I think

2  modern deterrence theory tends to shy away from longer

3  sentences as a key ingredient in deterrence and more towards

4  the fact that they're sentencing.

5  Q    But the question is:  There's a long history in the

6  academic literature that harsher sentences deter crime at

7  least to some extent; correct?

8  A    There is a long history.  It's a history that changes

9  over time, but there's a history.

10             THE COURT:  I'm sorry.

11             THE WITNESS:  There is a history that changes over

12  time, and it is a long history, yes.

13  Q    Now, in preparing for today's hearing, you read and

14  summarized the academic literature on general and specific

15  deterrence?

16  A    Yes.  I focus more closely on deterrence of gun crimes,

17  but yes.

18  Q    Those are the articles that are cited in the report and

19  the exhibits here.  Did you conduct any studies yourself in

20  preparing for this hearing?

21  A    No.

22  Q    In preparing for this hearing, did you conduct any

23  experiments?

24  A    No.

25  Q    Did you conduct any interviews yourself?

# Appendix to Response to Government Memo A43

*J. Fagan - Cross/Mr. Miller*                                        **26**

1    A    No.

2    Q    Did you talk to the defendant?

3    A    No.

4    Q    Did you talk to the defendant about the impact his

5    sentence would have on, well, if you didn't talk to him about

6    the impact his sentence would have on his future criminal

7    conduct, did you?

8    A    I did not speak to the defendant at all.

9    Q    Did you talk to people who commit crimes about the

10   effects of harsher sentences in this case?

11   A    In this case, no.

12   Q    Did you talk --

13   A    In other cases yes.

14   Q    But not in this case?

15   A    No.

16   Q    Not in preparing for this testimony today?

17   A    No.

18   Q    Did you talk to anyone in Brooklyn about how their

19   conduct would be affected by harsher sentences in Brooklyn gun

20   cases?

21   A    No.

22   Q    Did you talk to any criminals about the likelihood of

23   offending in preparing for this testimony today?

24   A    No.  I've done it before in my career but not in this

25   case.

# Appendix to Response to Government Memo A44

*J. Fagan - Cross/Mr. Miller*                    **27**

1   Q    Now, the studies that you've read and summarized, did any

2   of them specifically study criminal conduct in Brooklyn?

3   A    In Brooklyn?  No.

4   Q    Did any of them specifically study gun crimes in

5   Brooklyn?

6   A    No.  Well, I take it back.  The study that compared Exile

7   with Project Cease Fire in Boston and with the Comp Stat

8   program in New York did, since Brooklyn is part of New York,

9   to encompass criminal activity in New York.

10  Q    But other than that, none that you could provide?

11  A    In preparation for this, no.

12  Q    Now, you agree that it's hard to measure the general

13  deterrent effects of harsher sentences; correct?

14  A    I don't know that I necessarily agree with that.  It

15  depends on what you mean by "study."  If we look at places

16  that have one sentencing regime compared to another, and we

17  look at the deterrent effects of those, we look at the

18  deterrences in crime rates, we can make some inferences about

19  deterrence.

20  Q    What I asked is, is it hard -- do you agree that it's

21  hard to measure the general deterrent effects of harsher

22  sentencing?

23  A    No, I don't agree actually.  You can measure by looking

24  at reductions in crime rates.

25  Q    So I would like to direct you to your report which we are

# Appendix to Response to Government Memo A45

*J. Fagan - Cross/Mr. Miller*                    **28**

1    introducing as Government Exhibit 1, it's the same report that

2    you introduced earlier.

3            MR. MILLER:  I offer Government Exhibit 1, your

4    Honor, the professor's report.

5            MR. JACOBSON:  It's already in evidence as Defense

6    Exhibit B.

7            (Government's Exhibit 1, Professor Fagan's report,

8    was received in evidence as of this date.)

9    Q    Turn to Page 6 if you would, Professor.  In

10   Paragraph 5(a), your report says, "Two factors complicate

11   efforts to estimate the general deterrent effects of

12   incarceration."

13           Did you write that?

14   A    Yes.

15   Q    Two factors that complicate the efforts to estimate the

16   general deterrent effects of incarceration; correct?

17   A    Yes.

18   Q    Okay.  The first is that it's difficult to disentangle

19   the effects of incapacitation from the deterrent effects of

20   incarceration; correct?

21   A    Yes.

22   Q    And incapacitation is putting people in prison?

23   A    Yes.

24   Q    "Second, experiments on incarceration effects are not

25   feasible."  Correct?

# Appendix to Response to Government Memo A46

*J. Fagan - Cross/Mr. Miller*                                    **29**

1      THE COURT:  It's not putting them into prison, it's
2  keeping them in prison.
3      MR. MILLER:  Yes.
4  Q    Incapacitation is keeping and putting people in prison;
5  correct?
6  A    Somebody who is in prison is incapacitated.
7  Q    And so, the longer they are in prison, the longer they
8  are incapacitated?
9  A    Yes.
10 Q    The second factor that complicates efforts to estimate
11 the general deterrent effects of incarceration is that
12 experiments on incarceration effects are not feasible; right?
13 A    True experiments are not feasible.  Quasi-experiments are
14 feasible.
15 Q    Okay.  You wrote here that experiments on incarceration
16 effects are not feasible; right?
17 A    Right.
18 Q    Okay.  And, in fact, one of the exhibits that you cite,
19 one of the articles that you cite, the Raphael and Ludwig
20 article, says that disentangling the effects of deterrence of
21 incapacitation is difficult; correct?
22 A    Yes.
23 Q    I would like to show you a video, Professor.  This is
24 Government Exhibit 6.
25      THE COURT:  You can turn the screen so the audience

*J. Fagan - Cross/Mr. Miller*                    **30**

1    can see it as well as us at the table.  And those people in

2    that section move over.

3              Can you all see it now?

4              THE WITNESS:  Yes.

5              THE COURT:  Okay.  Six is admitted.

6              (Government's Exhibit 6, Video, was received in

7    evidence as of this date.)

8              MR. JACOBSON:  Your Honor, I don't know what six is;

9    yet, if I can preserve an objection as to the admission to the

10   exhibit.

11             MR. MILLER:  It's the video that we previously

12   submitted to the Court.

13             MR. JACOBSON:  Then I do object to this exhibit

14   coming into evidence, your Honor.  We've now viewed this video

15   at least four times in this courtroom.  It's far beyond the

16   scope of today's testimony from Professor Fagan.

17             MR. MILLER:  Professor Fagan has never seen the

18   video.  I would like to ask him a hypothetical about the

19   video.

20             THE COURT:  I'm sure he's interested in it.  It's an

21   interesting video.

22             MR. MILLER:  I am having a little technical trouble,

23   your Honor, I am hoping to fix it.

24             (A brief pause in the proceedings was held.)

25             MR. MILLER:  This is, for the record, which camera

# Appendix to Response to Government Memo A48

1  it was.  It was Camera 1 in the exhibit, and I'm going to

2  begin playing it at 10:03:20 p.m.

3          THE WITNESS:  Your Honor, can we pull that a little

4  bit closer?

5          THE COURT:  It's easier to go closer to the fire the

6  Indians used to say.  If you want to stand up and look at it,

7  you may.

8          MR. JACOBSON:  Judge, before the video is played, if

9  I could briefly be heard on this exhibit.

10          THE COURT:  Yes.

11          MR. JACOBSON:  Professor Fagan has read the criminal

12  complaint in this case which details step by step exactly

13  what's in the video so he knows what is this.  There's really

14  nothing additional provided by the video that he hasn't

15  already read and gone over in preparation for this testimony.

16          THE COURT:  Even professors respond to emotional

17  matters.  I think it would help the cross-examination if he

18  saw it, the event that.

19          MR. MILLER:  Thank you, your Honor.

20          (Video file played in open court.)

21  Q    Before you see two men walking down the street, a man in

22  a dark shirt and a man in a light shirt?

23  A    Yes.

24  Q    And now one has walk off camera.  The man in the dark

25  shirt, the man in the white shirt, appears to be waiting

# Appendix to Response to Government Memo A49

                    *J. Fagan - Cross/Mr. Miller*                    32

1   around?

2   A    Yes.

3   Q    Do you agree?

4   A    Yes.

5   Q    Now, the one in the dark shirt has come back up into the

6   frame from the bottom of the screen; correct?

7   A    Correct.

8   Q    It appears the two men shoot guns down the street;

9   correct?

10  A    Correct.

11  Q    And run off back up the way they came?

12  A    Right.

13  Q    You agree with me that it seems that they know each

14  other?

15          MR. JACOBSON:  Objection, your Honor.

16          THE COURT:  Sustained.

17  A    I have no way of answering that question.

18          THE COURT:  Sustained.

19  Q    The two men walked into the frame together; right,

20  Professor?

21  A    They didn't exchange words.

22  Q    But they came together?

23  A    They showed up at the same time, yes.

24  Q    And they were both on the corner together?

25  A    Yes.

# Appendix to Response to Government Memo A50

*J. Fagan - Cross/Mr. Miller*                    **33**

1  Q    They both shot guns together?

2  A    Yes.

3  Q    They both left running away together?

4  A    Yes.

5  Q    Looks dangerous; right?

6         MR. JACOBSON:  Objection.

7         THE COURT:  What was the question?

8  Q    Looks dangerous?

9         THE COURT:  It looks dangerous?  They were shooting

10 down the street in an area that's residential, and there were

11 people walking around on the street.

12        THE WITNESS:  Are we done?

13        THE COURT:  Yes, in that direction.  The only one

14 that was hit was the co-conspirator, if he was a

15 co-conspirator, who shot him.

16 Q    Professor, let's say the person in the dark shirt gets

17 arrested hours later and is convicted for having the gun, all

18 right?

19 A    Mm-hmm.

20 Q    Is it your opinion that the man in the light-colored

21 shirt is unaffected by the length of the sentence imposed on

22 the man in the dark-colored shirt?

23        MR. JACOBSON:  Objection.  It seems like he's

24 alluding to retribution or some other goal of sentencing.

25        THE COURT:  If you can't answer --

# Appendix to Response to Government Memo A51

*J. Fagan - Cross/Mr. Miller*                           34

1        THE WITNESS:  What does unaffected mean?

2        THE COURT:  If he doesn't want to answer any

3   question or want it clarified say so.

4        THE WITNESS:  I don't know what's unaffected or

5   affected.  What does that mean?

6   Q    Is there any affect on the man in the white shirt from

7   the length of the sentence on the man in the dark shirt?

8   A    My guess is that the man in the light shirt would

9   probably internalize more, be more affected by the fact that

10  the first guy was caught than the fact that he was facing a

11  punishment of 15 years or 10 years or 5 years.

12  Q    That's not my question.  My question is, is there any

13  effect on the man in the white shirt on the length of the

14  sentence imposed on the man in the dark shirt?

15  A    No.

16  Q    That's your opinion?

17  A    The research is fairly conclusive about that.

18  Q    Your opinion is that the guy in the light-colored shirt

19  is indifferent to whether the guy in the dark shirt is

20  sentenced to probation or ten years imprisonment?

21  A    Well, that's a different question.  I think he might

22  be -- well, it's an interesting question.  The best research

23  that we have suggests that there is not a great deal of effect

24  on a particular population of offenders of sending somebody to

25  prison or probation or intensive supervision in the community.

Appendix to Response to Government Memo A52

*J. Fagan - Cross/Mr. Miller*                    *35*

1   So that's the first part of the question.  What was the second

2   part.

3   Q    Are they indifferent between probation and a sentence of

4   ten years?

5   A    Well, nobody would be indifferent to it, but the fact is,

6   and the evidence suggests, that over a population of people

7   perhaps like those two young men of color in a residential

8   neighborhood that there seems to be overpopulation of people

9   no difference in how they're affected by probation or prison

10  sentences.

11         We've cited a study to that effect of which I'm a

12  coauthor.  It was done with 1,350-some-odd young men in two

13  different cities with fairly high rates of gun violence.

14  Q    Now, in your report --

15         THE COURT:  No difference between no prison and a

16  long sentence, or any prison?

17         THE WITNESS:  We looked at -- it's an -- it is

18  counterintuitive.

19         THE COURT:  It is.

20         THE WITNESS:  But we looked at these young when

21  given probation sentences and young men sentenced to a variety

22  of incarceration experiences, and then we contacted them after

23  their incarceration experiences, and we studied them over a

24  period of time for about eight years.  And the research came

25  up, fairly rigorous research, peer reviewed and so to show

# Appendix to Response to Government Memo A53

*J. Fagan - Cross/Mr. Miller*                    **36**

1    there was what we call a null effect of incarceration.

2              THE COURT:  On them?

3              THE WITNESS:  On those, yeah.  On these young them.

4              THE COURT:  We're talking about on others than the

5    person sentenced.  I take it that's your question.

6              MR. MILLER:  Yes, your Honor.

7              THE COURT:  That's what we're concerned about.

8    General deterrence.

9              THE WITNESS:  We don't have any data that would

10   suggest that there's unless -- well, I can only go back and

11   tell you what the evidence has shown.  The evidence has shown

12   fairly consistently that it's the risk of apprehension that

13   has a deterrent effect, a general deterrent effect, and not

14   necessarily the risk of imprisonment or particular punishment

15   caused.

16             THE COURT:  If apprehension didn't result, or never

17   resulted in any incarceration, in a court or told perhaps

18   don't do it again and that would have the same result on

19   people who know what happened as a sentence to prison.

20             THE WITNESS:  I don't think we have any evidence

21   about any effect.  I'm hard pressed to think of a regime that

22   for a crime like this, of a gun crime, or of a serious felony

23   crime where the risk of a prison sentence isn't on the table.

24             THE COURT:  So every one of the cases assumes at

25   least some incarceration if you're caught.

*J. Fagan - Cross/Mr. Miller*                          37

1              THE WITNESS:  For crimes of this sort, yes.

2              THE COURT:  And the ones incarcerated you say it

3    doesn't make much difference how long.

4              THE WITNESS:  This seems to be what the evidence has

5    shown.

6              THE COURT:  Have you examined the new statistical

7    analysis of the Sentencing Commission on what effects

8    recidivism?  They have some interesting table, the only one

9    that seemed particularly telling me to me was the one on prior

10   convictions.  If there was no prior conviction, recidivism

11   would be substantially less whatever the sentence.

12             THE WITNESS:  So a first incarceration?

13             THE COURT:  Yes.

14             THE WITNESS:  Yes.  That would make some sense.

15             THE COURT:  It's so counterintuitive.  It's very

16   hard to accept it.

17             THE WITNESS:  Well, it's been done in a number of

18   different contexts, and, in fact, if I'm not mistaken, I'm

19   fairly sure that the conclusion that I'm reciting about the

20   effects of extended periods of incarceration was also cited by

21   the National Academy of Sciences Panel on Incarceration.  It

22   was chaired by Jeremy Travis, who I think you know, and Bruce

23   Wesner.  And I think they reported out in 2014, perhaps '15, a

24   very thick report, and part of the report was the deterrent

25   effects of incarceration.  And I believe they reported out the

# Appendix to Response to Government Memo A55

*J. Fagan - Cross/Mr. Miller*                    38

1    same finding.

2           THE COURT:  The American Law Institute is doing

3    research on the effects of fencing on six offenses.  Don't

4    they assume that a longer sentence will have an impact on

5    general deterrence?

6           THE WITNESS:  I haven't seen that work, your Honor.

7           THE COURT:  Have you studied their proposals?

8    They're about to adopt them finally.

9           THE WITNESS:  No, I have not.

10          THE COURT:  Professor Wexler at Columbia.

11          THE WITNESS:  Herb Wexler.

12          THE COURT:  Yes.  He did the penal studies.  Didn't

13   he assume with Michael in his original study of crime that

14   there would be an impact.

15          THE WITNESS:  Of sentence lengths?

16          THE COURT:  Of sentence lengths.

17          THE WITNESS:  Yes, they did.  They were writing in

18   the 1930s and '40s.

19          THE COURT:  I know, I studied their stuff in '46,

20   and I taught it in '53 and it sounded very convincing to me.

21   I took the position that that's the way it was.  You got a

22   longer sentence people would pay attention.  Maybe there was a

23   difference in the type of criminal, white collar criminal, was

24   used to calculating benefits and detriments might see a

25   greater impact than the kid out in the street who acts quickly

Appendix to Response to Government Memo A56

*J. Fagan - Cross/Mr. Miller*                    **39**

1    on emotional grounds and doesn't think of future benefits and

2    detriments might have less of a feeling about sentences.  Does

3    that fit into the picture in any way?  People who are used to

4    calculating profit and loss might be affected by the length of

5    the sentence?

6            THE WITNESS:  I think that I would speculate that

7    that's the case.  The more that the person is working a

8    framework or thinking and acting in a framework based on those

9    kinds of rational calculations, then the more likely they

10   would be to do the crime cost benefit analysis things that are

11   applied in deterrence research.

12           There is also a field that's growing quite a bit and

13   I think actually drives some of the modern theorizing about

14   this which is behavioral economics where deterrence and

15   rationality is based on conventional conviction and cost

16   benefits calculation.

17           And behavioral economists talk a lot things, for

18   example, like discounting; that they simply make decisions

19   based on what's in front of them, and some of the long term

20   effects are discounted cognitively, meaning, they just they

21   simply will reduce the salience of what they calculation of

22   what that cost might be.

23           They do that often in the service of achieving a

24   particular goal.  And they also tend to inflate the value of

25   the goal in front of them.  If the goal in front of them, I'm

J. Fagan - Cross/Mr. Miller                    40

1    not sure what the contest was between the shooters and the

2    people they were shooting at.

3              THE COURT:  They weren't shooting at anybody, they

4    were just shooting.  There's a supposition that they might

5    have been in gangs, or on the edge of a different gang

6    territory and just wanted -- that there was a division at that

7    point.  But they weren't trying to kill any particular person,

8    they were just firing, in naval parlance, a shot before the

9    bow.

10             THE WITNESS:  In addition to discounting the costs,

11   if somebody wants something or wants to do something, they

12   will tend to inflate the benefits.  And we see this in common

13   behavior by people in shopping situations, and there's a

14   moment at which rationality is compromised.  And, again,

15   modern research, and this is something I haven't written about

16   this in here, but it seems to be quite prominent and quite

17   widely accepted.  The more -- the hotter the cognition, as we

18   say, the less rationality is present.  And you've mentioned

19   emotional in your questions and I think emotion is part of it.

20             THE COURT:  Go ahead.

21             MR. MILLER:  Thank you, your Honor.

22   EXAMINATION BY

23   MR. MILLER:

24   (Continuing.)

25   Q    Professor, you concluded in your report that any

*J. Fagan - Cross/Mr. Miller*                        *41*

1  additional term of incarceration beyond what Mr. Lawrence has

2  already served will provide little, if any, marginal effect on

3  the deterrence of gun crimes by other individuals in the

4  community; right?

5  A    Yes.

6  Q    At the time that you wrote your report, were you aware of

7  how much time Mr. Lawrence had served in prison?

8  A    I know he still was in a pretrial incarceration period of

9  time, but I don't believe he had served this.  This was not

10  post sentence.

11  Q    Do you know how long he had served?

12  A    I did know and then I forgot.

13  Q    Okay.  It was 66 days.

14  A    Okay.

15  Q    Are you aware of the maximum sentence in this case?

16  A    In federal court?

17  Q    Yes.

18  A    Under §924(c)?

19  Q    §922(g)?

20  A    §922(g).  An additional ten years.

21  Q    Correct.

22        Is it your opinion that Mr. Lawrence would be

23  indifferent to a sentence of 66 days, or a sentence of ten

24  years would affect his future?

25  A    A sentence of ten years or a sentence of?

# Appendix to Response to Government Memo A59

*J. Fagan - Cross/Mr. Miller*                    **42**

1  Q    66 days?

2  A    Indifferent, no.

3  Q    So it might have some effect?

4  A    Yes.

5  Q    And is it --

6  A    I don't know if deterrence would be one of those effects,

7  but he would certainly be affected by it.

8  Q    Is it your opinion that he would be indifferent from a

9  deterrence perspective to a sentence of 66 days and 10 years?

10  A    It's possible that he would be indifferent.  I would have

11  to spend some time with Mr. Lawrence to figure that out.

12  Q    It's possible that he would not be indifferent?

13  A    Yes.

14          MR. JACOBSON:  I'm sorry, are you talking about

15  specific deterrence?

16          MR. MILLER:  With respect to Mr. Lawrence, specific

17  deterrence.

18          MR. JACOBSON:  I don't know that that's the question

19  at issue today.

20          MR. MILLER:  Well, specific deterrence is one of the

21  factors and one of the bases of Professor Fagan's report so I

22  think it is quite proper.

23          THE COURT:  Stay on the general deterrence track.

24  Q    Is it your opinion, Professor, that all of the

25  individuals in Mr. Lawrence's community are indifferent from a

# Appendix to Response to Government Memo A60

*Proceedings*                                                                    43

1   general deterrence point of view between the sentence of

2   66 days and the sentence of ten years?

3   A    I have no way of knowing that.

4   Q    You have no way of knowing?

5   A    Right.

6   Q    Now, we've talked about a few studies that you've cited

7   in your report today, I just wanted to turn --

8   A    Can I clarify that answer?

9         THE COURT:  Yes, go ahead.

10        THE WITNESS:  So when you ask that question in a

11  community, I'm sure people in the community at large would be

12  affected by the difference in the sentences.  Would people who

13  were engaged or thinking about the possibility of engaging in

14  gun violence be affected by the difference in those sentences,

15  that would be the right question.  And without doing a fairly

16  systemic inquiry, I would not be able to say.

17  Q    So you're not able to say?

18  A    No.

19        THE COURT:  So what does that mean?  That a middle

20  class person would be more affected by general deterrence?

21        THE WITNESS:  They have more to lose, your Honor,

22  yes.  The costs would be much greater for them.

23        THE COURT:  So you'd have to up the sentences, if it

24  had any affect at all, on the lower than middle class.

25        THE WITNESS:  The calculation on deterrence is

# Appendix to Response to Government Memo A61

*Proceedings*                                    *44*

1   generally a net cost/net benefit calculation.  And if there is

2   little to be gained by not doing the crime, then that's offset

3   by the costs of doing the crime.

4          THE COURT:  Can you go to lunch and come back?

5          THE WITNESS:  I have a seminar at 4:00, your Honor.

6   I have to get uptown.

7          THE COURT:  You don't have to prepare for it?

8          THE WITNESS:  No, fortunately.

9          THE COURT:  So you could leave here for Columbia at

10  3:00.

11         THE WITNESS:  Yes.

12         MR. MILLER:  Judge, we don't have much more.

13         THE COURT:  I have Board of Judges meeting.  They

14  are up there assembled.

15         MR. JACOBSON:  My redirect will be very brief.

16         THE COURT:  Why don't you take a half hour lunch.

17         THE WITNESS:  Okay.

18         THE COURT:  I'll show my face, as in a faculty

19  meeting, and leave to come back.

20         THE WITNESS:  You've been in faculty meetings

21  before.  Unless you're on the agenda.

22         THE COURT:  I find this fascinating because it goes

23  counter to everything the statute says, that Congress

24  believes, and that the average middle class, and I assumed

25  everybody knew.  Let me ask this young man.

# Appendix to Response to Government Memo A62

*Proceedings*                                                            *45*

1          Would you have been affected more by a thought that
2    if you were caught you'd let get a longer sentence than you
3    would if you were caught and not a short sentence.
4          MR. JACOBSON:  Can I ask that he not answer that?
5          THE COURT:  Don't answer it.
6          Okay.  Take a half hour for lunch and then come
7    back.
8          THE WITNESS:  If it's of any relevance, I'm enjoying
9    this.
10         THE COURT:  It's disturbing.
11         (Defendant exits from courtroom at 1:02 p.m.)
12         THE WITNESS:  And the wrote a big article on the
13   impact Wexler when penal code.  I teach Wexler and Michael
14   when I teach a death penalty course.  That's one the first
15   readings.
16         (Luncheon recess taken; 1:03 p.m.)
17         (Continued on the following page.)
18
19
20
21
22
23
24
25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

# Appendix to Response to Government Memo A63

|  | *Proceedings* | **46** |
|---|---|---|

```
1                    AFTERNOON SESSION

2

3            (In open court.)

4            (Parties present.)

5            (Defendant enters the courtroom.)

6            THE COURT:  Let's proceed, shall we?

7            MR. JACOBSON:  Let's proceed.

8            THE COURT:  Well, we were discussing, I think

9    generally, does general deterrence have more of an impact when

10   you're dealing with defendants who are used to calculating?

11   That's the last point we were making.  We had that security

12   crook that got 150 years, what was his name?

13           THE WITNESS:  Madoff.

14           THE COURT:  That was directed, I take it, at people

15   who were involved in securities that had more of an impact

16   than on other groups who aren't used to that kind of

17   day-to-day calculations.  Their calculations are very closed.

18           THE WITNESS:  My guess and, again, white collar

19   crime, unfortunately, is not as well researched as it ought to

20   be.  But my guess is that other people considering running a

21   scheme like Madoff or some other white collar fraud activity

22   would think -- would observe what happened to Madoff and worry

23   more about how not to get caught.

24           THE COURT:  I see.

25           THE WITNESS:  They would be more careful in how they
```

# Appendix to Response to Government Memo A64

1   put their scheme together.

2          THE COURT:  What about adolescents whose frontal

3   brain hasn't fully developed and don't calculate consequences

4   so well?  Would this have less of an effect on them,

5   deterrence, general deterrence.

6          THE WITNESS:  Yes.  All of the research that I was

7   involved in the McArthur Commission, McArthur Research

8   Network, that actually investigated this for a fairly long

9   period of time.  And all of the research on this suggests that

10  adolescents are compromised with respect to sort of judging

11  the consequences of what they do.  They're much more impulsive

12  in their decision making.  They have a hard time regulating

13  their emotions whether they be anger or fear or want or lust.

14          There's just a number of deficits to their ability

15  to act rationally, to do the kind of rational calculation of

16  cost and benefits that an older person would be able to do.

17  This was recognized by the Supreme Court in a series of cases

18  which I'm sure you know.

19          THE COURT:  So age would enter into it possibly?

20          THE WITNESS:  Absolutely.  I didn't opine about it

21  in my report, but there is a conversation going on amongst

22  psychologists and neuroscience scholars about when brains

23  reach their full maturation and whether or not there should be

24  some realignment of legal institutions, particularly, juvenile

25  courts to recognize diminished capacity that extends beyond

# Appendix to Response to Government Memo A65

*Proceedings*                                                          48

1    the age of 18 well into the early 20s.  The evidence is not

2    conclusive, but it certainly is strong enough that there are

3    sustained efforts to study exactly this.

4             THE COURT:  So what do we do when we get an

5    adolescent as against a 40-year-old criminal?  A 40-year-old

6    criminal who is beginning to slow down for physical reasons,

7    but he can think, or she can think, compared to an adolescent

8    with respect to general deterrence?  Do we just ignore it, or

9    do we give greater weight to any class, any age group, any

10   people that have prior incarcerations.  All of the things that

11   we might consider.

12            THE WITNESS:  Let me cite back to some of the

13   research that I did where I actually -- one of the things that

14   I think that is a very important study.  It wasn't

15   necessary -- some of the people in the study were gun

16   offenders.

17            THE COURT:  Were what?

18            THE WITNESS:  Some of the people in the study that I

19   want to talk about, that I mentioned before, the 1,350 young

20   men, mostly young men.  I think there were only about 110

21   women, so it's roughly 1,200 men who were in two cities,

22   Philadelphia and Phoenix.  Very high crime cities,

23   particularly, at the time when we recruited them.  It was in

24   the early 19 -- it was the late 1990s when we recruited them

25   into the study and we followed them for years.

# Appendix to Response to Government Memo A66

*Proceedings*                                                              **49**

1          And we interviewed them extensively, repeatedly,

2     over the period of eight or nine years.  It was eight years,

3     actually.  What we found was those young men were much

4     more -- we found no difference in their recidivism rates

5     following their incarceration for whether they had served six

6     months or a year or two years.  I think the maximum that

7     somebody had served in the study was about three years.

8          And we did -- one of the strengths of that study is

9     that we did a very careful matching process.  So we were able

10    to match people of different sentence lengths depending on

11    their prior record, depending on prior commitments to

12    institutions, and so on.

13         So we were able to say that -- we were able to

14    approximate, all things being equal, to the person with one

15    year incarceration would recidivate more or less than the

16    person three years of incarceration.  And the answer was, no,

17    they did not.  There was just the same amount of recidivism

18    between the two groups.  And the strength of the study, as I

19    mentioned, is we actually were able to control statistically

20    for all the background factors that you're suggesting we

21    should do.  It was published in the Journal of Criminology and

22    it's somewhere in my curriculum vitae.

23         THE COURT:  So what would an academic say we should

24    do with the direction from Congress to consider that to assume

25    that there is general deterrence.  That's what they're saying.

# Appendix to Response to Government Memo A67

|                                    |     |
| ---------------------------------- | --- |
| *Proceedings*                      | **50** |

1     THE WITNESS:  There is general deterrence for some

2     people.  I think much of the literature on tax compliance --

3     THE COURT:  On what?

4     THE WITNESS:  Tax compliance.

5     THE COURT:  Tax, yes.

6     THE WITNESS:  Suggested that there is some general

7     deterrent effect.  Some of the literature on drunk driving, it

8     varies quite a bit, but there's some deterrent effect on drunk

9     driving.  Not as much as there is on tax, for example.

10    So it really depends on the offense and the offender

11    that we're concerned about.  When it comes to violent crime,

12    there is no reliable evidence of a general deterrent effect.

13    THE COURT:  Well, we're interested in deterring the

14    carrying of guns on the assumption is if there are fewer guns

15    out there, we'll have fewer people killed and fewer serious

16    crimes.

17    THE WITNESS:  I think that's true.

18    THE COURT:  And particularly, if you have gun-to-gun

19    adolescents.

20    THE WITNESS:  Can I describe, your Honor, some

21    research that did happen in New York and, in fact, Brooklyn

22    was one of the places where we did the study.  So I think -- I

23    didn't raise it in here because it really wasn't research

24    about deterrence, but what it was research about people who --

25    young men who were between the ages of 18 and 25 or 26 who

*Proceedings*                                               *51*

1    were engaged in gun violence.

2            So it give you a very quick study.  We interviewed

3    400 young men.  The interviews were done by people who --

4    myself and my colleagues.

5            THE COURT:  Is that a published study?

6            THE WITNESS:  Published.  I can give you particular

7    points in my can CV of the studies.

8            THE COURT:  Are they in your report?

9            THE WITNESS:  It's not in the report.  I didn't

10   include it, your Honor, because I think it was not about

11   deterrence.  The study wasn't about deterrence, it was about

12   the decision making, the process the young men went through in

13   deciding whether or not to carry a gun and whether or not to

14   use a gun.

15           So we interviewed 400 young men.  This took place

16   between 1996 and 1999, 1998.  And the articles were published

17   in '99, 2002, and 2005 and so on.  So what we found was the

18   reasons why they carried a gun largely had to do with

19   self-defense.  In some instances, they carried a gun because

20   it gave them some status in the community.  In some cases, it

21   would help them as an instrument to complete a robbery if

22   there was something they wanted to get, money or some other

23   thing, or in some cases drugs.  It's interesting that drugs

24   were not a big issue for this group of people.  The two

25   neighborhoods, by the way, were East New York and the

# Appendix to Response to Government Memo A69

*Proceedings*                                                              *52*

1   South Bronx where we did the interviews.

2          I also interviewed people who were in jail as well

3   as people who were on the street as well as people who had

4   been shot themselves and who were victims of gun violence.  So

5   it was a very elaborate study.

6          The thing that they told us which was interesting

7   was we asked them, actually, at some point about the police.

8   When I started to think about deterrence and policing and

9   thinking about my studies on the New York City policing

10  regime.  We asked them -- we went back and look at all of the

11  interviewed transcripts and we looked for mentions of the

12  police.  And some number, some percentage of them mentioned

13  the police in one way or another.  But most of them said the

14  police were never around, and police just weren't a factor in

15  their decision making as to whether or not to use a gun and

16  whether or not to carry a gun.

17         Later on, some people had said they had started to

18  carry, they had used shared guns because they were somewhat

19  afraid of being caught by the police with a gun, in which

20  case, they would have been arrested.  But, you know, I don't

21  know if they knew it or not, but simply carrying a gun in

22  New York doesn't get you a very stiff sentence.  It

23  essentially can be a misdemeanor or a very low-level felony.

24         But they were conscious of the fact that there were

25  no police so there were no risks of apprehension.  The idea of

# Appendix to Response to Government Memo A70

*Proceedings*                                              53

1  going to prison almost never came up in any of the, in any of

2  the interviews that we gave including some of the young men

3  who had spent a year in Rikers.  Very few of them had done any

4  kind of time upstate.

5          So what I think what's interesting this cost benefit

6  calculation had much more to do with the events immediately

7  when they were making their decision about whether or not to

8  use a gun or even to carry a gun.  And, again, they did it --

9  a lot of it was done out of threat when they felt, they

10 perceived a threat to themselves; or for reasons that were, as

11 you mentioned, really childish reasons:  They want status,

12 they want to look like a big man, and so on.

13         Some of them had some mental illness.  There was one

14 young man who said, he just didn't feel comfortable without

15 carrying a weapon and his reasons were very strange.  I'm not

16 a psychologist, but it wasn't hard to tell that there was some

17 symptoms at work with this young man.  And this was a time

18 just really coming off the peak of gun violence in New York in

19 the late 1990s.  The violence had peaked around '96 or so.

20         So the lack of presence of the police in studying

21 these 400-and-some-odd young men, I think, was really quite

22 prominent, and it speaks to the questions that I tried to

23 address in the report.  There was no deterrent effect for

24 these guys because there was no police around and this was

25 even in an era when stop and frisk was really ramping up in

# Appendix to Response to Government Memo A71

|  | *Proceedings*                                              *54* |
|---|---|
| 1 | New York. |
| 2 | MR. MILLER:  Your Honor, may I ask a question? |
| 3 | EXAMINATION BY |
| 4 | MR. MILLER: |
| 5 | (Continuing.) |
| 6 | Q    Just on that point that you were just discussing, you're |
| 7 | saying effectively that the people you interviewed didn't |
| 8 | think about prison, right, just wasn't part of the what came |
| 9 | up in the discussion. |
| 10 | A    No.  The only thing -- that's right, it didn't come up in |
| 11 | discussions.  They did think about the police, and they -- the |
| 12 | ones who were asked about the police said the police aren't |
| 13 | around, we're not worried about it. |
| 14 | Q    You also said that the state prison sentences for gun |
| 15 | crimes during that time were quite low? |
| 16 | A    Well, for carrying a gun. |
| 17 | Q    Correct. |
| 18 | A    Right. |
| 19 | Q    Yes.  Okay. |
| 20 | A    I think it's important.  Carrying a gun is different than |
| 21 | an armed robbery.  It's a very different offense and the |
| 22 | prison sentences as you know are quite high. |
| 23 | THE COURT:  We put a lot of effect on carrying in |
| 24 | federal. |
| 25 | MR. MILLER:  It's the crime that's at issue. |

# Appendix to Response to Government Memo A72

*Proceedings*                                                    55

1          THE WITNESS:  Felon in possession, yes.  It's
2     different than New York State.
3          THE COURT:  I give a lot of weight to carrying.  My
4     calculus is you carry a gun, you're going to get a heavy
5     sentence.  Much heavier because it will deter you and
6     incapacitate you, but it will also deter others.  That's the
7     way I've been sentencing now for quite a few years.  I think
8     probably most judges in this court sentence that way.  We're
9     all under that misapprehension.
10          I think, all tolled, you can say that tens of
11     thousands of extra months or days in prisons was served as a
12     result of the misapprehension of me and other judges in this
13     courthouse that if we hit them with a heavy sentence that we
14     can.
15          I remember, and I sometimes get ashamed when I think
16     of it, at one of the first sentences I had was a man who was
17     otherwise pretty good he had a good marriage, he had children,
18     he gave to charity, had been a veteran and he did something, I
19     forget the crime, it was a white collar crime, substantial tax
20     evasion or something like that.  And I gave him a stiff
21     sentence and he blanched.
22          So I explained to him, and in retrospect it sounds
23     absurd, you can think of yourself as making a contribution to
24     society in deterring other people from doing the same thing.
25     But I take it that at least in most crimes that we have here

# Appendix to Response to Government Memo A73

*Proceedings*                                                    *56*

1  involving drugs and things like that that was an insane

2  statement to make almost; right?

3          THE WITNESS:  Unless the statute -- it is an insane

4  statement.  It's an inefficient statement.  I can't go to the

5  mental state of the people.

6          THE COURT:  It's got no rationality, I would say

7  it's insane.

8          THE WITNESS:  Unless there is some underlying

9  unspoken theory of incapacitation.

10         THE COURT:  Well, you know, we've gone through this

11  with respect to specific crimes.  The Rockefeller thesis was

12  if you're really whack them hard, it's a good thing because

13  other people won't get involved.  That didn't work at all,

14  right, that was clear.

15         We had it with the guns.  We have to with the people

16  who look at child pornography, I think, to a large extent

17  based on what I've observed.  And what crime may be fraud by a

18  securities person.

19         THE WITNESS:  I would think white collar crimes

20  would be an appropriate target for a deterrence based

21  sentencing rationale.

22         THE COURT:  General deterrence and also specific.

23         THE WITNESS:  Both.

24         THE COURT:  On the ground, first, that they're used

25  to thinking more rationally perhaps and they got more to lose.

# Appendix to Response to Government Memo A74

*J. Fagan - Cross/Mr. Miller*                    **57**

1          THE WITNESS:  Yes.

2          MR. MILLER:  May I, Judge.

3          THE COURT:  Yes, I'm just trying to see what impact

4    all of this has on this defendant.

5    CROSS-EXAMINATION

6    BY MR. MILLER:

7    (Continuing.)

8    Q     Professor, can I direct your attention to

9    Government Exhibit 2, which is one of the reports, one of the

10   studies that you cite in your report?

11   A     Yes.

12   Q     It's the Bhatti and De Caro Study.  Did I say that

13   correctly?

14   A     Yes.

15   Q     This is one the studies you cite as a recent review of

16   deterrence literature?

17   A     Yes De Caro is my research assistant.

18   Q     I would like to direct your attention to the abstract

19   that's on the first page of the report?

20   A     Yes.

21   Q     About five lines up from the bottom, it says, "Results

22   indicate that a comparison of the counterfactual and actual

23   offending patterns suggest that most releasees were either

24   deterred from future offending, 40 percent, or merely

25   incapacitated by their incarceration, 56 percent."  Correct.

*J. Fagan - Cross/Mr. Miller*                    **58**

1          That's what the report says, yes?

2    A    Yes.

3    Q    And the report says that most releasees were either

4    deterred -- one of the things is they were deterred from

5    future offending, that's 40 percent of the releasees?

6    A    Correct.

7              MR. MILLER:  Your Honor, I move to admit this study.

8              THE COURT:  Admitted.

9              (Government's Exhibit 2 was received in evidence as

10   of this date.)

11   Q    Now, turning to Government Exhibit 3 that's Nagen and

12   Pogarski; is that right?

13   A    Pogarski, Greg Pogarski.

14   Q    This is also one of the studies you cite in your report?

15   A    Yes.

16   Q    This is a study that you cite in your report as a

17   laboratory experiment simulating deterrence conditions?

18   A    Yes.

19             MR. MILLER:  I move to admit Government Exhibit 3.

20             THE COURT:  Yes.  Admitted.

21             (Government's Exhibit 3 was received in evidence as

22   of this date.)

23   Q    This is generally an experiment on college students on

24   whether they would drive drunk under certain conditions?

25   A    Correct.

# Appendix to Response to Government Memo A76

J. Fagan - Cross/Mr. Miller                    59

1  Q    I would like to direct your attention to Page 877 of the

2  report.  I want to take your attention to the first sentence

3  of the last paragraph on the page.  This is in the results

4  section; correct?

5  A    Mm-hmm.

6  Q    And the report here says, "We find both a certainty and a

7  severity effect."

8  A    Yes.

9  Q    And this is studying a model of general deterrence;

10 correct?

11 A    Yes.  For college students in the condition of drunk

12 driving.

13 Q    This is an experiment on general deterrence?

14 A    Of drunk driving, not of gun violence.

15 Q    And they found both a certainty and a severity effect?

16 A    For drunk driving, yes.

17 Q    Okay.  And if you look at the bottom of Page 878?

18 A    Yes.

19 Q    Four lines up from the bottom, it says, "As for the

20 severity effect, its coefficient estimate applies that a

21 ten-month increase in the suspension period would reduce the

22 drunk driving probability by 6.8 percent."  Correct?

23 A    For drunk driving, yes.

24 Q    That's what the report says.

25 A    Yes.

# Appendix to Response to Government Memo A77

J. Fagan - Cross/Mr. Miller                                    60

1    Q    Now, I would like you to turn to Government Exhibit 4.

2          Government Exhibit 4 is a report that you cite by

3    Rosenfeld, Formango, and Balmer; correct?

4    A    Yes.

5          MR. MILLER:  And I move to admitted

6    Government Exhibit 4.

7          THE COURT:  Admitted.  3 and 4 are admitted.

8          (Government's Exhibits 3 and 4 were received in

9    evidence as of this date.)

10   Q    This is one of the studies that you talk about before

11   that studied the effects of Project Exile?

12   A    Correct.

13   Q    And that is a gun sentencing enhancement study -- regime

14   in Richmond, Virginia?

15   A    Correct.

16   Q    I would like you to turn to Page 424 of

17   Government Exhibit 4 and Page 437 of Government Exhibit 4.

18         And on Page 437 of Government Exhibit 4, I direct

19   your attention to the last paragraph.  And the report says,

20   "In summary, we find evidence consistent with an intervention

21   effect on homicide trends for Richmond's Project Exile.

22   Richmond's firearm homicide rate fell more rapidly than the

23   average firearm homicide rate among large U.S. cities with

24   other influences controlled."  Correct?

25   A    Yes.

# Appendix to Response to Government Memo A78

J. Fagan - Cross/Mr. Miller                                61

1  Q    And Project Exile was premised on bringing enhanced

2  prison sentences for firearms offenses; correct?

3  A    Yes.

4  Q    I would like to turn your attention to

5  Government Exhibit 5 which is the Raphael and Ludwig study;

6  correct?

7  A    Yes.  Can we -- am I allowed to ask questions.

8  Q    No, I ask the questions right now.

9          THE COURT:  Exhibit 5?

10         MR. MILLER:  Yes, we'd like to move that into

11 evidence, your Honor Government Exhibit 5.

12         (Government's Exhibit 5 was received in evidence as

13 of this date.)

14 Q    Let's turn to Page 254 of Government Exhibit 5.

15         This is again a study on Project Exile; correct?

16 A    Correct.

17 Q    About halfway down the page, the first sentence of the

18 last page, "The most compelling effort to date to isolate the

19 causal effects of sentencing enhancements come from Daniel

20 Kessler and Steven Levitt who analyzed the effects of

21 enhancements introduced by Proposition 8 in California.

22         That's what the report says; correct?

23 A    What page are you on?

24 Q    255?

25 A    Okay.  Yes.

# Appendix to Response to Government Memo A79

*J. Fagan - Redirect/Mr. Jacobson*                62

1    Q    And down the page about five lines up from the bottom,

2    the authors -- the report says, "The authors find a short-term

3    reduction in crimes covered by the enhancements of around four

4    percent, presumably, the result of the law's deterrent effect

5    on criminals."  Correct?

6    A    Yes.

7    Q    Now, we look at Page 263.  I want to take you to the last

8    paragraph.  This is the authors of this report writing, "Taken

9    at face value, the patterns discussed above are not

10   inconsistent with the real effect of Project Exile on the

11   number of homicides committed with firearms."  Correct?

12   A    Correct.

13            MR. MILLER:  No further questions, your Honor.

14            THE COURT:  Any redirect.

15            MR. JACOBSON:  Briefly, your Honor.  Thank you.

16   REDIRECT EXAMINATION

17   BY MR. JACOBSON:

18   Q    Professor Fagan, the Government just took you on a tour

19   of some snippets of the studies that were cited in your

20   report, can you speak to whether the Richmond study, for

21   example, was able to tease out specific versus incapacitory

22   versus general deterrent effects and how that would affect the

23   model in these studies?

24   A    No, they were trying to look at -- it's not clear

25   whether -- certainly, they weren't able to control for

# Appendix to Response to Government Memo A80

*J. Fagan - Redirect/Mr. Jacobson*                                        63

1    incapacitation effects.

2              But as I recall the study, if we go on past Page 264

3    and into 265 and beyond, I think we find a little bit more

4    equivocal evidence on the claims that they make.  And I think

5    if we go to the bottom of 267 and beyond, they say, "to

6    summarize the large increase in homicide rates occurring

7    during the late 1980s in Richmond coupled with the inverse

8    relationship between earlier and later changes in homicide

9    rates observed among other U.S. cities, cast serious doubt on

10   the validity of previous claims about the effect of Project

11   Exile.  And adjusting the decline in Richmond's homicide rates

12   for the increase in murder rates during the 1980s, leaves

13   little residual decline in need of explanation."

14   Q    And the Government mentioned what those -- exactly what

15   deterrent effects came out of it in terms of the number.  Is

16   that statistically significant in terms of the general

17   deterrent effect that they found versus isolating for

18   incapacitation and specific deterrence?

19   A    If you look at Table 7-3 on Page 270 there don't seem to

20   be statistically significant effects there.

21   Q    And since we're talking about incapacitation as it

22   relates to these studies, would you say that incapacitation is

23   more closely linked to the notion of specific deterrence, or

24   generally deterring future offenders?

25   A    It confounds any attempt to identify a general deterrent

Appendix to Response to Government Memo A81

*J. Fagan - Redirect/Mr. Jacobson*                          **64**

1    effect because a person -- because it assumes that people who

2    are in prison, who were active gun offenders, may not be

3    shooting their guns when they're out on the street.

4              And so, if there's a reduction in homicides, it

5    could be because there's a general deterrent effect, or

6    because the people who were the active shooters don't have the

7    opportunity to shoot and we cannot disentangle those two

8    effects.

9    Q    And is the question of recidivism a question of specific

10   or general deterrence?

11   A    Specific deterrence.

12   Q    You had discussed -- testified previously about the

13   difference in decision making between white collar defendants

14   and gun offenders.  And the Government has also asked you

15   about a drunk driving study.  Is there reason to believe that

16   decision making amongst a pool of potential drunk drivers

17   would be different from gun offenders in, say, Brooklyn?

18   A    Well, drunk drivers are a fairly large swath of the

19   population, unfortunately.  We don't know how large because we

20   don't know the true rates of drunk driving but we know that

21   check points for drunk driving seem to be able to catch a

22   number of drunk drivers.

23             I don't believe that there are -- that that

24   population of drunk drivers is comparable in any way to the

25   population of people who carry guns, and certainly, not

# Appendix to Response to Government Memo A82

*J. Fagan - Redirect/Mr. Jacobson*                65

1    comparable to the population of people who use guns.  So

2    extrapolating from drunk driving -- gun carrying to gun

3    violence is more than risky.

4    Q    And you had also discussed the interviews that you

5    conducted with potential offenders in East New York.

6            Does that point to considerations that they had that

7    would be different from the larger pool of drunk drivers as

8    you said?

9    A    I think they were a very, very different population than

10   the larger pool of drunk drivers.  There's really nothing

11   quite comparable.

12   Q    And the Court asked you or pointed to the statute

13   §3553(a) and it does say that one of the purposes of

14   sentencing or factors in sentence something to afford adequate

15   deterrence; is that right?

16   A    Yes.

17   Q    Does the statute say what weight should be placed on the

18   notion of general deterrence for any specific defendant or

19   type crime?

20   A    Not in my reading of the statute.  And my read is that it

21   doesn't seem to distinguish.  The text doesn't seem to

22   distinguish from specific to general deterrence.

23           MR. JACOBSON:  Nothing further, your Honor.

24           MR. MILLER:  Nothing further from the Government.

25           THE COURT:  So if you had an area in New York or any

# Appendix to Response to Government Memo A83

*J. Fagan - Redirect/Mr. Jacobson*                **66**

1    other place, and there are differences in crime committed and

2    differences in carrying guns, and you had a high gun-carrying

3    area.  If you were economically given a certain amount of

4    money, I take it your feeling would be put it out and police

5    on the street so they could catch quickly and, what, punish

6    lightly, relatively, compared to picking up people at random

7    as a small percentage of the total gun carriers and giving

8    them heavy sentences and paying the costs in prison and the

9    like?

10            THE WITNESS:  The National Academy report is

11   consistent with much of the writing in this area.

12            THE COURT:  Do we have it?

13            THE WITNESS:  No, I didn't cite to it, your Honor,

14   I'm sorry.  I think the studies that I cited actually were --

15            THE COURT:  Excuse me?

16            THE WITNESS:  The studies that I cited in the

17   report, in my report, are actually consistent with the

18   conclusions of the National Academy report.

19            THE COURT:  When was that report?

20            THE WITNESS:  It was issued, I believe, in either I

21   want to say 2014.  It's very recent.  It's very recent.

22            One of the things --

23            THE COURT:  Give us a citation and we'll get it for

24   our library.

25            THE WITNESS:  Okay.  I can send it by e-mail --

# Appendix to Response to Government Memo A84

*J. Fagan - Redirect/Mr. Jacobson*                    67

1    THE COURT:  Yes.

2    THE WITNESS:  -- to Mr. Mr. Jacobson.

3    One thing I wanted to say is they do go into

4  recommendations, or at least the implications of the research.

5  And one of the implications of the research is that funding

6  should be redirected from prisons to police.  Under the

7  assumption that they would there would be a much greater

8  effect on crime of increasing the risk of apprehension than

9  there would be by lengthening the sentences that convicted

10  offenders receive.  They were very, very clear on that.

11    They don't necessarily talk specifically about gun

12  violence, but I think they're making assumptions that this

13  applies across the board.  There's a couple of other papers

14  that go that this detail and fairly sophisticated empirical

15  arguments about those, so I would be happy to produce those

16  cites to the Court.

17    THE COURT:  That would also imply, wouldn't it,

18  greater reliance on picking up people almost at random rather

19  than waiting for crimes to be committed.

20    THE WITNESS:  I think the theory is that the

21  presence of police and a fairly proactive enforcement regime

22  where they respond to signals of crime very immediately seems

23  to be a way to communicate to the offender that there is risk.

24  We don't have really good experiments to say whether or not

25  the effect is achieved simply by the presence of police, or by

# Appendix to Response to Government Memo A85

*J. Fagan - Redirect/Mr. Jacobson*    **68**

1    what the police do when they're actually on the ground in

2    those places and that would be very helpful to know.  And I

3    think that much of the stop and frisk regime, not to debate

4    about that in New York, tried to disentangle that question.

5            But my strong sense of reading the literature on

6    this, and my own research, is the presence of police is a much

7    more effective deterrent than a regime where people are

8    arrested and put away.

9            When Professor Zimmering did his report on the study

10   crime decline in New York that was published in 2011, his

11   conclusions, after reading the data, were very much the same;

12   that it was the heightened presence of the police much more so

13   than incarceration.  He did actually look at incarceration

14   effects --

15           THE COURT:  They weren't proactively stopping and

16   searching?

17           THE WITNESS:  He ducked that question, your Honor.

18           THE COURT:  He ducked it.

19           THE WITNESS:  Yes.  He said there's something about

20   the police.  The way the police are managed, the way the

21   police are deployed, the way they're allocated to very

22   specific hot spots of crime to exert their influence there,

23   but you stopped short of saying that any particular tactic was

24   more effective than another tactic take.  This was the

25   conclusion of the Academy report as well.

*J. Fagan - Redirect/Mr. Jacobson*                **69**

1    THE COURT:  Of course, it might antagonize the local

2    population to have all those people, right?  That's another

3    factor.  And the privacy factors of having the police flood an

4    area.

5    THE WITNESS:  Yes, your Honor.  That's absolutely

6    right.  I've written about that as well.  It's a very delicate

7    balance to deploy the police.

8    THE COURT:  In any event, is it accurate to sum up

9    your testimony at least with respect to adolescents up to the

10   age of 25, let's say, that heavier sentences do not lead to

11   proportionally less crimes through general deterrence?

12   THE WITNESS:  For violent crimes and for gun crimes.

13   That seems to be where the evidence goes.

14   THE COURT:  Well, of course, that's why we're

15   punishing gun crimes to avoid gun crimes.

16   THE WITNESS:  Correct.  In my report, your Honor,

17   just on this question, we mentioned a particular program in

18   Chicago that I was involved in evaluating the program called

19   the Project Safe Neighborhoods Program which was really an

20   alternative to the -- it was a deterrence model, but it was

21   very much of a specific deterrence model coupled with the idea

22   of raising the benefits of not doing the crime.  And when --

23   and this was for gun offenders in Chicago who were, like gun

24   offenders in any other places, mostly poor, living in

25   conditions of poverty and other high-crime neighborhoods and

# Appendix to Response to Government Memo A87

*J. Fagan - Redirect/Mr. Jacobson*          70

1    so on.

2            And in this effort, what they did what the program

3    did was to raise the net benefit of avoiding crime by

4    intervening with gun offenders who had been on probation or

5    parole, and giving them job training and access to jobs and

6    housing support and mental health and healthcare.  Just the

7    range of social services and interventions.  And they stayed

8    out of crime and we compared them.

9            We compared different neighborhoods.  We had two

10   otherwise perfectly matched neighborhoods.  And in the

11   neighborhoods where the gun offenders were participating in

12   the PSN Program, the gun violence rates went down fairly

13   dramatically in five years while we were in the program.

14           And this is the same situation that was studied in

15   Cease Fire in Boston, which is mentioned in one of the items

16   that I reviewed, but it's a pretty well-known program where

17   they did the same thing.  There was a religious element to

18   that program where the police and the probation officers and

19   the clergy all intervened together and gave the same message:

20   If you mess up, if you commit another crime, we're going to

21   lock you up.  If you get a job and go to school and obey the

22   law, we will give you every support you need to stay straight

23   and avoid crimes.  So they raised the benefit of going

24   straight and also raised the cost of doing the crime.  And

25   this program was extremely successful for five or six years.

# Appendix to Response to Government Memo A88

*J. Fagan - Redirect/Mr. Jacobson*                    71

1        THE COURT:  The cost being what?  Elimination from

2    the program?

3        THE WITNESS:  No, the cost would be if you were

4    caught doing another crime you would be in prison.

5        THE COURT:  General deterrence.

6        THE WITNESS:  Yes.  Specific deterrence in that

7    case.  It was specific.  But the results of that program in

8    the neighborhoods was concentrated.  Actually, it was in

9    several neighborhoods in Boston.  The juvenile homicides rates

10   in Boston went to zero for two or three years and stayed at an

11   extremely low level for several years.

12       THE COURT:  Well, it's hard to tell whether that's

13   the job programs.  You get jobs for people, they don't get

14   driven to crime because they're not -- they don't have money

15   in their pockets.

16       THE WITNESS:  From a deterrence perspective, your

17   Honor, it also suggests that if you think about the net

18   benefit/net cost ratio, then the net benefit of avoiding the

19   crime is much greater and the cost --

20       THE COURT:  Is what?

21       THE WITNESS:  Much greater.

22       The cost of doing the crime is the same.  If you're

23   caught, you're going to get punished.  But the net benefit of

24   avoiding the crime increases and then competes with, or if not

25   exceeds the benefit of doing the crime.

# Appendix to Response to Government Memo A89

*J. Fagan - Redirect/Mr. Jacobson*                72

1       THE COURT:  So with respect to an adolescent and gun

2   crimes, we ignore general deterrence taken into consideration

3   of possible specific.

4       THE WITNESS:  That's a hard question, your Honor.  I

5   think if you take a strictly utilitarian view, there can be --

6   there might be a general deterrent effect, but certainly, we

7   don't need extremely long sentences to achieve it.

8       THE COURT:  What's an extremely long sentence?

9       THE WITNESS:  Well.

10      THE COURT:  Where do you draw that line when you

11  cross over from a light sentence into one that is very harsh?

12      THE WITNESS:  That's a difficult question, your

13  Honor.  My guess is that there are many factors that would go

14  into that calculation.  The nature of the incarceration

15  itself.  Going to Attica would be quite different than going

16  to a small residential program with 30 young men in a pod in a

17  facility.

18      THE COURT:  I've in a number of recent opinions, you

19  have to consider the nature of the incarceration in

20  determining the length of the sentence.

21      THE WITNESS:  Yes, I think that's right.

22      THE COURT:  Some of these criminals have mental

23  problems that, I guess, make it more difficult for them to

24  respond in a sensible way.

25      THE WITNESS:  That seems to be the evidence.

# Appendix to Response to Government Memo A90

*J. Fagan - Redirect/Mr. Jacobson*          73

1          THE COURT:  Okay.  Well, Counsel, I have nothing to
2    ask.  I would like to go up and listen to your lecture but
3    unfortunately I have other matters to attend to.
4          THE WITNESS:  It's "women in prison" today.
5          THE COURT:  Excuse me.
6          THE WITNESS:  It's "women in prison."  It's a
7    seminar on incarceration.
8          THE COURT:  Women in Prison.  Okay.  Thank you very
9    much.
10          THE WITNESS:  Thank you, your Honor.
11          THE COURT:  And if you want to send us that other
12    study.
13          MR. JACOBSON:  We'll file a letter with the Court
14    with the citations.
15          THE COURT:  The American Academy of Arts and
16    Sciences have a publication on just this issue, too?
17          THE WITNESS:  I haven't seen it.
18          THE COURT:  Okay.  Thank you very much.  Are we
19    going to have another witness?
20          MR. LIFSHITZ:  Your Honor, the Government is
21    prepared to proceed to sentence.  I don't think there are any
22    witnesses from either side.
23          THE COURT:  I'm not prepared.  I want to think it
24    through.  Based on everything we knew, what's your number?
25          MR. LIFSHITZ:  Ten years, your Honor.

# Appendix to Response to Government Memo A91

*J. Fagan - Redirect/Mr. Jacobson*          74

1      THE COURT:  How much?

2      MR. LIFSHITZ:  Ten years to protect the community,

3   which far outweighs all the other statutory factors the Court

4   has to consider.

5      THE COURT:  Incapacitation being a major factor.

6      MR. LIFSHITZ:  Exactly, yes.  The factors are

7   weighed differently in each case, and in this case the

8   defendant tried to murder people in the middle of Brooklyn.

9   It can be no more dangerous man appearing before your Honor

10  for sentencing.

11     THE COURT:  Even if they ever showed they tried to

12  murder, it's certainly what we call reckless.

13     MR. LIFSHITZ:  Your Honor, at a minimum.  I think

14  earlier your Honor may have suggested he was not trying to

15  murder people.  We can't show you the people he was trying to

16  kill because the camera footage doesn't show had a side of the

17  street.

18     THE COURT:  It shows some of the people running

19  across he crossing the street.

20     MR. LIFSHITZ:  I strongly oppose reaching the

21  opposite conclusion that he was somehow not trying to murder

22  people.  If he was not trying to murder people, the best way

23  to do that would not -- would be not to fire a gun down the

24  middle of a residential street.

25     THE COURT:  I notice this is a piece of evidence

# Appendix to Response to Government Memo A92

*J. Fagan - Redirect/Mr. Jacobson*          75

1    that shots were fired which seemed to be parallel to the

2    ground, not up into the air which would be a warning kind of

3    thing.  Parallel to the ground.

4              MR. LIFSHITZ:  Yes.

5              THE COURT:  Before the bullets fell to the ground,

6    it would have damaged people that would have been passed.

7              MR. LIFSHITZ:  Let's not forget that he almost

8    killed his own co-conspirator.  That would have been a

9    complete tragedy.

10             THE COURT:  You want to submit any more papers on

11   the basis of this evidence.

12             MR. JACOBSON:  We would rest on our submissions,

13   your Honor.  I think we would like the opportunity to argue

14   it.  I'm happy to respond to the Government's points.  I think

15   one thing that they've been unable to do is to say why the

16   guidelines, which already have all of that conduct built into

17   them, are inappropriate in this case.

18             THE COURT:  The guidelines are what?

19             MR. JACOBSON:  The guidelines that were originally

20   agreed upon by the parties was a Total Offense Level of 15.

21   With his Criminal History Category of II that resulted in 21

22   to 27 months.  We're not asking for any extreme departure.

23   We're just asking for the guidelines that were agreed upon

24   between the parties and provided to the Court in the plea

25   penalty sheet at the guilty plea.

# Appendix to Response to Government Memo A93

*J. Fagan - Redirect/Mr. Jacobson*                76

1      THE COURT:  Were those the agreed-upon guidelines?

2      MR. LIFSHITZ:  Your Honor, there is no plea

3  agreement in this case.  There is no agreement on anything.

4      MR. JACOBSON:  The Government provided a penalty

5  sheet to the Court which had these exact guidelines in them.

6      THE COURT:  Now, what do the calculations lead to.

7      MR. LIFSHITZ:  Your Honor, the PSR has a base

8  offense level of 14, an enhancement for discharging a firearm

9  which is not disputed; and an enhancement for a victim

10  sustaining bodily injury which is not disputed; and the

11  reduction for acceptance of responsibility which we don't

12  dispute.

13      The result is an offense level of 21 and because

14  he's in Category II the guidelines range is 41 to 51 months in

15  custody.  That seems to be the accurate guidelines

16  calculation.  We're asking for more but.  We don't dispute

17  that that's the correctly determined range.

18      THE COURT:  Make a note of that.

19      MR. JACOBSON:  There is some dispute about the

20  guidelines only because the Government did provide the lower

21  guideline to the Court in the plea penalty sheet.

22      THE COURT:  They're not bound by it.

23      MR. JACOBSON:  Of course they're not bound by it,

24  but that's what they thought this case was worth in terms of

25  the guidelines that's what we continue to believe it's worth

# Appendix to Response to Government Memo A94

*J. Fagan - Redirect/Mr. Jacobson*          77

1   in terms of the enhancements.  Even with Probation's

2   additional enhancements, it's still encompasses all the

3   conduct and all of the factors that the Government has now

4   decided warrants a ten-year sentence.  So it's hard to see why

5   those enhancement aren't sufficient in the Government's eyes.

6          The ideas of incapacitation and specific deterrence

7   are already built in to Congress's determinations to the

8   enhancement that Probation has applied in their calculation.

9   If anything, we think all of the other factors in the case

10  would warrant a sentence below the PSR's calculation of

11  41 months.  Mr. Lawrence has spent eight months on home

12  incarceration already.

13         THE COURT:  He's not getting credit for that under

14  the guidelines.

15         MR. JACOBSON:  Not under the guidelines, but it was

16  tantamount to the incarceration at MDC.  He was confined to

17  his home.  His entire family has been here at the court

18  proceedings and has told the Court their feelings about

19  Mr. Lawrence and the support network that they will be

20  providing for him after his incarceratory period is over.

21         Ms. Graham, who is Mr. Lawrence's mother, has

22  actually spoken to the Court on a number occasions and spoken

23  about her son and her feelings about the case and how she's

24  already started to help get on the right track.

25         If your Honor remembers, Mr. Lawrence was actually

# Appendix to Response to Government Memo A95

1  out on bail for much longer than a year in this case before it

2  was federalized.  He was out on bail for ten months and then

3  another number of months on federal bail after he was brought

4  here on this criminal complaint.  No violations that led to

5  revocation.  He was doing well, he was being a good father to

6  his children, which is what he's told the Court a number of

7  owe times is what he wants to do and he has young kids that he

8  would like to be there to provide for.

9        And so, what Professor Fagan said, which, I think is

10  important, in a number of cities they have used more

11  community-based interventions as a replacement for just a

12  longer incarceratory sentence.  They can provide the same,

13  both specific and general deterrent effects.

14        And so, what we're asking the Court for is because

15  there's no official program in New York City, the Court can

16  craft a community-based intervention that would provide that

17  same support and that same model.

18        THE COURT:  You mean through Probation?

19        MR. JACOBSON:  Through Probation, absolutely.  And

20  Ms. Guevara, a social worker in our office, can speak more

21  pointedly to that.  There's a reentry plan that she has

22  prepared with Mr. Lawrence's family and with Mr. Lawrence.

23        THE COURT:  Has that been supplied to the Court?

24        MR. JACOBSON:  We can provide it by letter.  She

25  does have a copy that we can hand up to the Government and to

# Appendix to Response to Government Memo A96

*J. Fagan - Redirect/Mr. Jacobson*      79

1   the Court now.  But as the Court is aware, and in addition to

2   just an incarceratory sentence, their interventions like

3   community service and confinement in a community reentry

4   center, and then supervised release with strict conditions,

5   that, if were violated would bring Mr. Lawrence back before

6   the Court subject to additional incarceration.

7            THE COURT:  Court Exhibit 1 of today's date.

8            (Court's Exhibit 1 was marked in evidence as of this

9   date.)

10           MR. JACOBSON:  I think another important point is

11   Mr. Lawrence, on this case, for this conduct has been out on

12   bail and he's been confined now for a couple months.  But

13   before that, he was out on bail for almost a year and a half.

14   No additional charges, no violations that led to revocation.

15           So I think if we can opinion that positive

16   trajectory.  And I know Ms. Guevara can speak better to what

17   some of those interventions could look like if the Court would

18   it hear from her.

19           THE COURT:  It's your case.  I'm not calling

20   witnesses.

21           MR. LIFSHITZ:  Your Honor, can I respond to some of

22   what was just said?

23           THE COURT:  Yes.

24           MR. LIFSHITZ:  There is absolutely no basis to say

25   there have been no violations.  When he was arrested on his

# Appendix to Response to Government Memo A97

*J. Fagan - Redirect/Mr. Jacobson*                    **80**

1  federal case, he had fraudulent bank cards in his backpack.

2  We moved for detention, Judge Scanlon ordered him released.

3  We appealed to Judge DeArcy Hall and she allowed him to remain

4  released.  She didn't find that he didn't commit the bank

5  fraud.  He had cards in his backpack that were used recently

6  in Brooklyn despite being in the names of people who live

7  outside of New York State.  So he was absolutely committing

8  crimes while on release.

9       And now we're talking about him like he's some

10  adolescent who was caught shoplifting.  He's a 25-year-old man

11  who tried to kill people in the middle of Brooklyn.  The

12  community has to be protected for as long as possible.  No

13  good citizen of Brooklyn should be condemned to live in the

14  same neighborhood as Murray Lawrence for the next ten years.

15  They've tried to make this case.  They're trying to look at it

16  through this very narrow lens of general deterrence, so this

17  expert came and testified.

18       I would submit that if everything the expert said is

19  believed at worst the factor is simply a wash.  He's not

20  saying that a long sentence somehow undermines the purpose of

21  general deterrence, he's just saying it's not served.  And if

22  you listen closely to what he said, what he wrote in his

23  report and what's written in all the reports he relied on, is

24  that you can't disentangle the effect of deterrence versus

25  incapacitation and a million other societal factors that lead

# Appendix to Response to Government Memo A98

*J. Fagan - Redirect/Mr. Jacobson*                    *81*

1  to people committing crimes.

2          He concedes that in some studies drunk driving is

3  reduced by deterrence.  He told you that white collar crime

4  can be reduced by deterrence.  That he would have the Court

5  believe that Mr. Murray Lawrence is part of some community of

6  irrational people who will commit gun crimes whether people

7  who did that are sentenced to probation or ten years.  And I

8  think the Court observed that that was counterintuitive.

9          I think it's crazy.  It borders on offensive and

10  racist to treat people differently in the white collar context

11  and in this context.  And if it were true, he wouldn't be

12  fighting so hard for a lenient sentence.  He wants the most

13  lenient sentence he can possibly get.  He cares about what

14  sentence he gets.  People who are considering committing the

15  crime he committed care about the same thing.  And we know he

16  committed this crime with another person.  If only that other

17  person can be deterred by sentencing Murray Lawrence to ten

18  years, then general deterrence supports a sentence of ten

19  years.

20          So the specific deterrence -- but, again, we've gone

21  down this rabbit hole of deterrence.  It's a statutory factor

22  we absolutely believe it favors a serious sentence.  But, in

23  this case, the need to protect the community from Murray

24  Lawrence outweighs everything else, and a ten-year sentence is

25  warranted.

Appendix to Response to Government Memo A99

*J. Fagan - Redirect/Mr. Jacobson*                    82

1          THE COURT:  All right.  Give me a date about a month

2   from today and we'll sentence him on that date.

3          COURTROOM DEPUTY:  Monday April 24th at 10:30.

4          MR. JACOBSON:  That's fine for us.  Thank you.

5          MR. LIFSHITZ:  That's fine.

6          THE COURT:  Split a set of the transcripts.  See

7   that I get a copy quickly.

8          Thank you very much.

9          MR. LIFSHITZ:  Thank you.

10          MR. JACOBSON:  Thank you.

11          (Defendant exits from courtroom at 2:31 p.m.)

12          (WHEREUPON, this matter was adjourned to April 24,

13   2017, at 10:30 a.m.)

14

15                          *   *   *

16

17                    CERTIFICATE OF REPORTER

18

    I certify that the foregoing is a correct transcript of the
19   record of proceedings in the above-entitled matter.

20

21

22

        _____
24   Anthony D. Frisolone, FAPR, RDR, CRR, CRI
     Official Court Reporter
25

# Appendix to Response to Government Memo A100

83

1                              INDEX

2

3

4    WITNESS:                                        PAGE:

5    JEFFREY FAGAN

6           DIRECT EXAMINATION

7           BY MR. JACOBSON.........................    6

8           CROSS-EXAMINATION

9           BY MR. MILLER..........................   23

10          CROSS-EXAMINATION

11          BY MR. MILLER..........................   57

12          REDIRECT EXAMINATION

13          BY MR. JACOBSON........................   62

14

15                          *****

16

17

18

19

20

21

22

23

24

25

# Appendix to Response to Government Memo A101

84

1

2                          INDEX OF EXHIBITS

3

4    FOR THE GOVERNMENT:                                    PAGE:

5    Government's Exhibit 1, Professor Fagan's report,

6    was received in evidence as of this date............    28

7    Government's Exhibit 6, Video, was received in

8    evidence as of this date...........................    30

9    Government's Exhibit 2 was received in evidence as

10   of this date.......................................    58

11   Government's Exhibit 3 was received in evidence as

12   of this date.......................................    58

13   Government's Exhibits 3 and 4 were received in

14   evidence as of this date...........................    60

15   Government's Exhibit 5 was received in evidence as

16   of this date.......................................    61

17

18   FOR THE DEFENSE:

19   Defendant's Exhibit A was marked in evidence as

20   of this date.......................................     6

21   Defendant's Exhibit B was marked in evidence as

22   of this date.......................................    10

23   Defendant's Exhibits C through J were marked in

24   evidence as of this date...........................    10

25

# Appendix to Response to Government Memo A102

```
 1   COURT EXHIBITS:

 2   Court's Exhibit 1 was marked in evidence as of

 3   this date.........................................   79

 4

 5                        * * * * *

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

('15 - afternoon)                                                          Page 1
# Appendix to Response to Government Memo A103

**'15** [1] - 37:23
**'40s** [1] - 38:18
**'46** [1] - 38:19
**'53** [1] - 38:20
**'96** [1] - 53:19
**'99** [1] - 51:17

## 1

**1** [8] - 28:1, 28:3, 28:7, 31:1, 79:7, 79:8, 84:5, 85:2
**1,200** [1] - 48:21
**1,350** [1] - 48:19
**1,350-some-odd** [1] - 35:12
**10** [5] - 12:19, 34:11, 42:9, 84:22, 84:24
**10:03:20** [1] - 31:2
**10:30** [2] - 82:3, 82:13
**110** [1] - 48:20
**11201** [3] - 1:15, 1:20, 2:4
**11:15** [1] - 1:8
**12:01** [1] - 3:18
**14** [1] - 76:8
**15** [1] - 34:11, 75:20
**150** [1] - 46:12
**16-CR-243** [2] - 3:8, 3:22
**16-CR-243(JBW** [1] - 1:3
**16th** [1] - 1:20
**18** [2] - 48:1, 50:25
**19** [1] - 48:24
**1930s** [1] - 38:18
**1980s** [2] - 63:7, 63:12
**1990s** [2] - 48:24, 53:19
**1996** [1] - 51:16
**1998** [1] - 51:16
**1999** [1] - 51:16
**1:02** [1] - 45:11
**1:03** [1] - 45:16

## 2

**2** [3] - 57:9, 58:9, 84:9
**2(V** [1] - 24:9
**20** [1] - 12:19
**2002** [1] - 51:17
**2005** [1] - 51:17
**2011** [1] - 68:10
**2014** [2] - 37:23, 66:21
**2017** [2] - 1:7, 82:13
**20s** [1] - 48:1
**21** [2] - 75:21, 76:13
**23** [1] - 83:9
**24** [1] - 82:12
**24th** [1] - 82:3
**25** [2] - 50:25, 69:10
**25-year-old** [1] - 80:10
**254** [1] - 61:14
**255** [1] - 61:24
**26** [1] - 50:25
**263** [1] - 62:7
**264** [1] - 63:2

**265** [1] - 63:3
**267** [1] - 63:5
**27** [1] - 75:22
**270** [1] - 63:19
**271** [1] - 1:15
**28** [2] - 1:7, 84:6
**2:31** [1] - 82:11

## 3

**3** [8] - 12:19, 58:11, 58:19, 58:21, 60:7, 60:8, 84:11, 84:13
**30** [2] - 72:16, 84:8
**3:00** [1] - 44:10

## 4

**4** [3] - 60:7, 60:8, 84:13
**40** [2] - 57:24, 58:5
**40-year-old** [2] - 48:5
**400** [2] - 51:3, 51:15
**400-and-some-odd** [1] - 53:21
**41** [2] - 76:14, 77:11
**424** [1] - 60:16
**437** [2] - 60:17, 60:18
**4:00** [1] - 44:5

## 5

**5** [6] - 12:19, 34:11, 61:5, 61:9, 61:11, 61:12, 61:14, 84:15
**5(a** [1] - 28:10
**51** [1] - 76:14
**56** [1] - 57:25
**57** [1] - 83:11
**58** [2] - 84:10, 84:12

## 6

**6** [6] - 28:9, 29:24, 30:6, 83:7, 84:7, 84:20
**6.8** [1] - 59:22
**60** [1] - 84:14
**61** [1] - 84:16
**613-2487** [1] - 2:11
**613-2694** [1] - 2:12
**62** [1] - 83:13
**66** [5] - 41:13, 41:23, 42:1, 42:9, 43:2

## 7

**7-3** [1] - 63:19
**718** [2] - 2:11, 2:12
**75** [1] - 2:4
**79** [1] - 85:3

## 8

**8** [1] - 61:21
**877** [1] - 59:1
**878** [1] - 59:17

## A

**a pod** [1] - 72:16
**a.m** [2] - 1:8, 82:13
**ability** [1] - 47:14
**able** [11] - 13:22, 43:16, 43:17, 47:16, 49:9, 49:13, 49:19, 62:21, 62:25, 64:21
**above-entitled** [1] - 82:19
**absolutely** [6] - 47:20, 69:5, 78:19, 79:24, 80:7, 81:22
**abstract** [1] - 57:18
**absurd** [1] - 55:23
**academic** [4] - 24:23, 25:6, 25:14, 49:23
**Academy** [5] - 37:21, 66:10, 66:18, 68:25, 73:15
**accept** [1] - 37:16
**acceptance** [1] - 76:11
**accepted** [1] - 40:17
**access** [1] - 70:5
**accorded** [1] - 4:15
**according** [1] - 12:5
**accurate** [5] - 11:24, 12:1, 13:6, 69:8, 76:15
**accurately** [1] - 18:12
**achieve** [1] - 72:7
**achieved** [1] - 67:25
**achieving** [1] - 39:23
**act** [2] - 21:16, 47:15
**acting** [1] - 39:8
**active** [2] - 64:2, 64:6
**activity** [5] - 12:11, 16:21, 27:9, 46:21
**acts** [1] - 38:25
**actual** [2] - 18:14, 57:22
**add** [1] - 12:17
**addition** [2] - 40:10, 79:1
**additional** [6] - 31:14, 41:1, 41:20, 77:2, 79:6, 79:14
**address** [1] - 53:23
**adequate** [2] - 24:10, 65:14
**adjourned** [1] - 82:12
**adjusting** [1] - 63:11
**admission** [1] - 30:9
**admit** [2] - 58:7, 58:19
**admitted** [10] - 8:23, 9:1, 9:8, 10:2, 30:5, 58:8, 58:20, 60:5, 60:7
**adolescent** [6] - 8:9, 8:12, 48:5, 48:7, 72:1, 80:10
**adolescents** [5] - 8:11, 47:2, 47:10, 50:19, 69:9
**adopt** [1] - 38:8
**adult** [1] - 8:11
**advertise** [1] - 20:7
**advertising** [4] - 20:17, 20:23, 21:2, 21:11
**affect** [7] - 18:20, 19:1, 21:13, 34:6, 41:24, 43:24, 62:22
**affected** [10] - 26:19, 34:5, 34:9, 35:9, 39:4, 42:7, 43:12, 43:14, 43:20, 45:1
**affidavit** [2] - 9:21, 10:10
**afford** [2] - 24:10, 65:14
**afraid** [1] - 52:19
**afternoon** [5] - 3:14, 3:17, 3:20, 6:7, 46:1

# Appendix to Response to Government Memo A104

**age** [5] - 22:2, 47:19, 48:1, 48:9, 69:10
**Agency** [1] - 7:14
**agenda** [1] - 44:21
**ages** [1] - 50:25
**ago** [1] - 4:22
**agree** [11] - 12:8, 23:10, 23:14, 23:21, 24:22, 27:12, 27:14, 27:20, 27:23, 32:3, 32:13
**agreed** [3] - 75:20, 75:23, 76:1
**agreed-upon** [1] - 76:1
**agreement** [2] - 76:3
**ahead** [4] - 21:23, 23:4, 40:20, 43:9
**aided** [1] - 2:14
**air** [1] - 75:2
**allocated** [1] - 68:21
**ALLON** [1] - 1:16
**Allon** [2] - 3:13, 3:24
**allowed** [2] - 61:7, 80:3
**alluding** [1] - 33:24
**almost** [5] - 53:1, 56:2, 67:18, 75:7, 79:13
**alternative** [1] - 69:20
**alternatives** [1] - 20:3
**America** [2] - 3:8, 3:12
**AMERICA** [1] - 1:3
**American** [3] - 7:22, 38:2, 73:15
**amount** [2] - 49:17, 66:3
**analysis** [2] - 37:7, 39:10
**analyzed** [1] - 61:20
**anger** [1] - 47:13
**answer** [8] - 14:24, 18:23, 33:25, 34:2, 43:8, 45:4, 45:5, 49:16
**answering** [1] - 32:17
**antagonize** [1] - 69:1
**Anthony** [2] - 2:10, 82:24
**apologize** [1] - 6:2
**appealed** [1] - 80:3
**appearances** [1] - 3:10
**appearing** [1] - 74:9
**applied** [2] - 39:11, 77:8
**applies** [2] - 59:20, 67:13
**applying** [1] - 15:23
**apprehended** [2] - 11:16, 14:21
**apprehension** [10] - 11:15, 12:12, 14:20, 15:15, 20:9, 36:12, 36:16, 52:25, 67:8
**approach** [2] - 11:22, 14:10
**appropriate** [1] - 56:20
**approximate** [1] - 49:14
**April** [2] - 82:3, 82:12
**area** [5] - 33:10, 65:25, 66:3, 66:11, 69:4
**areas** [1] - 22:22
**argue** [1] - 75:13
**arguments** [1] - 67:15
**armed** [1] - 54:21
**arrested** [6] - 18:1, 18:5, 33:17, 52:20, 68:8, 79:25
**arrive** [1] - 12:3
**article** [3] - 8:16, 29:20, 45:12
**articles** [7] - 7:24, 8:2, 8:5, 8:6, 25:18, 29:19, 51:16
**Arts** [1] - 73:15
**ashamed** [1] - 55:15
**assembled** [1] - 44:14

**assistant** [1] - 57:17
**Assistant** [2] - 1:17, 3:13
**associated** [1] - 12:9
**assume** [6] - 14:13, 17:18, 20:14, 38:4, 38:13, 49:24
**assumed** [1] - 44:24
**assumes** [1] - 36:24, 64:1
**assuming** [2] - 12:13, 17:6
**assumption** [1] - 11:24, 50:14, 67:7
**assumptions** [1] - 67:12
**attempt** [1] - 63:25
**attend** [1] - 73:3
**attention** [7] - 38:22, 57:8, 57:18, 59:1, 59:2, 60:19, 61:4
**Attica** [1] - 72:15
**Attorney** [2] - 1:14, 3:13
**Attorneys** [1] - 1:17, 1:18
**audience** [1] - 29:25
**authored** [2] - 8:2, 8:15
**authors** [1] - 62:2, 62:8
**average** [2] - 44:24, 60:23
**avoid** [2] - 69:15, 70:23
**avoiding** [3] - 70:3, 71:18, 71:24
**aware** [3] - 41:6, 41:15, 79:1
**awkward** [1] - 6:3

## B

**Bachelor's** [1] - 6:24
**background** [2] - 7:8, 49:20
**backpack** [2] - 80:1, 80:5
**bail** [5] - 78:1, 78:2, 78:3, 79:12, 79:13
**balance** [1] - 69:7
**Balmer** [1] - 60:3
**bank** [2] - 80:1, 80:4
**bargains** [1] - 18:6
**Barnard** [1] - 4:10
**base** [1] - 76:7
**based** [12] - 18:24, 19:19, 19:22, 22:19, 39:8, 39:15, 39:19, 56:17, 56:20, 73:24, 78:11, 78:16
**bases** [1] - 42:21
**basis** [2] - 75:11, 79:24
**bear** [1] - 20:4
**BEFORE** [1] - 1:11
**begin** [2] - 15:2, 31:2
**beginning** [1] - 48:6
**behalf** [1] - 4:4
**behavior** [2] - 21:16, 40:13
**behavioral** [2] - 39:14, 39:17
**behaviors** [1] - 22:13
**believes** [1] - 44:24
**below** [1] - 77:10
**bench** [1] - 3:6
**benefit** [13] - 12:3, 12:17, 16:14, 16:20, 39:10, 44:1, 53:5, 70:3, 70:23, 71:18, 71:23, 71:25
**benefit/net** [1] - 71:18
**benefits** [10] - 11:19, 12:2, 16:16, 16:17, 38:24, 39:1, 39:16, 40:12, 47:16, 69:22
**best** [4] - 18:20, 18:21, 34:22, 74:22
**better** [2] - 6:9, 79:16
**between** [11] - 12:19, 35:3, 35:15,

40:1, 43:1, 49:18, 50:25, 51:16, 63:8, 64:13, 75:24
**beyond** [5] - 30:15, 41:1, 47:25, 63:3, 63:5
**Bhatti** [1] - 57:12
**big** [3] - 45:12, 51:24, 53:12
**biggest** [1] - 20:7
**billboards** [1] - 20:18
**binder** [3] - 4:23, 5:24, 6:11
**bit** [6] - 6:2, 22:21, 31:4, 39:12, 50:8, 63:3
**blanched** [1] - 55:21
**board** [1] - 67:13
**Board** [1] - 44:13
**bodily** [1] - 76:10
**book** [1] - 8:16
**books** [1] - 8:15
**border** [1] - 13:15
**borders** [1] - 81:9
**Boston** [4] - 27:7, 70:15, 71:9, 71:10
**bottom** [2] - 32:6, 57:21, 59:17, 59:19, 62:1, 63:5
**bound** [2] - 76:22, 76:23
**bow** [1] - 40:9
**box** [1] - 11:1
**brain** [1] - 47:3
**brains** [1] - 47:22
**break** [1] - 23:19
**brief** [3] - 23:5, 30:24, 44:15
**briefly** [5] - 10:7, 11:6, 19:18, 31:9, 62:15
**bring** [1] - 79:5
**bringing** [1] - 61:1
**Bronx** [1] - 52:1
**Brooklyn** [16] - 1:5, 1:15, 1:20, 2:4, 26:18, 26:19, 27:2, 27:3, 27:5, 27:8, 50:21, 64:17, 74:8, 80:6, 80:11, 80:13
**brought** [1] - 78:3
**Bruce** [1] - 37:22
**Buffalo** [2] - 7:1, 7:3
**built** [2] - 75:16, 77:7
**bullets** [1] - 75:5
**business** [1] - 7:15
**BY** [15] - 1:16, 1:21, 2:5, 6:6, 9:9, 23:9, 24:19, 40:22, 54:3, 57:6, 62:17, 83:7, 83:9, 83:11, 83:13

## C

**Cadman** [1] - 1:15
**calculate** [1] - 47:3
**calculating** [3] - 38:24, 39:4, 46:10
**calculation** [17] - 11:25, 12:3, 12:17, 14:16, 16:12, 16:15, 16:21, 39:16, 39:21, 43:25, 44:1, 47:15, 53:6, 72:14, 76:16, 77:8, 77:10
**calculations** [15] - 15:4, 39:9, 46:17, 76:6
**calculus** [1] - 55:4
**California** [1] - 61:21
**camera** [3] - 30:25, 31:24, 74:16
**Camera** [1] - 31:1
**cancer** [1] - 21:18
**cannot** [1] - 64:7

# Appendix to Response to Government Memo A105

**capacity** [1] - 47:25
**CAPERS** [1] - 1:13
**capital** [2] - 7:17, 8:7
**cards** [2] - 80:1, 80:5
**care** [1] - 81:15
**career** [1] - 26:24
**careful** [2] - 46:25, 49:9
**cares** [1] - 81:13
**caring** [1] - 22:7
**Caro** [2] - 57:12, 57:17
**carried** [3] - 22:24, 51:18, 51:19
**carriers** [1] - 66:7
**carry** [7] - 23:1, 51:13, 52:16, 52:18, 53:8, 55:4, 64:25
**carrying** [17] - 21:14, 22:1, 22:9, 22:12, 22:18, 23:3, 50:14, 52:21, 53:15, 54:16, 54:20, 54:23, 55:3, 65:2, 66:2
**case** [34] - 3:22, 5:19, 9:18, 10:10, 10:23, 15:19, 15:20, 16:7, 16:25, 17:4, 19:2, 19:24, 26:10, 26:11, 26:14, 26:25, 31:12, 39:7, 41:15, 52:20, 71:7, 74:7, 75:17, 76:3, 76:24, 77:9, 77:23, 78:1, 79:11, 79:19, 80:1, 80:15, 81:23
**cases** [8] - 13:9, 14:5, 26:13, 26:20, 36:24, 47:17, 51:20, 51:23
**cast** [1] - 63:9
**catch** [2] - 64:21, 66:5
**Category** [1] - 76:14
**caught** [12] - 17:1, 17:2, 17:3, 34:10, 36:25, 45:2, 45:3, 46:23, 52:19, 71:4, 71:23, 80:10
**causal** [1] - 61:19
**CAUSE** [1] - 1:10
**caused** [1] - 36:15
**Cease** [2] - 27:7, 70:15
**center** [1] - 79:4
**certain** [3] - 22:22, 58:24, 66:3
**certainly** [7] - 15:16, 42:7, 48:2, 62:25, 64:25, 72:6, 74:12
**certainty** [2] - 59:6, 59:15
**CERTIFICATE** [1] - 82:17
**certify** [1] - 82:18
**chaired** [1] - 37:22
**changed** [1] - 22:2
**changes** [3] - 25:8, 25:11, 63:8
**charged** [2] - 8:14, 16:1
**charges** [1] - 79:14
**charity** [1] - 55:18
**check** [1] - 64:21
**Chicago** [3] - 22:19, 69:18, 69:23
**child pornography** [1] - 56:16
**childish** [1] - 53:11
**children** [2] - 55:17, 78:6
**cigarette** [3] - 21:10, 21:16, 21:17
**cigarettes** [1] - 21:12
**circulated** [1] - 14:23
**circumstances** [1] - 16:11
**citation** [1] - 66:23
**citations** [1] - 73:14
**cite** [9] - 29:18, 29:19, 48:12, 57:10, 57:15, 58:14, 58:16, 60:2, 66:13
**cited** [7] - 25:18, 35:11, 37:20, 43:6, 62:19, 66:14, 66:16
**cites** [1] - 67:16
**cities** [6] - 35:13, 48:21, 48:22, 60:23,

63:9, 78:10
**citizen** [1] - 80:13
**City** [4] - 7:13, 13:13, 52:9, 78:15
**Civil** [2] - 7:2, 9:21
**claims** [2] - 63:4, 63:10
**clarified** [1] - 34:3
**clarify** [2] - 14:24, 43:8
**class** [4] - 43:20, 43:24, 44:24, 48:9
**clear** [4] - 14:17, 56:14, 62:24, 67:10
**clearance** [1] - 17:25
**clergy** [1] - 70:19
**Clinton** [1] - 2:4
**closed** [1] - 46:17
**closely** [3] - 25:16, 63:23, 80:22
**closer** [4] - 21:20, 24:2, 31:4, 31:5
**co** [3] - 33:14, 33:15, 75:8
**co-conspirator** [3] - 33:14, 33:15, 75:8
**coauthor** [1] - 35:12
**code** [1] - 45:13
**coefficient** [1] - 59:20
**cognition** [1] - 40:17
**cognitively** [1] - 39:20
**collar** [8] - 38:23, 46:18, 46:21, 55:19, 56:19, 64:13, 81:3, 81:10
**colleagues** [1] - 51:4
**college** [2] - 58:23, 59:11
**College** [2] - 4:10, 7:12
**color** [1] - 35:7
**colored** [3] - 33:20, 33:22, 34:18
**Columbia** [5] - 7:5, 7:7, 8:17, 38:10, 44:9
**comfortable** [1] - 53:14
**coming** [2] - 30:14, 53:18
**Commission** [2] - 37:7, 47:7
**commit** [4] - 26:9, 70:20, 80:4, 81:6
**commitments** [1] - 49:11
**committed** [5] - 62:11, 66:1, 67:19, 81:15, 81:16
**committing** [3] - 80:7, 81:1, 81:14
**common** [3] - 22:19, 22:21, 40:12
**communicate** [1] - 67:23
**communicated** [6] - 14:7, 17:10, 17:16, 18:10, 18:11
**communities** [6] - 14:18, 17:11, 19:5, 20:18, 21:11, 22:13
**community** [24] - 16:5, 16:9, 19:5, 19:10, 19:19, 19:22, 20:6, 21:21, 22:19, 22:20, 34:25, 41:4, 42:25, 43:11, 51:20, 74:2, 78:11, 78:16, 79:3, 80:12, 81:5, 81:23
**community-based** [2] - 78:11, 78:16
**Comp** [1] - 27:7
**companies** [1] - 21:10
**comparable** [2] - 64:24, 65:1, 65:11
**compared** [7] - 13:9, 27:6, 27:16, 48:7, 66:6, 70:8, 70:9
**comparison** [1] - 57:22
**compelling** [1] - 71:24
**competes** [1] - 71:24
**complaint** [2] - 15:21, 31:12, 78:4
**complete** [2] - 51:21, 75:9
**compliance** [2] - 50:2, 50:4
**complicate** [2] - 28:10, 28:15
**complicates** [1] - 29:10
**component** [1] - 21:2

**components** [2] - 11:13, 11:18
**compromised** [2] - 40:14, 47:10
**Computer** [1] - 2:14
**Computer-aided** [1] - 2:14
**computerized** [1] - 2:13
**concedes** [1] - 81:2
**concentrated** [1] - 71:8
**concerned** [2] - 36:7, 50:11
**concluded** [5] - 13:2, 13:3, 13:7, 13:21, 40:25
**conclusion** [4] - 19:1, 37:19, 68:25, 74:21
**conclusions** [3] - 20:22, 66:18, 68:11
**conclusive** [2] - 34:17, 48:2
**condemned** [1] - 80:13
**condition** [1] - 59:11
**conditions** [5] - 15:8, 58:17, 58:24, 69:25, 79:4
**conduct** [11] - 23:22, 24:10, 25:19, 25:22, 25:25, 26:7, 26:19, 27:2, 75:16, 77:3, 79:11
**conducted** [3] - 22:5, 22:6, 65:5
**confined** [2] - 77:16, 79:12
**confinement** [1] - 79:3
**confounds** [1] - 63:25
**Congress** [3] - 24:13, 44:23, 49:24
**Congress's** [1] - 77:7
**congressional** [1] - 24:16
**connection** [1] - 10:23
**conscious** [1] - 52:24
**consensus** [4] - 12:5, 12:15, 12:21, 15:13
**consequences** [2] - 47:3, 47:11
**consider** [4] - 48:11, 49:24, 72:19, 74:4
**consideration** [3] - 11:18, 11:19, 72:2
**considerations** [1] - 65:6
**considered** [1] - 24:9
**considering** [4] - 14:18, 15:5, 46:20, 81:14
**consistent** [3] - 60:20, 66:11, 66:17
**consistently** [1] - 36:12
**conspirator** [3] - 33:14, 33:15, 75:8
**contacted** [1] - 35:22
**contemplating** [1] - 16:5
**contest** [1] - 40:1
**context** [3] - 16:20, 81:10, 81:11
**contexts** [1] - 37:18
**contingent** [1] - 16:11
**continue** [1] - 76:25
**Continued** [1] - 45:17
**Continuing** [5] - 9:11, 24:21, 40:24, 54:5, 57:7
**contribution** [1] - 55:23
**control** [5] - 7:19, 8:20, 8:21, 49:19, 62:25
**controlled** [1] - 60:24
**conventional** [1] - 39:15
**conversation** [1] - 47:21
**convicted** [5] - 12:13, 18:3, 18:4, 33:17, 67:9
**conviction** [4] - 11:9, 12:14, 37:10, 39:15
**convictions** [1] - 37:10
**convincing** [1] - 38:20

(copy    developed)                                                      Page 4

Appendix to Response to Government Memo A106

copy [2] - 78:25, 82:7
corner [1] - 32:24
correct [33] - 25:7, 27:13, 28:16, 28:20, 28:25, 29:5, 29:21, 32:6, 32:7, 32:9, 32:10, 41:21, 54:17, 57:25, 58:6, 58:25, 59:4, 59:10, 59:22, 60:3, 60:12, 60:15, 60:24, 61:2, 61:6, 61:15, 61:16, 61:22, 62:5, 62:11, 62:12, 69:16, 82:18
correctly [2] - 57:13, 76:17
cost [15] - 11:16, 12:3, 12:17, 16:16, 39:10, 39:15, 39:22, 47:16, 53:5, 70:24, 71:1, 71:3, 71:18, 71:19, 71:22
cost/net [1] - 44:1
costs [15] - 11:11, 11:19, 11:25, 12:2, 12:9, 15:9, 15:16, 16:16, 16:18, 17:17, 40:10, 43:22, 44:3, 66:8
Counsel [2] - 3:10, 73:1
counsel [1] - 3:23
count [1] - 8:1
counter [1] - 44:23
counterfactual [1] - 57:22
counterintuitive [3] - 35:18, 37:15, 81:8
couple [3] - 20:21, 67:13, 79:12
coupled [2] - 63:7, 69:21
course [5] - 15:5, 45:14, 69:1, 69:14, 76:23
courses [3] - 8:17, 8:21, 8:22
Court [29] - 2:10, 2:11, 3:4, 4:23, 10:19, 11:21, 30:12, 47:17, 65:12, 67:16, 73:13, 74:3, 75:24, 76:5, 76:21, 77:18, 77:22, 78:6, 78:14, 78:15, 78:23, 79:1, 79:6, 79:7, 79:17, 81:4, 81:8, 82:24
court [23] - 3:1, 3:2, 4:4, 5:7, 8:9, 8:10, 8:23, 9:2, 13:9, 16:7, 17:4, 17:5, 17:7, 20:12, 23:18, 31:20, 36:17, 41:16, 46:3, 55:8, 77:17, 85:1
Court's [3] - 5:23, 79:8, 85:2
courthouse [1] - 55:13
Courthouse [1] - 1:5
courtroom [6] - 3:18, 4:8, 30:15, 45:11, 46:5, 82:11
COURTROOM [7] - 3:3, 3:7, 3:21, 5:10, 5:15, 5:17, 82:3
courts [2] - 18:20, 47:25
covered [1] - 62:3
craft [1] - 78:16
crazy [1] - 81:9
credit [1] - 77:13
CRI [2] - 2:10, 82:24
crime [55] - 9:6, 11:12, 11:19, 11:20, 12:3, 12:4, 12:12, 12:14, 13:12, 14:19, 15:5, 16:5, 16:18, 17:25, 18:4, 23:15, 24:22, 25:6, 27:18, 27:24, 36:22, 36:23, 38:13, 39:10, 44:2, 44:3, 46:19, 48:22, 50:11, 54:25, 55:19, 56:17, 65:19, 66:1, 67:8, 67:22, 68:10, 68:22, 69:22, 69:25, 70:3, 70:8, 70:20, 70:24, 71:4, 71:14, 71:19, 71:22, 71:24, 71:25, 81:3, 81:15, 81:16
crimes [32] - 12:22, 12:24, 13:12, 13:20, 13:23, 18:2, 19:14, 20:19, 21:22, 25:16, 26:9, 27:4, 37:1, 41:3, 50:16, 54:15, 55:25, 56:11, 56:19, 62:3, 81:5

69:11, 69:12, 69:15, 70:23, 72:2, 80:8, 81:1, 81:6
CRIMINAL [1] - 1:10
Criminal [2] - 7:12, 7:13
criminal [24] - 3:7, 3:21, 7:11, 8:9, 8:12, 8:13, 8:15, 8:19, 12:10, 16:21, 23:11, 23:22, 23:25, 24:5, 24:10, 26:6, 27:2, 27:9, 31:11, 38:23, 48:5, 48:6, 78:4
Criminal History Category [1] - 75:21
criminals [3] - 26:22, 62:5, 72:22
criminology [1] - 8:20
Criminology [2] - 7:23, 49:21
crook [1] - 46:12
CROSS [4] - 23:8, 57:5, 83:8, 83:10
cross [2] - 31:17, 72:11
CROSS-EXAMINATION [4] - 23:8, 57:5, 83:8, 83:10
cross-examination [1] - 31:17
crossing [1] - 74:19
CRR [2] - 2:10, 82:24
current [1] - 7:4
curriculum [2] - 6:14, 49:22
custody [1] - 76:15
CV [2] - 6:14, 51:7

## D

damaged [1] - 75:6
dangerous [5] - 21:17, 33:5, 33:8, 33:9, 74:9
Daniel [1] - 61:19
dark [8] - 31:22, 31:24, 32:5, 33:16, 33:22, 34:7, 34:14, 34:19
dark-colored [1] - 33:22
data [3] - 15:3, 36:9, 68:11
date [14] - 6:20, 10:4, 10:16, 28:8, 30:7, 58:10, 58:22, 60:9, 61:13, 61:18, 79:7, 79:9, 82:1, 82:2
date........... [1] - 84:6
date........................ [3] - 84:8, 84:14, 84:24
date...................................... [5] - 84:10, 84:12, 84:16, 84:20, 84:22
date..................................... [1] - 85:3
day-to-day [1] - 46:17
days [6] - 41:13, 41:23, 42:1, 42:9, 43:2, 55:11
De [2] - 57:12, 57:17
deal [2] - 16:23, 34:23
dealing [2] - 24:7, 46:10
DeArcy [1] - 80:3
death [2] - 8:22, 45:14
debate [1] - 68:3
decide [1] - 11:11
decided [2] - 20:6, 20:7, 77:4
deciding [1] - 51:13
decision [9] - 12:1, 16:10, 21:5, 47:12, 51:12, 52:15, 53:7, 64:13, 64:16
decision-making [2] - 12:1, 21:5
decisions [1] - 39:18
decline [3] - 63:11, 63:13, 68:10
defendant [1] - 1:8, 57:4, 65:18

Defendant [5] - 3:2, 3:18, 45:11, 46:5, 82:11
defendant's exhibit [3] - 4:23, 10:3, 84:21
Defendant's Exhibit A [2] - 6:19, 84:19
Defendant's Exhibits [2] - 10:15, 84:23
defendants [2] - 46:10, 64:13
DEFENDERS [1] - 1:18
Defenders [3] - 2:6, 2:8, 4:3
DEFENSE [1] - 84:18
Defense [7] - 5:24, 6:10, 9:12, 9:24, 10:5, 10:11, 28:5
defense [2] - 5:1, 51:19
deficits [1] - 47:14
Degree [2] - 6:24, 6:25
delicate [1] - 69:6
DEPARTMENT [1] - 2:3
departure [1] - 75:22
deploy [1] - 69:7
deployed [1] - 68:21
DEPUTY [5] - 3:3, 3:7, 3:21, 5:10, 5:15, 5:17, 82:3
describe [4] - 7:8, 11:6, 11:21, 50:20
despite [1] - 80:6
detail [1] - 67:14
details [1] - 31:12
detection [7] - 11:9, 11:14, 11:15, 12:12, 15:10, 15:15, 17:24
detention [1] - 80:2
deter [6] - 20:1, 23:15, 24:22, 25:6, 55:5, 55:6
determinations [1] - 77:7
determined [1] - 76:17
determining [1] - 72:20
deterred [4] - 57:24, 58:4, 81:17
deterrence [93] - 4:15, 8:3, 10:18, 10:21, 11:7, 11:8, 11:13, 11:22, 11:23, 12:7, 12:16, 12:21, 12:24, 14:11, 15:10, 15:12, 15:24, 17:16, 19:4, 19:13, 19:15, 19:16, 20:4, 23:12, 23:17, 23:18, 23:21, 23:24, 24:1, 24:3, 24:4, 24:10, 24:11, 24:25, 25:2, 25:3, 25:15, 25:16, 27:19, 29:20, 36:8, 38:5, 39:11, 39:14, 41:3, 42:6, 42:9, 42:15, 42:17, 42:20, 42:23, 43:1, 43:20, 43:25, 46:9, 47:5, 48:8, 49:25, 50:1, 50:24, 51:11, 52:8, 56:20, 56:22, 57:16, 58:17, 59:9, 59:13, 63:18, 63:23, 64:10, 64:11, 65:15, 65:18, 65:22, 69:11, 69:20, 69:21, 71:5, 71:6, 71:16, 72:2, 77:6, 80:16, 80:21, 80:24, 81:3, 81:4, 81:18, 81:20, 81:21
deterrences [1] - 27:18
deterrent [49] - 8:6, 8:7, 8:8, 8:10, 8:12, 8:13, 9:5, 9:19, 12:9, 12:10, 13:3, 13:8, 13:16, 13:21, 13:22, 17:13, 17:19, 18:21, 19:9, 19:23, 20:24, 21:3, 27:13, 27:17, 27:21, 28:11, 28:16, 28:19, 29:11, 36:13, 37:24, 50:7, 50:8, 50:12, 53:23, 62:4, 62:22, 63:15, 63:17, 63:25, 64:5, 68:7, 72:6, 78:13
deterring [3] - 50:13, 55:24, 63:24
detriments [2] - 38:24, 39:2
developed [1] - 47:3

(difference ; Exile)

Appendix to Response to Government Memo A107    Page 5

**difference** [9] - 12:18, 35:9, 35:15, 37:3, 38:23, 43:12, 43:14, 49:4, 64:13
**differences** [2] - 66:1, 66:2
**different** [18] - 13:10, 17:11, 21:6, 22:4, 22:23, 34:21, 35:13, 37:18, 40:5, 49:10, 54:20, 54:21, 55:2, 64:17, 65:7, 65:9, 70:9, 72:15
**differently** [2] - 74:7, 81:10
**difficult** [5] - 15:25, 28:18, 29:21, 72:12, 72:23
**difficulty** [1] - 15:6
**diminished** [1] - 47:25
**DIRECT** [2] - 6:5, 83:6
**direct** [6] - 10:5, 27:25, 57:8, 57:18, 59:1, 60:18
**directed** [1] - 46:14
**direction** [3] - 6:10, 33:13, 49:24
**discharging** [1] - 76:8
**discounted** [1] - 39:20
**discounting** [2] - 39:18, 40:10
**discuss** [1] - 19:18
**discussed** [4] - 18:24, 62:9, 64:12, 65:4
**discussing** [2] - 46:8, 54:6
**discussion** [1] - 54:9
**discussions** [1] - 54:11
**disentangle** [4] - 28:18, 64:7, 68:4, 80:24
**disentangling** [1] - 29:20
**dispute** [3] - 76:12, 76:16, 76:19
**disputed** [2] - 76:9, 76:10
**disseminate** [1] - 19:12
**disseminated** [1] - 16:8
**distinguish** [3] - 13:20, 65:21, 65:22
**DISTRICT** [3] - 1:1, 1:1, 1:11
**District** [4] - 1:14, 2:3, 3:4
**disturbing** [1] - 45:10
**division** [1] - 40:6
**Docket** [1] - 3:8
**document** [2] - 6:13, 9:15
**documents** [1] - 15:20
**domestic** [1] - 8:14
**done** [11] - 18:2, 19:13, 20:21, 22:7, 26:24, 33:12, 35:12, 37:17, 51:3, 53:3, 53:9
**doubt** [1] - 63:9
**doubts** [1] - 24:15
**down** [13] - 13:5, 14:7, 21:19, 23:19, 31:21, 32:8, 33:10, 48:6, 61:17, 62:1, 70:12, 74:23, 81:21
**Dr** [1] - 9:5
**dramatic** [1] - 13:12
**dramatically** [1] - 70:13
**draw** [1] - 72:10
**drive** [1] - 58:24
**driven** [1] - 71:14
**drivers** [6] - 64:16, 64:18, 64:22, 64:24, 65:7, 65:10
**drives** [1] - 39:13
**driving** [7] - 50:7, 50:9, 59:12, 59:14, 59:16, 59:22, 59:23, 64:15, 64:20, 64:21, 65:2, 81:2
**drug** [4] - 7:17, 7:18, 8:13, 8:20
**drugs** [3] - 51:23, 56:1
**drunk** [19] - 50:7, 50:8, 58:24, 59:11,
59:14, 59:16, 59:22, 59:23, 64:15, 64:16, 64:18, 64:20, 64:21, 64:22, 64:24, 65:2, 65:7, 65:10, 81:2
**ducked** [2] - 68:17, 68:18
**duly** [1] - 5:12
**during** [3] - 54:15, 63:7, 63:12

# E

**E-mail** [1] - 2:12
**e-mail** [1] - 66:25
**early** [3] - 24:25, 48:1, 48:24
**easier** [1] - 31:5
**East** [3] - 1:15, 51:25, 65:5
**EASTERN** [1] - 1:1
**Eastern** [3] - 1:14, 2:3, 3:4
**economic** [2] - 11:22, 14:10
**economically** [1] - 66:3
**economics** [1] - 39:14
**economists** [1] - 39:17
**edge** [1] - 40:5
**educational** [2] - 6:23, 22:3
**effect** [46] - 8:7, 9:5, 12:9, 12:10, 13:21, 13:23, 14:14, 17:13, 17:19, 18:21, 18:22, 19:9, 19:24, 20:22, 20:25, 21:3, 21:12, 34:13, 34:23, 35:11, 36:1, 36:13, 36:21, 41:2, 42:3, 47:4, 50:7, 50:8, 50:12, 53:23, 54:23, 59:7, 59:15, 59:20, 60:21, 62:4, 62:10, 63:10, 63:17, 64:1, 64:5, 67:8, 67:25, 72:6, 80:24
**effective** [2] - 68:7, 68:24
**effectively** [1] - 54:7
**effectiveness** [1] - 12:6
**effects** [44] - 8:6, 8:9, 8:10, 8:12, 8:13, 9:19, 12:16, 13:3, 13:4, 13:8, 13:16, 13:17, 13:19, 17:14, 26:10, 27:13, 27:17, 27:21, 28:11, 28:16, 28:19, 28:24, 29:11, 29:12, 29:16, 29:20, 37:7, 37:20, 37:25, 38:3, 39:20, 42:6, 60:11, 61:19, 61:20, 62:22, 63:1, 63:15, 63:20, 64:8, 68:14, 78:13
**effort** [3] - 13:11, 61:18, 70:2
**efforts** [4] - 28:11, 28:15, 29:10, 48:3
**eight** [4] - 35:24, 49:2, 77:11
**either** [6] - 19:3, 19:9, 57:23, 58:3, 66:20, 73:22
**elaborate** [1] - 52:5
**elected** [1] - 7:22
**element** [1] - 70:17
**elevated** [1] - 21:7
**elimination** [1] - 71:1
**emotion** [1] - 40:19
**emotional** [3] - 31:16, 39:1, 40:19
**emotions** [1] - 47:13
**emphasize** [1] - 25:1
**empirical** [4] - 12:6, 15:13, 18:25, 67:14
**encompass** [1] - 27:9
**encompasses** [2] - 24:11, 77:2
**enforcement** [4] - 12:11, 13:10, 13:14, 67:21
**engage** [1] - 11:12, 11:25, 12:4
**engaged** [2] - 43:13, 51:1
**engaging** [1] - 43:13

**Engineering** [3] - 6:24, 7:1, 7:2
**enhanced** [2] - 19:7, 61:1
**enhancement** [5] - 60:13, 76:8, 76:9, 77:5, 77:8
**enhancements** [5] - 61:19, 61:21, 62:3, 77:1, 77:2
**enjoying** [1] - 45:8
**enter** [1] - 47:19
**enters** [2] - 3:18, 46:5
**entire** [1] - 77:17
**entitled** [1] - 82:19
**Epidemiology** [1] - 7:6
**equal** [1] - 49:14
**equivocal** [1] - 63:4
**era** [1] - 53:25
**ESQ** [4] - 1:13, 1:16, 1:16, 1:21
**essential** [5] - 23:10, 23:22, 23:24, 24:2, 24:5
**essentially** [1] - 52:23
**estimate** [6] - 17:2, 23:2, 28:11, 28:15, 29:10, 59:20
**estimates** [1] - 22:4
**estimating** [1] - 17:3
**ethnic** [1] - 22:2
**evaluating** [1] - 69:18
**evasion** [1] - 55:20
**event** [2] - 31:18, 69:8
**events** [2] - 16:13, 53:6
**evidence** [42] - 6:16, 6:19, 9:25, 10:3, 10:12, 10:16, 16:19, 18:12, 23:1, 28:5, 28:8, 30:7, 30:14, 35:6, 36:11, 36:20, 37:4, 48:1, 50:12, 58:9, 58:21, 60:9, 60:20, 61:11, 61:12, 63:4, 69:13, 72:25, 74:25, 75:11, 79:8, 84:6, 84:8, 84:9, 84:11, 84:14, 84:15, 84:19, 84:21, 84:24, 85:2
**exact** [1] - 76:5
**exactly** [5] - 7:10, 31:12, 48:3, 63:14, 74:6
**examination** [1] - 31:17
**EXAMINATION** [12] - 6:5, 9:9, 23:8, 24:19, 40:22, 54:3, 57:5, 62:16, 83:6, 83:8, 83:10, 83:12
**examined** [2] - 5:12, 37:6
**example** [5] - 17:22, 21:9, 39:18, 50:9, 62:21
**exceeds** [1] - 71:25
**exchange** [1] - 32:21
**excuse** [3] - 10:22, 66:15, 73:5
**execution** [2] - 8:7, 8:8
**exert** [1] - 68:22
**exhibit** [4] - 30:10, 30:13, 31:1, 31:9
**Exhibit** [24] - 5:24, 28:1, 28:3, 28:7, 29:24, 30:6, 57:9, 58:9, 58:11, 58:19, 58:21, 61:5, 61:9, 61:11, 61:12, 61:14, 79:7, 79:8, 84:5, 84:7, 84:9, 84:11, 84:15, 85:2
**Exhibit A** [2] - 6:11, 6:15
**Exhibit B** [3] - 9:12, 9:24, 28:6
**Exhibit C** [1] - 10:5
**EXHIBITS** [2] - 84:2, 85:1
**Exhibits** [3] - 10:12, 60:8, 84:13
**exhibits** [2] - 25:19, 29:18
**Exile** [10] - 13:18, 20:16, 20:25, 27:6, 60:11, 60:21, 61:1, 61:15, 62:10, 63:11

exits [2] - 45:11, 82:11
expect [1] - 18:9
experiences [2] - 35:22, 35:23
experiment [4] - 13:14, 58:17, 58:23, 59:13
experimental [1] - 20:2
experiments [8] - 21:7, 25:23, 28:24, 29:12, 29:13, 29:15, 67:24
expert [5] - 8:23, 9:1, 9:5, 80:17, 80:18
explained [1] - 55:22
explanation [1] - 63:13
extend [1] - 19:7
extended [1] - 37:20
extends [1] - 47:25
extensively [1] - 49:1
extent [3] - 24:23, 25:7, 56:16
extra [1] - 55:11
extraordinary [1] - 19:11
extrapolating [1] - 65:2
extreme [1] - 75:22
extremely [4] - 70:25, 71:11, 72:7, 72:8
eyes [1] - 77:5

**F**

face [4] - 22:6, 44:18, 62:9
face-to-face [1] - 22:6
facility [1] - 72:17
facing [1] - 34:10
Facsimile [1] - 2:12
fact [10] - 14:4, 20:23, 25:4, 29:18, 34:9, 34:10, 35:5, 37:18, 50:21, 52:24
factor [7] - 4:16, 29:10, 52:14, 69:3, 74:5, 80:19, 81:21
factors [16] - 15:24, 16:22, 19:1, 24:9, 28:10, 28:15, 42:21, 49:20, 65:14, 69:3, 72:13, 74:3, 74:6, 77:3, 77:9, 80:25
Factors [1] - 6:25
facts [1] - 9:19
faculty [2] - 44:18, 44:20
Fagan [15] - 5:2, 5:16, 5:24, 6:10, 6:22, 9:5, 9:12, 10:17, 15:18, 18:15, 30:16, 30:17, 31:11, 62:18, 78:9
FAGAN [2] - 5:11, 83:5
Fagan's [3] - 28:7, 42:21, 84:5
fairly [13] - 11:8, 20:16, 34:17, 35:13, 35:25, 36:12, 37:19, 43:15, 47:8, 64:18, 67:14, 67:21, 70:12
familiar [1] - 9:15
family [4] - 4:7, 10:24, 77:17, 78:22
FAPR [2] - 2:10, 82:24
far [2] - 30:15, 74:3
fascinating [1] - 44:22
fatal [2] - 22:14, 22:16
father [1] - 78:5
favors [1] - 81:22
fear [1] - 47:13
feasible [5] - 28:25, 29:12, 29:13, 29:14, 29:16
February [1] - 1:7
Federal [3] - 2:6, 2:8, 4:3
FEDERAL [1] - 1:18
federal [15] - 8:23, 13:9, 16:1, 16:7,

17:4, 17:6, 17:20, 18:17, 19:7, 19:8, 20:11, 41:16, 54:24, 78:3, 80:1
federalization [1] - 12:25
federalized [3] - 14:2, 14:5, 78:2
federalizing [1] - 13:24
feelings [2] - 77:18, 77:23
fell [2] - 60:22, 75:5
Fellow [1] - 7:13
fellow [1] - 7:22
felon [1] - 55:1
felony [2] - 36:22, 52:23
felt [1] - 53:9
fencing [1] - 38:3
few [5] - 6:21, 22:18, 43:6, 53:3, 55:7
fewer [3] - 50:14, 50:15
field [1] - 39:12
fighting [1] - 81:12
figure [1] - 42:11
file [2] - 31:20, 73:13
finally [1] - 38:8
fine [3] - 4:24, 82:4, 82:5
fire [2] - 31:5, 74:23
Fire [2] - 27:7, 70:15
firearm [4] - 8:21, 60:22, 60:23, 76:8
firearms [5] - 7:18, 61:2, 62:11
fired [1] - 75:1
firing [1] - 40:8
first [11] - 5:11, 28:18, 34:10, 35:1, 37:12, 45:14, 55:16, 56:24, 57:19, 59:2, 61:17
fit [1] - 39:3
five [4] - 57:21, 62:1, 70:13, 70:25
fix [1] - 30:23
flip [1] - 10:7
flood [1] - 69:3
Floor [1] - 1:20
focus [3] - 7:16, 22:17, 25:16
followed [1] - 48:25
following [2] - 45:17, 49:5
follows [1] - 5:13
footage [1] - 74:16
FOR [2] - 1:10, 84:18
foregoing [1] - 82:18
forget [2] - 55:19, 75:7
forgoing [1] - 11:20
forgot [1] - 41:12
Formango [1] - 60:3
formulations [1] - 24:25
fortunately [1] - 44:8
four [3] - 30:15, 59:19, 62:3
frame [2] - 32:6, 32:19
framework [2] - 39:8
fraud [3] - 46:21, 56:17, 80:5
fraudulent [1] - 80:1
frisk [2] - 53:25, 68:3
Frisolone [2] - 2:10, 82:24
front [5] - 5:7, 5:24, 39:19, 39:25
frontal [1] - 47:2
full [1] - 47:23
fully [1] - 47:3
funding [1] - 67:5
future [8] - 17:7, 17:21, 26:6, 39:1, 41:24, 57:24, 58:5, 63:24

**G**

gained [1] - 44:2
gang [1] - 40:5
gangs [1] - 40:5
general [64] - 4:15, 8:7, 9:5, 9:18, 10:18, 10:21, 11:6, 11:8, 11:13, 12:6, 12:21, 12:24, 13:8, 14:11, 15:23, 15:24, 17:15, 18:21, 19:5, 19:9, 20:24, 21:20, 23:17, 23:21, 24:3, 24:4, 24:11, 25:14, 27:12, 27:21, 28:11, 28:16, 29:11, 36:8, 36:13, 38:5, 42:23, 43:1, 43:20, 46:9, 47:5, 48:8, 49:25, 50:1, 50:6, 50:12, 56:22, 59:9, 59:13, 62:22, 63:16, 63:25, 64:5, 64:10, 65:18, 65:22, 69:11, 71:5, 72:2, 72:6, 78:13, 80:16, 80:21, 81:18
generally [8] - 14:8, 14:22, 15:8, 22:24, 44:1, 46:9, 58:23, 63:24
ghetto [1] - 21:11
given [3] - 19:6, 35:21, 66:3
goal [4] - 33:24, 39:24, 39:25
GOVERNMENT [1] - 84:4
Government [21] - 1:13, 4:22, 15:21, 28:1, 28:3, 29:24, 57:9, 58:11, 58:19, 61:5, 61:11, 61:14, 62:18, 63:14, 64:14, 65:24, 73:20, 76:4, 76:20, 77:3, 78:25
Government Exhibit 4 [6] - 60:1, 60:2, 60:6, 60:17, 60:18
Government's [14] - 28:7, 30:6, 58:9, 58:21, 60:8, 61:12, 75:14, 77:5, 84:5, 84:7, 84:9, 84:11, 84:13, 84:15
graduated [1] - 4:10
Graham [3] - 2:7, 4:6, 77:21
great [4] - 16:17, 16:23, 20:13, 34:23
greater [8] - 17:17, 38:25, 43:22, 48:9, 67:7, 67:18, 71:19, 71:21
Greg [1] - 58:13
ground [5] - 56:24, 68:1, 75:2, 75:3, 75:5
grounds [1] - 39:1
group [3] - 21:14, 48:9, 51:24
groups [5] - 22:2, 22:3, 46:16, 49:18
growing [1] - 39:12
guess [6] - 18:13, 34:8, 46:18, 46:20, 72:13, 72:23
Guevara [3] - 2:6, 78:20, 79:16
guideline [1] - 76:21
guidelines [14] - 17:22, 19:8, 75:16, 75:18, 75:19, 75:23, 76:1, 76:5, 76:14, 76:15, 76:20, 76:25, 77:14, 77:15
guilty [1] - 75:25
gun [74] - 9:6, 9:20, 12:22, 12:24, 13:8, 13:12, 13:20, 13:23, 13:25, 14:2, 18:16, 19:14, 20:1, 20:8, 20:19, 21:14, 22:7, 22:9, 22:12, 22:18, 22:23, 23:1, 23:2, 25:16, 26:19, 27:4, 33:17, 35:13, 36:22, 41:3, 43:14, 48:15, 50:18, 51:1, 51:13, 51:14, 51:18, 51:19, 52:4, 52:15, 52:16, 52:19, 52:21, 53:8, 53:18, 54:14, 54:16, 54:20, 55:4, 59:14, 60:13, 64:2, 64:14, 64:17, 65:2, 66:2, 66:7, 67:11, 69:12, 69:15, 69:23, 70:4, 70:11, 70:12, 72:1, 74:23, 81:6
gun-carrying [2] - 21:14, 66:2
gun-to-gun [1] - 50:18

(guns - JACOBSON..........................................................................    Page 7

## Appendix to Response to Government Memo A109

**guns** [13] - 20:6, 22:1, 22:22, 32:8, 33:1, 50:14, 52:18, 56:15, 64:3, 64:25, 65:1, 66:2
**guy** [3] - 34:10, 34:18, 34:19
**guys** [1] - 53:24

## H

**half** [3] - 44:16, 45:6, 79:13
**halfway** [1] - 61:17
**Hall** [1] - 80:3
**hand** [2] - 5:10, 78:25
**happy** [2] - 67:15, 75:14
**Harcourt** [2] - 2:8, 4:5
**hard** [16] - 12:18, 14:16, 17:14, 23:2, 27:12, 27:20, 27:21, 36:21, 37:16, 47:12, 53:16, 56:12, 71:12, 72:4, 77:4, 81:12
**harsh** [1] - 72:11
**harsher** [3] - 23:14, 24:22, 25:1, 25:6, 26:10, 26:19, 27:13, 27:21
**Health** [1] - 7:7
**health** [1] - 70:6
**healthcare** [1] - 70:6
**hear** [2] - 10:25, 79:18
**heard** [1] - 31:9
**hearing** [3] - 25:13, 25:20, 25:22
**heavier** [2] - 55:5, 69:10
**heavily** [1] - 11:23
**heavy** [3] - 55:4, 55:13, 66:8
**heightened** [1] - 68:12
**heightening** [1] - 11:9
**held** [2] - 23:5, 30:24
**help** [3] - 31:17, 51:21, 77:24
**helpful** [1] - 68:2
**Herb** [1] - 38:11
**high** [5] - 35:13, 48:22, 54:22, 66:2, 69:25
**high-crime** [1] - 69:25
**higher** [2] - 22:7, 22:13
**highest** [1] - 20:19
**history** [7] - 24:23, 25:5, 25:8, 25:9, 25:11, 25:12
**hit** [2] - 33:14, 55:13
**hmm** [2] - 33:19, 59:5
**hole** [1] - 81:21
**home** [3] - 22:24, 77:11, 77:17
**homicide** [6] - 60:21, 60:22, 60:23, 63:6, 63:8, 63:11
**homicides** [3] - 62:11, 64:4, 71:9
**Honor** [55] - 3:14, 3:17, 3:20, 4:1, 4:14, 4:19, 4:21, 5:5, 5:21, 6:15, 9:4, 9:25, 10:11, 19:22, 21:15, 21:24, 23:6, 28:4, 30:8, 30:14, 30:23, 31:3, 31:19, 32:15, 36:6, 38:6, 40:21, 43:21, 44:5, 50:20, 51:10, 54:2, 58:7, 61:11, 62:13, 62:15, 65:23, 66:13, 68:17, 69:5, 69:16, 71:17, 72:4, 72:13, 73:10, 73:20, 73:25, 74:9, 74:13, 74:14, 75:13, 76:2, 76:7, 77:25, 79:21
**HONORABLE** [1] - 1:11
**Honorable** [2] - 3:5, 3:6
**hoping** [1] - 30:23
**hot** [1] - 68:22

**hotter** [1] - 40:17
**hour** [2] - 44:16, 45:6
**hours** [1] - 33:17
**housing** [1] - 70:6
**Human** [1] - 6:25
**hypothetical** [1] - 30:18

## I

**idea** [3] - 16:25, 52:25, 69:21
**ideas** [1] - 77:6
**identification** [1] - 6:11
**identify** [1] - 13:22, 63:25
**ignore** [2] - 48:8, 72:2
**II** [2] - 75:21, 76:14
**illegal** [2] - 22:9, 22:10
**illness** [2] - 21:18, 53:13
**imagine** [1] - 15:6
**immediately** [2] - 53:6, 67:22
**impact** [10] - 20:15, 26:4, 26:6, 38:4, 38:14, 38:25, 45:13, 46:9, 46:15, 57:3
**implications** [2] - 67:4, 67:5
**imply** [1] - 67:17
**important** [4] - 48:14, 54:20, 78:10, 79:10
**imposed** [2] - 33:21, 34:14
**imposing** [1] - 24:9
**imprisonment** [2] - 34:20, 36:14
**impulsive** [1] - 47:11
**inappropriate** [1] - 75:17
**incapacitate** [1] - 55:6
**incapacitated** [3] - 29:6, 29:8, 57:25
**incapacitation** [12] - 28:19, 28:22, 29:4, 29:21, 56:9, 63:1, 63:18, 63:21, 63:22, 74:5, 77:6, 80:25
**incapacitory** [1] - 62:21
**incarcerated** [1] - 37:2
**Incarceration** [1] - 37:21
**incarceration** [30] - 20:12, 28:12, 28:16, 28:20, 28:24, 29:11, 29:12, 29:15, 35:22, 35:23, 36:1, 36:17, 36:25, 37:12, 37:20, 37:25, 41:1, 41:8, 49:5, 49:15, 49:16, 57:25, 68:13, 72:14, 72:19, 73:7, 77:12, 77:16, 79:6
**incarcerations** [1] - 48:10
**incarceratory** [3] - 77:20, 78:12, 79:2
**include** [2] - 9:21, 51:10
**including** [3] - 13:12, 19:13, 53:2
**inconclusive** [1] - 21:1
**inconsistent** [1] - 62:10
**increase** [3] - 59:21, 63:6, 63:12
**increases** [1] - 71:24
**increasing** [1] - 67:8
**INDEX** [1] - 83:1
**iNDEX** [1] - 84:2
**Indians** [1] - 31:6
**indicate** [1] - 57:22
**indifferent** [9] - 34:19, 35:3, 35:5, 41:23, 42:2, 42:8, 42:10, 42:12, 42:25
**individual** [2] - 16:23, 17:6
**individuals** [2] - 41:3, 42:25
**inefficient** [1] - 56:4
**inference** [1] - 17:12
**inferences** [1] - 27:18

**inflate** [2] - 39:24, 40:12
**influence** [1] - 68:22
**influences** [1] - 60:24
**information** [7] - 14:7, 14:22, 17:10, 18:9, 19:12, 21:4
**ingredient** [1] - 25:3
**inherently** [1] - 21:17
**injuries** [2] - 22:14, 22:16
**injury** [1] - 76:10
**inquiry** [1] - 43:16
**insane** [3] - 56:1, 56:3, 56:7
**instances** [1] - 51:19
**Institute** [1] - 38:2
**institutions** [2] - 47:24, 49:12
**instrument** [1] - 51:21
**intensive** [1] - 34:25
**interact** [1] - 14:10
**interested** [2] - 30:20, 50:13
**interesting** [6] - 30:21, 34:22, 37:8, 51:23, 52:6, 53:5
**internalize** [1] - 34:9
**internalized** [2] - 21:5, 21:8
**intervened** [1] - 70:19
**intervening** [1] - 70:4
**intervention** [2] - 60:20, 78:16
**interventions** [6] - 19:19, 19:23, 70:7, 78:11, 79:2, 79:17
**interviewed** [6] - 49:1, 51:2, 51:15, 52:2, 52:11, 54:7
**interviews** [6] - 22:6, 25:25, 51:3, 52:1, 53:2, 65:4
**introduced** [2] - 28:2, 61:21
**introducing** [1] - 28:1
**inverse** [1] - 63:7
**investigated** [1] - 47:8
**involved** [7] - 7:20, 13:13, 21:21, 46:15, 47:7, 56:13, 69:18
**involving** [2] - 13:10, 56:1
**inward** [1] - 12:20
**irrational** [1] - 81:6
**Isadora** [2] - 2:8, 4:5
**isolate** [1] - 61:18
**isolating** [1] - 63:17
**issue** [6] - 14:25, 16:14, 42:19, 51:24, 54:25, 73:16
**issued** [1] - 66:20
**issues** [1] - 14:2
**items** [1] - 70:15
**itself** [2] - 21:17, 72:15

## J

**Jack** [2] - 3:5, 3:6
**JACK** [1] - 1:11
**Jacobson** [3] - 3:15, 4:3, 67:2
**JACOBSON** [47] - 1:21, 3:15, 3:20, 4:3, 4:12, 4:21, 5:1, 5:4, 5:20, 5:23, 6:2, 6:6, 6:15, 9:4, 9:10, 9:24, 10:11, 10:24, 21:24, 28:5, 30:8, 30:13, 31:8, 31:11, 32:15, 33:6, 33:23, 42:14, 42:18, 44:15, 45:4, 46:7, 62:15, 62:17, 65:23, 73:13, 75:12, 75:19, 76:4, 76:19, 76:23, 77:15, 78:19, 78:24, 79:10, 82:4, 82:10
**JACOBSON**......................... [2] - 83:7,

(jail - Michelle)

Page 8

83:13

**jail** [1] - 52:2
**Jay** [1] - 7:12
**Jeffrey** [2] - 5:1, 5:16
**JEFFREY** [2] - 5:11, 83:5
**Jeremy** [1] - 37:22
**job** [3] - 70:5, 70:21, 71:13
**jobs** [2] - 70:5, 71:13
**John** [1] - 7:12
**joined** [2] - 3:25, 4:5
**joint** [1] - 13:11
**Journal** [1] - 49:21
**journals** [1] - 7:25
**JUDGE** [1] - 1:11
**judge** [2] - 31:8, 44:12
**Judge** [4] - 23:19, 57:2, 80:2, 80:3
**judges** [3] - 44:13, 55:8, 55:12
**judging** [1] - 47:10
**jury** [1] - 11:1
**Justice** [3] - 7:11, 7:12, 7:13
**justice** [3] - 7:17, 8:22, 12:10
**justifications** [5] - 23:11, 23:22, 23:25, 24:2, 24:5
**juvenile** [5] - 7:17, 8:10, 8:22, 47:24, 71:9

### K

**keeping** [2] - 29:2, 29:4
**kept** [2] - 3:19, 5:18
**Kessler** [1] - 61:20
**key** [3] - 19:15, 25:3
**kid** [1] - 38:25
**kids** [1] - 78:7
**kill** [3] - 40:7, 74:16, 80:11
**killed** [2] - 50:15, 75:8
**kind** [10] - 12:20, 13:10, 14:15, 15:6, 16:13, 16:15, 46:16, 47:15, 53:4, 75:2
**kinds** [2] - 15:4, 39:9
**knowing** [3] - 17:17, 43:3, 43:4
**knowledge** [8] - 14:19, 14:25, 16:3, 16:8, 17:11, 18:14, 19:14, 19:17
**known** [1] - 70:16
**knows** [1] - 31:13

### L

**lab** [1] - 21:6
**laboratories** [1] - 15:7
**laboratory** [2] - 16:20, 58:17
**lack** [1] - 53:20
**large** [6] - 43:11, 56:16, 60:23, 63:6, 64:18, 64:19
**largely** [1] - 51:18
**larger** [2] - 65:7, 65:10
**last** [7] - 5:19, 22:18, 46:11, 59:3, 60:19, 61:18, 62:7
**late** [3] - 48:24, 53:19, 63:7
**law** [6] - 7:5, 7:18, 8:15, 8:19, 13:10, 70:22
**Law** [3] - 7:5, 8:17, 38:2
**law's** [1] - 62:4
**LAWRENCE** [1] - 1:7
**Lawrence** [23] - 1:19, 3:9, 3:16, 3:22,

4:4, 16:1, 19:3, 19:6, 41:1, 41:7, 41:22, 42:11, 42:16, 77:11, 77:19, 77:25, 78:22, 79:5, 79:11, 80:14, 81:5, 81:17, 81:24
**Lawrence's** [8] - 2:7, 4:6, 4:7, 15:19, 19:2, 42:25, 77:21, 78:22
**lead** [3] - 69:10, 76:6, 80:25
**least** [9] - 18:18, 20:20, 24:22, 25:7, 30:15, 36:25, 55:25, 67:4, 69:9
**leave** [2] - 44:9, 44:19
**leaves** [1] - 63:12
**lecture** [1] - 73:2
**led** [2] - 78:4, 79:14
**left** [2] - 22:24, 33:3
**legal** [2] - 22:8, 47:24
**length** [8] - 11:16, 14:21, 15:11, 33:21, 34:7, 34:13, 39:4, 72:20
**lengthening** [1] - 67:9
**lengths** [2] - 38:15, 38:16, 49:10
**lengthy** [8] - 8:10, 9:19, 12:9, 12:16, 14:6, 14:14, 14:15, 19:15
**lenient** [2] - 81:12, 81:13
**lens** [1] - 80:16
**less** [9] - 15:9, 15:15, 22:21, 37:11, 39:2, 40:18, 47:4, 49:15, 69:11
**letter** [2] - 73:13, 78:24
**level** [5] - 13:14, 52:23, 71:11, 76:8, 76:13
**Levitt** [1] - 61:20
**library** [1] - 66:24
**Lifshitz** [2] - 3:13, 3:24
**LIFSHITZ** [19] - 1:16, 3:12, 3:24, 4:14, 4:19, 73:20, 73:25, 74:2, 74:6, 74:13, 74:20, 75:4, 75:7, 76:2, 76:7, 79:21, 79:24, 82:5, 82:9
**light** [5] - 31:22, 33:20, 34:8, 34:18, 72:11
**light-colored** [2] - 33:20, 34:18
**lightly** [1] - 66:6
**likelihood** [2] - 17:2, 26:22
**likely** [3] - 14:5, 14:20, 39:9
**limited** [1] - 13:2
**line** [1] - 72:10
**lines** [4] - 20:3, 57:21, 59:19, 62:1
**linked** [1] - 63:23
**listen** [2] - 73:2, 80:22
**literature** [10] - 12:15, 15:14, 18:25, 24:23, 25:6, 25:14, 50:2, 50:7, 57:16, 68:5
**live** [2] - 80:6, 80:13
**lives** [1] - 19:6
**living** [1] - 69:24
**local** [1] - 69:1
**lock** [1] - 70:21
**Lock** [2] - 13:1, 13:18
**look** [15] - 13:24, 27:15, 27:17, 31:6, 52:10, 53:12, 56:16, 59:17, 62:7, 62:24, 63:19, 68:13, 79:17, 80:15
**looked** [7] - 12:24, 12:25, 13:17, 13:19, 35:17, 35:20, 52:11
**looking** [1] - 27:23
**looks** [3] - 33:5, 33:8, 33:9
**lose** [2] - 43:21, 56:25
**loss** [1] - 39:4
**lost** [1] - 8:1

**low** [3] - 52:23, 54:15, 71:11
**low-level** [1] - 52:23
**lower** [2] - 43:24, 76:20
**Ludwig** [2] - 29:19, 61:5
**lunch** [3] - 44:4, 44:16, 45:6
**Luncheon** [1] - 45:16
**lust** [1] - 47:13

### M

**Madoff** [3] - 46:13, 46:21, 46:22
**mail** [2] - 2:12, 66:25
**maintenance** [1] - 13:15
**major** [1] - 74:5
**majority** [1] - 18:18
**man** [18] - 31:21, 31:22, 31:24, 31:25, 33:20, 33:22, 34:6, 34:7, 34:8, 34:13, 34:14, 44:25, 53:12, 53:14, 53:17, 55:16, 74:9, 80:10
**managed** [1] - 68:20
**Manhattan** [1] - 7:14
**marginal** [1] - 41:2
**marked** [9] - 6:11, 6:19, 10:3, 10:15, 79:8, 84:19, 84:21, 84:23, 85:2
**marriage** [1] - 55:17
**Masters** [1] - 6:25
**match** [2] - 16:17, 49:10
**matched** [1] - 70:10
**matching** [1] - 49:9
**materials** [2] - 10:8, 10:9
**MATHEW** [1] - 1:16
**Mathew** [1] - 3:24
**matter** [3] - 21:6, 82:12, 82:19
**matters** [2] - 31:17, 73:3
**Matthew** [1] - 4:1
**maturation** [1] - 47:23
**maximum** [2] - 41:15, 49:6
**McArthur** [1] - 47:7
**MDC** [1] - 77:16
**mean** [5] - 27:15, 34:1, 34:5, 43:19, 78:18
**meaning** [1] - 39:20
**meant** [1] - 23:19
**measure** [3] - 27:12, 27:21, 27:23
**measures** [1] - 19:11
**meeting** [2] - 44:13, 44:19
**meetings** [1] - 44:20
**Melman** [1] - 7:6
**member** [1] - 7:22
**members** [2] - 4:7, 10:24
**men** [17] - 31:21, 32:8, 32:19, 35:7, 35:12, 35:21, 48:20, 48:21, 49:3, 50:25, 51:3, 51:12, 51:15, 53:2, 53:21, 72:16
**mental** [4] - 53:13, 56:5, 70:6, 72:22
**mentioned** [10] - 16:22, 19:21, 40:18, 48:19, 49:19, 52:12, 53:11, 63:14, 69:17, 70:15
**mentions** [1] - 52:11
**merely** [1] - 57:24
**mess** [1] - 70:20
**message** [1] - 70:19
**mic** [1] - 6:8
**Michael** [2] - 38:13, 45:13
**Michelle** [1] - 3:25

Appendix to Response to Government Memo A111

**MICHELLE** [1] - 2:5
**middle** [6] - 43:19, 43:24, 44:24, 74:8, 74:24, 80:11
**midst** [1] - 16:21
**might** [15] - 14:14, 17:8, 17:12, 19:18, 22:25, 34:21, 38:24, 39:2, 39:4, 39:22, 40:4, 42:3, 48:11, 69:1, 72:6
**MILLER** [5] - 1:16, 23:19, 30:11, 54:2, 54:25
**Miller** [2] - 3:24, 4:1
**MILLER** ........................ [2] - 83:9, 83:11
**million** [1] - 80:25
**mind** [1] - 24:13
**minimum** [1] - 74:13
**misapprehension** [2] - 55:9, 55:12
**misdemeanor** [1] - 52:23
**mistaken** [1] - 37:18
**model** [6] - 14:11, 59:9, 62:23, 69:20, 69:21, 78:17
**modern** [3] - 25:2, 39:13, 40:15
**moment** [3] - 14:13, 16:12, 40:14
**Monday** [1] - 82:3
**money** [3] - 51:22, 66:4, 71:14
**month** [2] - 59:21, 82:1
**months** [9] - 49:6, 55:11, 75:22, 76:14, 77:11, 78:2, 78:3, 79:12
**most** [10] - 12:8, 12:17, 18:16, 52:13, 55:8, 55:25, 57:23, 58:3, 61:18, 81:12
**mostly** [2] - 48:20, 69:24
**mother** [3] - 2:7, 4:6, 77:21
**move** [7] - 5:8, 9:4, 30:2, 58:7, 58:19, 60:5, 61:10
**moved** [2] - 5:7, 80:2
**moves** [1] - 5:6
**MR. MILLER** [30] - 4:1, 6:17, 9:7, 10:1, 10:13, 19:22, 23:6, 23:9, 24:20, 28:3, 29:3, 30:17, 30:22, 30:25, 31:19, 36:6, 40:21, 40:23, 42:16, 42:20, 44:12, 54:4, 57:2, 57:6, 58:7, 58:19, 60:5, 61:10, 62:13, 65:24
**murder** [7] - 8:8, 63:12, 74:8, 74:12, 74:15, 74:21, 74:22
**murders** [3] - 13:12, 13:19, 13:23
**MURPHY** [1] - 2:5
**Murphy** [1] - 3:25
**MURRAY** [1] - 1:7
**Murray** [11] - 1:19, 2:7, 3:9, 3:15, 3:22, 4:4, 4:6, 80:14, 81:5, 81:17, 81:23
**must** [1] - 24:16
**myth** [1] - 18:13

### N

**Nagen** [1] - 58:11
**name** [3] - 3:23, 5:15, 46:12
**names** [1] - 80:6
**narrow** [1] - 80:16
**National** [3] - 37:21, 66:10, 66:18
**nature** [2] - 72:14, 72:19
**naval** [1] - 40:8
**necessarily** [3] - 27:14, 36:14, 67:11
**necessary** [1] - 48:15
**need** [4] - 63:13, 70:22, 72:7, 81:23

**neighborhood** [2] - 35:8, 80:14
**Neighborhoods** [1] - 69:19
**neighborhoods** [7] - 51:25, 69:25, 70:9, 70:10, 70:11, 71:8, 71:9
**neighbors** [1] - 20:18
**net** [9] - 12:3, 16:14, 16:20, 44:1, 70:3, 71:17, 71:18, 71:23
**network** [1] - 77:19
**Network** [1] - 47:8
**neuroscience** [1] - 47:22
**never** [4] - 30:17, 36:16, 52:14, 53:1
**NEW** [1] - 1:1, 1:18
**new** [1] - 37:6
**New** [30] - 1:5, 1:14, 1:15, 1:20, 2:3, 2:4, 3:4, 6:24, 7:1, 7:3, 7:13, 13:13, 18:19, 22:20, 27:8, 27:9, 50:21, 51:25, 52:9, 52:22, 53:18, 54:1, 55:2, 65:5, 65:25, 68:4, 68:10, 78:15, 80:7
**next** [2] - 6:3, 80:14
**nine** [1] - 49:2
**nobody** [1] - 35:5
**none** [1] - 27:10
**nonfatal** [2] - 22:14, 22:16
**norm** [1] - 22:22
**note** [2] - 3:10, 76:18
**nothing** [6] - 21:24, 31:14, 65:10, 65:23, 65:24, 73:1
**notice** [2] - 20:22, 74:25
**notion** [2] - 63:23, 65:18
**null** [1] - 36:1
**number** [16] - 4:7, 7:10, 12:23, 18:2, 37:17, 47:14, 52:12, 62:11, 63:15, 64:22, 72:18, 73:24, 77:22, 78:3, 78:6, 78:10

### O

**obey** [1] - 70:21
**object** [1] - 30:13
**objected** [1] - 4:17
**objection** [10] - 4:18, 6:17, 9:7, 10:1, 10:13, 19:22, 30:9, 32:15, 33:6, 33:23
**observe** [2] - 17:13, 46:22
**observed** [5] - 11:11, 20:2, 56:17, 63:9, 81:8
**occasions** [1] - 77:22
**occurring** [1] - 63:6
**OF** [6] - 1:1, 1:3, 1:10, 1:18, 82:17, 84:2
**offender** [12] - 11:10, 11:21, 14:11, 15:1, 15:2, 15:4, 15:25, 17:7, 17:21, 50:10, 67:23
**offenders** [23] - 8:9, 8:12, 8:13, 9:20, 11:10, 11:23, 12:18, 14:5, 14:18, 18:1, 20:1, 34:24, 48:16, 63:24, 64:2, 64:14, 64:17, 65:5, 67:10, 69:23, 69:24, 70:4, 70:11
**offending** [4] - 26:23, 57:23, 57:24, 58:5
**offense** [6] - 16:1, 50:10, 54:21, 76:8, 76:13
**offenses** [5] - 13:25, 14:2, 18:16, 38:3, 61:2
**offensive** [1] - 81:9

**offer** [3] - 9:24, 10:11, 28:3
**office** [4] - 4:6, 4:12, 15:22, 78:20
**Officer** [1] - 3:25
**officers** [1] - 70:18
**official** [1] - 78:15
**Official** [2] - 2:11, 82:24
**offset** [1] - 44:2
**often** [2] - 18:5, 39:23
**older** [1] - 47:16
**one** [50] - 12:13, 13:2, 13:7, 13:10, 14:1, 14:2, 15:5, 16:3, 16:22, 17:11, 17:18, 20:24, 22:17, 22:23, 23:10, 23:21, 23:24, 27:16, 29:18, 29:19, 31:24, 32:5, 33:13, 36:24, 37:8, 37:9, 42:6, 42:20, 42:21, 45:14, 48:13, 49:8, 49:14, 50:22, 52:13, 53:13, 55:16, 57:9, 57:15, 58:4, 58:14, 60:10, 65:13, 66:22, 67:3, 67:5, 70:15, 72:11, 75:15
**One** [1] - 1:19
**ones** [2] - 37:2, 54:12
**open** [4] - 3:1, 3:2, 31:20, 46:3
**opine** [1] - 47:20
**opinion** [7] - 33:20, 34:16, 34:18, 41:22, 42:8, 42:24, 79:15
**opinions** [1] - 72:18
**opportunity** [2] - 64:7, 75:13
**oppose** [1] - 74:20
**opposite** [1] - 74:21
**ordered** [1] - 80:2
**organizations** [1] - 7:21
**original** [1] - 38:13
**originally** [1] - 75:19
**otherwise** [2] - 55:17, 70:10
**ought** [1] - 46:19
**outside** [2] - 16:19, 80:7
**outweighs** [2] - 74:3, 81:24
**overpopulation** [1] - 35:8
**overruled** [1] - 4:18
**owe** [1] - 78:7
**own** [2] - 68:6, 75:8

### P

**p.m** [5] - 3:18, 31:2, 45:11, 45:16, 82:11
**Page** [10] - 28:9, 59:1, 59:17, 60:16, 60:17, 60:18, 61:14, 62:7, 63:2, 63:19
**page** [7] - 45:17, 57:19, 59:3, 61:17, 61:18, 61:23, 62:1
**PAGE** [2] - 83:4, 84:4
**Panel** [1] - 37:21
**papers** [2] - 67:13, 75:10
**Paragraph** [1] - 28:10
**paragraph** [2] - 59:3, 60:19, 62:8
**paralegal** [2] - 4:5, 4:11, 4:12
**Paralegal** [1] - 2:8
**parallel** [2] - 75:1, 75:3
**parlance** [1] - 40:8
**parole** [1] - 70:5
**part** [7] - 27:8, 35:1, 35:2, 37:24, 40:19, 54:8, 81:5
**participated** [1] - 20:2
**participating** [1] - 70:11
**particular** [13] - 9:2, 12:25, 13:24,

(particularly - punishing)

Appendix to Response to Government Memo A112

15:18, 17:20, 17:25, 34:24, 36:14,
39:24, 40:7, 51:6, 68:23, 69:17
  **particularly** [4] - 37:9, 47:24, 48:23,
50:18
  **parties** [3] - 46:4, 75:20, 75:24
  **passed** [2] - 18:14, 75:6
  **past** [1] - 63:2
  **patterns** [2] - 57:23, 62:9
  **pause** [2] - 23:5, 30:24
  **pay** [1] - 38:22
  **paying** [1] - 66:8
  **peak** [1] - 53:18
  **peaked** [1] - 53:19
  **peer** [2] - 7:24, 35:25
  **penal** [2] - 38:12, 45:13
  **penalty** [5] - 8:22, 45:14, 75:25, 76:4,
76:21
  **people** [61] - 19:5, 21:19, 21:21, 22:23,
26:9, 28:22, 29:4, 30:1, 33:11, 35:6,
35:8, 36:19, 38:22, 39:3, 40:2, 40:13,
43:11, 43:12, 46:14, 46:20, 48:10,
48:15, 48:18, 49:10, 50:2, 50:15, 50:24,
51:3, 51:24, 52:2, 52:3, 52:17, 54:7,
55:24, 56:5, 56:13, 56:15, 64:1, 64:6,
64:25, 65:1, 66:6, 67:18, 68:7, 69:2,
71:13, 74:8, 74:15, 74:18, 74:22, 75:6,
80:6, 80:11, 81:1, 81:6, 81:10, 81:14
  **perceive** [1] - 16:19
  **perceived** [1] - 53:10
  **percent** [5] - 57:24, 57:25, 58:5, 59:22,
62:4
  **percentage** [2] - 52:12, 66:7
  **perception** [1] - 11:24
  **perceptions** [2] - 11:14, 15:14
  **perfectly** [1] - 70:10
  **perhaps** [4] - 35:7, 36:17, 37:23, 56:25
  **period** [6] - 35:24, 41:8, 47:9, 49:2,
59:21, 77:20
  **periods** [1] - 37:20
  **permission** [1] - 5:23
  **person** [14] - 8:14, 16:5, 33:16, 36:5,
39:7, 40:7, 43:20, 47:16, 49:14, 49:16,
56:18, 64:1, 81:16, 81:17
  **persons** [1] - 23:18
  **perspective** [2] - 42:9, 71:16
  **persuade** [1] - 12:4
  **Ph.D** [1] - 7:2
  **Philadelphia** [1] - 48:22
  **Phoenix** [1] - 48:22
  **physical** [1] - 48:6
  **picking** [2] - 66:6, 67:18
  **picture** [1] - 39:3
  **piece** [1] - 74:25
  **Pierrepont** [1] - 1:19
  **place** [2] - 51:15, 66:1
  **placed** [1] - 65:17
  **places** [4] - 27:15, 50:22, 68:2, 69:24
  **plan** [1] - 78:21
  **play** [1] - 19:19
  **played** [2] - 31:8, 31:20
  **playing** [1] - 31:2
  **Plaza** [2] - 1:15, 1:19
  **plea** [5] - 18:5, 75:24, 75:25, 76:2,
76:21
    **pockets** [1] - 71:15

  **Pogarski** [3] - 58:12, 58:13
  **point** [8] - 23:2, 40:7, 43:1, 46:11,
52:7, 54:6, 65:6, 79:10
  **pointed** [1] - 65:12
  **pointedly** [1] - 78:21
  **points** [3] - 51:7, 64:21, 75:14
  **police** [25] - 52:7, 52:12, 52:13, 52:14,
52:19, 52:25, 53:20, 53:24, 54:11,
54:12, 66:4, 67:6, 67:21, 67:25, 68:1,
68:6, 68:12, 68:20, 68:21, 69:3, 69:7,
70:18
  **policing** [5] - 7:17, 13:13, 13:15, 52:8,
52:9
  **policy** [5] - 7:2, 7:18, 8:20
  **pool** [3] - 64:16, 65:7, 65:10
  **poor** [1] - 69:24
  **population** [8] - 34:24, 35:6, 64:19,
64:24, 64:25, 65:1, 65:9, 69:2
  **position** [2] - 7:4, 38:21
  **positive** [1] - 79:15
  **possession** [1] - 55:1
  **possibility** [5] - 14:19, 15:10, 16:5,
19:12, 43:13
  **possible** [5] - 21:3, 42:10, 42:12, 72:3,
80:12
  **possibly** [2] - 47:19, 81:13
  **post** [1] - 41:10
  **posted** [1] - 20:18
  **potential** [2] - 64:16, 65:5
  **poverty** [1] - 69:25
  **premised** [1] - 61:1
  **preparation** [3] - 10:10, 27:11, 31:15
  **prepare** [1] - 44:7
  **prepared** [4] - 9:18, 73:21, 73:23,
78:22
  **preparing** [6] - 10:10, 25:13, 25:20,
25:22, 26:16, 26:23
  **presence** [5] - 53:20, 67:21, 67:25,
68:6, 68:12
  **present** [4] - 3:2, 4:4, 40:18, 46:4
  **presentence** [1] - 15:22
  **preserve** [1] - 30:9
  **presiding** [1] - 3:5
  **pressed** [1] - 36:21
  **presumably** [1] - 62:4
  **pretrial** [1] - 41:8
  **pretty** [2] - 55:17, 70:16
  **prevalent** [2] - 22:1, 22:11
  **previous** [1] - 63:10
  **previously** [2] - 30:11, 64:12
  **principle** [1] - 23:14
  **prison** [25] - 14:6, 20:8, 28:22, 29:1,
29:2, 29:4, 29:6, 29:7, 34:25, 35:9,
35:15, 35:16, 36:19, 36:23, 41:7, 53:1,
54:8, 54:14, 54:22, 61:2, 64:2, 66:8,
71:4, 73:4, 73:6
  **Prison** [1] - 73:8
  **prisons** [2] - 55:11, 67:6
  **privacy** [1] - 69:3
  **private** [1] - 7:14
  **proactive** [1] - 67:21
  **proactively** [1] - 68:15
  **probability** [1] - 59:22
  **probation** [9] - 15:22, 34:20, 34:25,
35:3, 35:9, 35:21, 70:4, 70:18, 81:7

  **PROBATION** [1] - 2:3
  **Probation** [4] - 3:25, 77:8, 78:18,
78:19
  **Probation's** [1] - 77:1
  **probation/policing/religious** [1] -
13:11
  **problem** [1] - 20:7
  **problems** [1] - 72:23
  **proceed** [4] - 4:25, 46:6, 46:7, 73:21
  **Proceedings** [1] - 2:13
  **proceedings** [4] - 23:5, 30:24, 77:18,
82:19
  **process** [5] - 12:1, 14:9, 21:5, 49:9,
51:12
  **produce** [1] - 67:15
  **produced** [2] - 2:14, 4:21
  **professional** [3] - 7:4, 7:8, 7:20
  **Professor** [23] - 5:1, 5:18, 5:24, 6:10,
6:22, 7:6, 9:12, 10:17, 15:18, 18:15,
28:7, 28:9, 29:23, 30:16, 30:17, 31:11,
32:20, 42:21, 42:24, 62:18, 68:9, 78:9,
84:5
  **professor** [7] - 7:5, 7:9, 23:10, 33:16,
38:10, 40:25, 57:8
  **professor's** [1] - 28:4
  **professors** [1] - 31:16
  **profile** [1] - 21:21
  **profit** [1] - 39:4
  **program** [14] - 7:2, 14:1, 27:8, 69:17,
69:18, 70:2, 70:13, 70:16, 70:18, 70:25,
71:2, 71:7, 72:16, 78:15
  **Program** [4] - 7:3, 20:25, 69:19, 70:12
  **programs** [2] - 13:1, 71:13
  **Project** [10] - 13:18, 20:16, 27:7,
60:11, 60:21, 61:1, 61:15, 62:10, 63:10,
69:19
  **projecting** [1] - 21:10
  **prominent** [2] - 40:16, 53:22
  **proper** [1] - 42:22
  **propertied** [1] - 17:1
  **proportionally** [1] - 69:11
  **proposals** [1] - 38:7
  **Proposition** [1] - 61:21
  **prosecuted** [3] - 16:24, 17:6, 18:16
  **protect** [2] - 74:2, 81:23
  **protected** [1] - 80:12
  **provide** [8] - 18:22, 27:10, 41:2, 76:20,
78:8, 78:12, 78:16, 78:24
  **provided** [5] - 4:20, 4:23, 31:14, 75:24,
76:4
  **providing** [1] - 77:20
  **PSN** [1] - 70:12
  **PSR** [1] - 76:7
  **PSR's** [1] - 77:10
  **psychologist** [1] - 53:16
  **psychologists** [1] - 47:22
  **public** [1] - 7:2
  **Public** [1] - 7:6
  **publication** [1] - 73:16
  **published** [5] - 49:21, 51:5, 51:6,
51:16, 68:10
  **pull** [1] - 31:3
  **punish** [1] - 66:5
  **punished** [3] - 18:4, 18:19, 71:23
  **punishing** [1] - 69:15

# Appendix to Response to Government Memo A113

**punishment** [24] - 7:17, 8:7, 9:6, 11:10, 11:11, 11:16, 11:17, 12:2, 12:9, 14:22, 15:9, 15:11, 15:16, 15:17, 17:8, 18:9, 19:16, 23:11, 23:25, 24:2, 24:5, 34:11, 36:14
**punishments** [2] - 19:18, 20:12
**purpose** [1] - 80:20
**purposes** [1] - 65:13
**pursuant** [1] - 9:21
**pursuing** [1] - 13:8
**pushing** [1] - 21:13
**put** [5] - 21:4, 47:1, 54:23, 66:4, 68:8
**putting** [3] - 28:22, 29:1, 29:4

## Q

**qualify** [1] - 9:4
**quasi** [1] - 29:13
**quasi-experiments** [1] - 29:13
**questions** [8] - 6:3, 6:21, 10:17, 40:19, 53:22, 61:7, 61:8, 62:13
**quick** [1] - 51:2
**quickly** [3] - 38:25, 66:5, 82:7
**quite** [13] - 21:6, 21:20, 39:12, 40:16, 42:22, 50:8, 53:21, 54:15, 54:22, 55:7, 65:11, 72:15

## R

**rabbit** [1] - 81:21
**racist** [1] - 81:10
**raise** [3] - 5:10, 50:23, 70:3
**raised** [2] - 70:23, 70:24
**raising** [2] - 12:11, 69:22
**ramping** [1] - 53:25
**random** [3] - 14:8, 66:6, 67:18
**range** [3] - 70:7, 76:14, 76:17
**Raphael** [2] - 29:19, 61:5
**rapidly** [1] - 60:22
**rate** [5] - 17:25, 18:1, 22:7, 60:22, 60:23
**rates** [14] - 8:8, 20:19, 22:13, 27:18, 27:24, 35:13, 49:4, 63:6, 63:9, 63:11, 63:12, 64:20, 70:12, 71:9
**rather** [1] - 67:18
**ratio** [1] - 71:18
**rational** [9] - 11:21, 11:23, 14:11, 14:16, 15:1, 15:2, 15:25, 39:9, 47:15
**rationale** [1] - 56:21
**rationality** [7] - 15:3, 16:12, 16:20, 39:15, 40:14, 40:18, 56:6
**rationally** [3] - 12:1, 47:15, 56:25
**RDR** [2] - 2:10, 82:24
**reach** [2] - 20:22, 47:23
**reaching** [1] - 74:20
**read** [6] - 24:1, 25:13, 27:1, 31:11, 31:15, 65:20
**reading** [3] - 65:20, 68:5, 68:11
**readings** [2] - 45:15
**real** [1] - 62:10
**realignment** [1] - 47:24
**realistic** [1] - 17:2
**really** [20] - 12:16, 12:18, 12:19, 14:4, 18:12, 20:20, 21:6, 22:12, 23:2, 31:13,

50:10, 50:23, 53:11, 53:18, 53:21, 53:25, 56:12, 65:10, 67:24, 69:19
**reason** [1] - 64:15
**reasons** [5] - 48:6, 51:18, 53:10, 53:11, 53:15
**receive** [1] - 67:10
**received** [12] - 28:8, 30:6, 58:9, 58:21, 60:8, 61:12, 84:6, 84:7, 84:9, 84:11, 84:13, 84:15
**recent** [4] - 57:15, 66:21, 72:18
**recently** [1] - 80:5
**recess** [1] - 45:16
**recidivate** [1] - 49:15
**recidivism** [5] - 37:8, 37:10, 49:4, 49:17, 64:9
**reciting** [1] - 37:19
**reckless** [1] - 74:12
**recognize** [3] - 6:13, 10:7, 47:25
**recognized** [1] - 47:17
**recommendations** [1] - 67:4
**record** [7] - 3:11, 3:23, 5:15, 13:6, 30:25, 49:11, 82:19
**recorded** [1] - 2:13
**recruited** [2] - 48:23, 48:24
**redirect** [2] - 44:15, 62:14
**REDIRECT** [2] - 62:16, 83:12
**redirected** [1] - 67:6
**reduce** [2] - 39:21, 59:21
**reduced** [2] - 81:3, 81:4
**reduction** [3] - 62:3, 64:4, 76:11
**reductions** [2] - 13:12, 27:24
**reentry** [2] - 78:21, 79:3
**refer** [1] - 9:12
**regards** [1] - 16:1
**regime** [13] - 16:4, 17:18, 17:19, 17:20, 18:19, 27:16, 36:21, 52:10, 60:13, 67:21, 68:3, 68:7
**regimes** [2] - 13:10, 18:17
**regulating** [1] - 47:12
**regulation** [1] - 8:21
**related** [1] - 13:23
**relates** [2] - 12:22, 63:22
**relationship** [1] - 63:8
**relative** [1] - 18:2
**relatively** [1] - 66:6
**release** [2] - 79:4, 80:8
**released** [2] - 80:2, 80:4
**releasees** [3] - 57:23, 58:3, 58:5
**relevance** [3] - 19:25, 24:17, 45:8
**relevant** [2] - 7:20, 8:17
**reliable** [1] - 50:12
**reliance** [1] - 67:18
**relied** [1] - 80:23
**relies** [2] - 11:23, 15:14
**religious** [1] - 70:17
**remain** [1] - 80:3
**remember** [2] - 7:9, 55:15
**remembers** [1] - 77:25
**remote** [1] - 21:18
**repeatedly** [1] - 49:1
**repercussions** [1] - 15:1
**replacement** [1] - 78:11
**report** [45] - 4:20, 9:18, 15:22, 25:18, 27:25, 28:1, 28:4, 28:7, 28:10, 35:14, 37:24, 40:25, 41:6, 42:21, 43:7, 47:21,

51:8, 51:9, 53:23, 57:10, 57:19, 58:1, 58:3, 58:14, 58:16, 59:2, 59:6, 59:24, 60:2, 60:19, 61:22, 62:2, 62:8, 62:20, 66:10, 66:17, 66:18, 66:19, 68:9, 68:25, 69:16, 80:23, 84:5
**reported** [2] - 37:23, 37:25
**REPORTER** [1] - 82:17
**Reporter** [3] - 2:10, 2:11, 82:24
**reporter** [2] - 5:7, 13:6
**reports** [2] - 57:9, 80:23
**require** [1] - 23:1
**requires** [1] - 17:16
**Research** [2] - 7:13, 47:7
**research** [31] - 7:16, 7:18, 12:5, 15:7, 15:23, 18:15, 18:24, 19:13, 20:2, 20:20, 22:5, 22:7, 22:17, 34:17, 34:22, 35:24, 35:25, 38:3, 39:11, 40:15, 47:6, 47:9, 48:13, 50:21, 50:23, 50:24, 57:17, 67:4, 67:5, 68:6
**researched** [1] - 46:19
**residential** [4] - 33:10, 35:7, 72:16, 74:24
**residual** [1] - 63:13
**respect** [9] - 14:20, 22:2, 23:17, 42:16, 47:10, 48:8, 56:11, 69:9, 72:7
**respond** [5] - 31:16, 67:22, 72:24, 75:14, 79:21
**responsibility** [1] - 76:11
**rest** [1] - 75:12
**result** [5] - 36:16, 36:18, 55:12, 62:4, 76:13
**resulted** [2] - 36:17, 75:21
**Results** [1] - 57:21
**results** [2] - 59:3, 71:7
**retribution** [1] - 33:24
**retrospect** [1] - 55:22
**review** [2] - 18:25, 57:15
**reviewed** [7] - 7:25, 10:9, 15:20, 15:21, 15:22, 20:20, 35:25, 70:16
**revocation** [2] - 78:5, 79:14
**rewards** [2] - 11:19, 11:20
**Richmond** [5] - 13:18, 14:1, 60:14, 62:20, 63:7
**Richmond's** [3] - 60:21, 60:22, 63:11
**rigorous** [1] - 35:25
**Rikers** [1] - 53:3
**rise** [1] - 3:3
**risk** [18] - 11:14, 11:15, 12:11, 13:15, 14:6, 14:20, 15:15, 15:16, 17:23, 17:24, 18:3, 19:16, 21:18, 36:12, 36:14, 36:23, 67:8, 67:23
**risks** [9] - 11:9, 11:11, 14:21, 15:10, 15:14, 16:6, 18:8, 21:7, 52:25
**risky** [1] - 65:3
**road** [1] - 21:19
**robbery** [5] - 51:21, 54:21
**ROBERT** [1] - 1:13
**Rockefeller** [1] - 56:11
**role** [1] - 19:19
**Rose** [2] - 2:7, 4:6
**Rosenfeld** [1] - 60:3
**roughly** [1] - 48:21
**Rules** [1] - 9:22
**rumor** [1] - 18:13
**run** [1] - 32:11

(running .strategize)

# Appendix to Response to Government Memo A114

**running** [4] - 14:6, 33:3, 46:20, 74:18
**Rutgers** [1] - 7:10
**Ruyter** [1] - 2:8
**Ruyter-Harcourt** [1] - 2:8
**résumé** [1] - 6:22

## S

**sacrifice** [1] - 16:12
**Safe** [1] - 69:19
**salience** [1] - 39:21
**salient** [1] - 15:9
**Sam** [1] - 4:3
**SAMUEL** [1] - 1:21
**Samuel** [1] - 3:15
**sanctions** [3] - 8:13, 8:14, 14:12
**saw** [1] - 31:18
**Scanlon** [1] - 80:2
**scheme** [2] - 46:21, 47:1
**scholarly** [1] - 7:16
**scholars** [1] - 47:22
**school** [2] - 4:9, 70:21
**School** [4] - 7:5, 7:6, 7:11, 8:18
**Sciences** [2] - 37:21, 73:16
**scope** [1] - 30:16
**screen** [2] - 29:25, 32:6
**searching** [1] - 68:16
**seat** [1] - 5:17
**second** [3] - 28:24, 29:10, 35:1
**section** [2] - 30:2, 59:4
**sector** [1] - 13:11
**securities** [2] - 46:15, 56:18
**security** [1] - 46:11
**see** [10] - 11:1, 30:1, 30:3, 31:21, 38:24, 40:12, 46:24, 57:3, 77:4, 82:6
**seeing** [1] - 12:18
**seem** [9] - 15:8, 17:13, 20:20, 21:7, 63:19, 64:21, 65:21
**selection** [1] - 14:8
**self** [1] - 51:19
**self-defense** [1] - 51:19
**seminar** [2] - 44:5, 73:7
**seminars** [4] - 8:19, 8:20, 8:21
**send** [2] - 66:25, 73:11
**sending** [1] - 34:24
**SENIOR** [1] - 1:11
**Senior** [1] - 7:13
**sense** [5] - 18:3, 18:16, 21:15, 37:14, 68:5
**sensible** [1] - 72:24
**sentence** [58] - 14:6, 17:5, 19:6, 19:7, 19:24, 24:9, 26:5, 26:6, 33:21, 34:7, 34:14, 35:3, 35:16, 36:19, 36:23, 37:11, 38:4, 38:15, 38:16, 38:22, 39:5, 41:10, 41:15, 41:23, 41:25, 42:9, 43:1, 43:2, 45:2, 45:3, 49:10, 52:22, 55:5, 55:8, 55:13, 55:21, 59:2, 61:17, 65:14, 72:8, 72:11, 72:20, 73:21, 77:4, 77:10, 78:12, 79:2, 80:20, 81:12, 81:13, 81:14, 81:18, 81:22, 81:24, 82:2
**sentenced** [4] - 34:20, 35:21, 36:5, 81:7
**sentences** [28] - 8:11, 9:20, 12:16, 14:14, 14:16, 19:15, 23:14, 24:22, 25:1,

25:3, 25:6, 26:10, 26:19, 27:13, 35:10, 35:21, 39:2, 43:12, 43:14, 43:23, 54:14, 54:22, 55:16, 61:2, 66:8, 67:9, 69:10, 72:7
**Sentencing** [1] - 37:7
**SENTENCING** [1] - 1:10
**sentencing** [17] - 3:8, 3:21, 4:16, 14:21, 16:3, 18:7, 25:4, 27:16, 27:22, 33:24, 55:7, 56:21, 60:13, 61:19, 65:14, 74:10, 81:17
**series** [1] - 47:17
**serious** [5] - 8:11, 36:22, 50:15, 63:9, 81:22
**served** [8] - 41:2, 41:7, 41:9, 41:11, 49:5, 49:7, 55:11, 80:21
**service** [2] - 39:23, 79:3
**services** [1] - 70:7
**session** [1] - 3:5
**SESSION** [1] - 46:1
**set** [1] - 82:6
**seven** [1] - 7:10
**several** [3] - 7:9, 71:9, 71:11
**severity** [3] - 59:7, 59:15, 59:20
**shall** [1] - 46:6
**shared** [4] - 18:10, 22:22, 22:23, 52:18
**sheet** [3] - 75:25, 76:5, 76:21
**shirt** [15] - 31:22, 31:25, 32:5, 33:16, 33:21, 33:22, 34:6, 34:7, 34:8, 34:13, 34:14, 34:18, 34:19
**shoot** [2] - 32:8, 64:7
**shooters** [2] - 40:1, 64:6
**shooting** [5] - 33:9, 40:2, 40:3, 40:4, 64:3
**shoplifting** [1] - 80:10
**shopping** [1] - 40:13
**short** [4] - 13:21, 45:3, 62:2, 68:23
**short-term** [2] - 13:21, 62:2
**shorter** [1] - 17:5
**shot** [4] - 33:1, 33:15, 40:8, 52:4
**shots** [1] - 75:1
**show** [6] - 15:3, 29:23, 35:25, 44:18, 74:15, 74:16
**showed** [1] - 32:23, 74:11
**shown** [4] - 22:20, 36:11, 37:5
**shows** [2] - 22:6, 74:18
**shy** [1] - 25:2
**side** [4] - 6:3, 73:22, 74:16
**signals** [1] - 67:22
**significant** [2] - 63:16, 63:20
**simple** [1] - 11:8
**simply** [6] - 21:19, 39:18, 39:21, 52:21, 67:25, 80:19
**simulating** [1] - 58:17
**simulations** [1] - 15:7
**sit** [2] - 5:5, 11:1
**sitting** [1] - 6:3
**situated** [2] - 18:20, 18:22
**situation** [3] - 22:25, 70:14
**situations** [1] - 40:13
**six** [6] - 7:10, 30:5, 30:8, 38:3, 49:5, 70:25
**slow** [2] - 13:5, 48:6
**small** [3] - 12:23, 66:7, 72:16
**smoke** [1] - 21:20
**smoking** [2] - 21:16, 21:17

**snippets** [1] - 62:19
**social** [2] - 70:7, 78:20
**Social** [1] - 2:6
**societal** [1] - 80:25
**society** [1] - 55:24
**Society** [1] - 7:23
**solid** [1] - 23:2
**someone** [1] - 15:2
**sometimes** [1] - 55:15
**somewhat** [5] - 8:12, 17:5, 21:18, 22:6, 52:18
**somewhere** [1] - 49:22
**son** [1] - 77:23
**sophisticated** [1] - 67:14
**sorry** [5] - 3:19, 5:18, 25:10, 42:14, 66:14
**sort** [4] - 15:4, 20:25, 37:1, 47:10
**sounded** [1] - 38:20
**sounds** [2] - 17:15, 55:22
**South** [1] - 52:1
**speaks** [1] - 53:22
**special** [1] - 21:10
**specific** [28] - 9:19, 13:22, 19:4, 23:24, 24:1, 24:4, 24:11, 25:14, 42:15, 42:16, 42:20, 56:11, 56:22, 62:21, 63:18, 63:23, 64:9, 64:11, 65:18, 65:22, 68:22, 69:21, 71:6, 71:7, 72:3, 77:6, 78:13, 81:20
**specifically** [6] - 12:22, 15:25, 19:4, 27:2, 27:4, 67:11
**speculate** [2] - 21:15, 39:6
**speeded** [1] - 20:9
**spend** [2] - 42:11
**spent** [2] - 53:3, 77:11
**split** [1] - 82:6
**spoken** [2] - 77:22
**spot** [3] - 15:5, 16:10, 16:11
**spots** [1] - 68:22
**stand** [2] - 5:3, 31:6
**start** [1] - 24:16
**started** [4] - 5:20, 52:8, 52:17, 77:24
**Stat** [1] - 27:7
**state** [10] - 3:23, 5:15, 16:7, 17:5, 18:16, 18:19, 20:12, 54:14, 56:5
**State** [4] - 7:1, 7:3, 55:2, 80:7
**statement** [3] - 56:2, 56:4
**statistical** [1] - 37:6
**statistically** [3] - 49:19, 63:16, 63:20
**status** [2] - 51:20, 53:11
**statute** [7] - 19:8, 24:8, 44:23, 56:3, 65:12, 65:17, 65:20
**statutory** [4] - 4:16, 74:3, 81:21
**stay** [2] - 42:23, 70:22
**stayed** [2] - 70:7, 71:10
**stenography** [1] - 2:13
**step** [2] - 31:12
**Steven** [1] - 61:20
**stiff** [2] - 52:22, 55:20
**still** [2] - 41:8, 77:2
**stop** [4] - 12:16, 13:15, 53:25, 68:3
**stopped** [2] - 68:23
**stopping** [1] - 68:15
**straight** [2] - 70:22, 70:24
**strange** [1] - 53:15
**strategize** [1] - 22:3

# Appendix to Response to Government Memo A115

**street** [13] - 13:14, 14:8, 31:21, 32:8, 33:10, 33:11, 38:25, 52:3, 64:3, 66:5, 74:17, 74:19, 74:24

**Street** [1] - 2:4

**street-level** [1] - 13:14

**strength** [1] - 49:18

**strengths** [1] - 49:8

**strict** [1] - 79:4

**strictly** [1] - 72:5

**strong** [5] - 13:14, 15:13, 20:17, 48:2, 68:5

**strongly** [1] - 74:20

**students** [2] - 58:23, 59:11

**studied** [5] - 35:23, 38:7, 38:19, 60:11, 70:14

**studies** [27] - 12:6, 12:8, 12:23, 12:25, 13:1, 13:24, 15:23, 20:21, 20:22, 20:23, 20:24, 25:19, 27:1, 38:12, 43:6, 51:7, 52:9, 57:10, 57:15, 58:14, 60:10, 62:19, 62:23, 63:22, 66:14, 66:16, 81:2

**study** [35] - 13:3, 13:7, 13:9, 13:17, 14:3, 17:9, 27:2, 27:4, 27:6, 27:15, 35:11, 38:13, 48:3, 48:14, 48:15, 48:18, 48:25, 49:7, 49:8, 49:18, 50:22, 51:2, 51:5, 51:11, 52:5, 58:7, 58:16, 60:13, 61:5, 61:15, 62:20, 63:2, 64:15, 68:9, 73:12

**Study** [1] - 57:12

**studying** [2] - 53:20, 59:9

**stuff** [1] - 38:19

**subject** [2] - 4:14, 79:6

**subjects** [1] - 7:25

**submissions** [1] - 75:12

**submit** [2] - 75:10, 80:18

**submitted** [1] - 30:12

**substantial** [1] - 55:19

**substantially** [1] - 37:11

**successful** [1] - 70:25

**succinctly** [1] - 10:21

**sufficient** [2] - 16:17, 77:5

**suggest** [3] - 19:14, 36:10, 57:23

**suggested** [2] - 50:6, 74:14

**suggesting** [1] - 49:20

**suggests** [4] - 34:23, 35:6, 47:9, 71:17

**sum** [1] - 69:8

**summarize** [2] - 10:19, 63:6

**summarized** [2] - 25:14, 27:1

**summary** [1] - 60:20

**supervised** [1] - 79:4

**supervision** [1] - 34:25

**supplied** [1] - 78:23

**support** [4] - 70:6, 70:22, 77:19, 78:17

**supports** [1] - 81:18

**supposition** [1] - 40:4

**Supreme** [1] - 47:17

**survey** [1] - 22:8

**surveys** [1] - 22:20

**suspension** [1] - 59:21

**Sustained** [2] - 32:16, 32:18

**sustained** [1] - 48:3

**sustaining** [1] - 76:10

**swath** [1] - 64:18

**swear** [1] - 5:9

**sworn** [1] - 5:12

**symptoms** [1] - 53:17

**systemic** [1] - 43:16

## T

**table** [3] - 30:1, 36:23, 37:8

**Table** [1] - 63:19

**tactic** [2] - 68:23, 68:24

**tall** [1] - 20:17

**tantamount** [1] - 77:16

**target** [1] - 56:20

**taught** [5] - 7:11, 8:17, 8:19, 38:20

**tax** [5] - 50:2, 50:4, 50:5, 50:9, 55:19

**teach** [2] - 45:13, 45:14

**tease** [1] - 62:21

**technical** [1] - 30:22

**telephone** [1] - 22:8

**Telephone** [1] - 2:11

**telescopes** [1] - 12:20

**ten** [16] - 34:20, 35:4, 41:20, 41:23, 41:25, 43:2, 59:21, 73:25, 74:2, 77:4, 78:2, 80:14, 81:7, 81:17, 81:18, 81:24

**ten-month** [1] - 59:21

**ten-year** [2] - 77:4, 81:24

**tend** [2] - 39:24, 40:12

**tends** [1] - 25:2

**tens** [1] - 55:10

**term** [4] - 13:21, 39:19, 41:1, 62:2

**terms** [5] - 23:17, 63:15, 63:16, 76:24, 77:1

**territory** [1] - 40:6

**testified** [3] - 5:12, 64:12, 80:17

**testimony** [5] - 26:16, 26:23, 30:16, 31:15, 69:9

**text** [1] - 65:21

**texts** [1] - 24:1

**the defendant** [8] - 1:18, 1:18, 5:11, 23:18, 26:2, 26:4, 26:8, 74:7

**themselves** [2] - 52:4, 53:10

**theoretical** [1] - 15:13

**theorizing** [1] - 39:13

**theory** [8] - 10:19, 11:6, 11:8, 19:4, 25:1, 25:2, 56:9, 67:20

**therefore** [2] - 12:13, 14:6

**thesis** [1] - 56:11

**they've** [2] - 75:15, 80:15

**thick** [1] - 37:24

**thinking** [4] - 39:8, 43:13, 52:9, 56:25

**third** [1] - 13:17

**thousands** [1] - 55:11

**threat** [2] - 53:9, 53:10

**three** [5] - 11:14, 13:9, 49:7, 49:16, 71:10

**Title 18** [1] - 24:9

**today** [8] - 4:4, 4:5, 26:16, 26:23, 42:19, 43:7, 73:4, 82:2

**today's** [3] - 25:13, 30:16, 79:7

**together** [7] - 32:19, 32:22, 32:24, 33:1, 33:3, 47:1, 70:19

**tolled** [1] - 55:11

**took** [4] - 20:22, 38:21, 51:15, 62:18

**topic** [1] - 8:3

**total** [1] - 66:7

**Total Offense Level** [1] - 75:20

**touch** [1] - 19:17

**tour** [1] - 62:18

**towards** [1] - 25:3

**track** [2] - 42:23, 77:24

**tragedy** [1] - 75:9

**training** [1] - 70:5

**trajectory** [1] - 79:16

**transcript** [1] - 82:18

**Transcript** [1] - 2:13

**TRANSCRIPT** [1] - 1:10

**Transcription** [1] - 2:14

**transcripts** [2] - 52:11, 82:6

**Travis** [1] - 37:22

**treat** [1] - 81:10

**trends** [1] - 60:21

**tried** [8] - 16:7, 17:4, 53:22, 68:4, 74:8, 74:11, 80:11, 80:15

**Trigger** [2] - 13:1, 13:17

**trouble** [1] - 30:22

**true** [4] - 29:13, 50:17, 64:20, 81:11

**trying** [8] - 40:7, 57:3, 62:24, 74:14, 74:15, 74:21, 74:22, 80:15

**Tuesday** [1] - 1:7

**turn** [7] - 28:9, 29:25, 43:7, 60:1, 60:16, 61:4, 61:14

**turning** [1] - 58:11

**Two** [1] - 28:10

**two** [13] - 28:15, 31:21, 32:8, 32:19, 35:7, 35:12, 48:21, 49:6, 49:18, 51:24, 64:7, 70:9, 71:10

**type** [2] - 38:23, 65:19

## U

**U.S** [2] - 60:23, 63:9

**U.S.P.O** [1] - 2:5

**ultimately** [1] - 12:13

**unable** [1] - 75:15

**unaffected** [3] - 33:21, 34:1, 34:4

**uncertainty** [3] - 14:3, 16:23, 17:7

**under** [12] - 12:25, 15:8, 17:17, 19:4, 19:7, 19:8, 41:18, 55:9, 58:24, 67:6, 77:13, 77:15

**underlying** [1] - 56:8

**undermines** [1] - 80:20

**understood** [1] - 17:10

**unfolding** [1] - 16:13

**unfortunately** [3] - 46:19, 64:19, 73:3

**United States** [13] - 1:1, 1:3, 1:5, 1:11, 1:14, 1:17, 2:3, 3:3, 3:8, 3:12, 3:13, 3:22, 4:2

**University** [5] - 6:25, 7:1, 7:3, 7:7, 7:10

**unknown** [1] - 14:4

**unless** [4] - 36:10, 44:21, 56:3, 56:8

**unlikely** [2] - 16:18, 19:3

**unproved** [1] - 20:9

**unspoken** [1] - 56:9

**up** [27] - 11:1, 14:3, 16:17, 20:9, 31:6, 32:5, 32:11, 32:23, 35:25, 43:23, 44:14, 53:1, 53:25, 54:9, 54:10, 57:21, 59:19, 62:1, 66:6, 67:18, 69:8, 69:9, 70:20, 70:21, 73:2, 75:2, 78:25

**upstate** [1] - 53:4

**uptown** [1] - 44:6

**usage** [1] - 21:12

utilitarian [1] - 72:5

## V

validity [1] - 63:10
value [2] - 39:24, 62:9
varies [2] - 22:18, 50:8
variety [1] - 35:21
varying [1] - 15:8
versus [7] - 3:22, 16:7, 18:17, 62:21, 62:22, 63:17, 80:24
veteran [1] - 55:18
vexing [1] - 5:19
victim [1] - 76:9
victims [1] - 52:4
video [10] - 29:23, 30:11, 30:14, 30:18, 30:19, 30:21, 31:8, 31:13, 31:14, 31:20
Video [2] - 30:6, 84:7
view [2] - 43:1, 72:5
viewed [1] - 30:14
violated [1] - 79:5
violations [3] - 78:4, 79:14, 79:25
violence [11] - 8:14, 35:13, 43:14, 51:1, 52:4, 53:18, 53:19, 59:14, 65:3, 67:12, 70:12
violent [3] - 21:22, 50:11, 69:12
Virginia [2] - 13:19, 60:14
vitae [2] - 6:14, 49:22
Vivienne [1] - 2:6

## W

waiting [3] - 3:19, 31:25, 67:19
waiving [1] - 8:9
walk [1] - 31:24
walked [1] - 32:19
walking [2] - 31:21, 33:11
wants [4] - 40:11, 78:7, 81:12
warning [1] - 75:2
warrant [1] - 77:10
warranted [1] - 81:25
warrants [1] - 77:4
wash [1] - 80:19
ways [1] - 20:1
weapon [1] - 53:15
week [1] - 4:22
weighed [1] - 74:7
weighs [1] - 12:1
weight [4] - 4:15, 48:9, 55:3, 65:17
WEINSTEIN [1] - 1:11
Weinstein [2] - 3:5, 3:6
well-known [1] - 70:16
Wesner [1] - 37:23
Wexler [4] - 38:10, 38:11, 45:13
whack [1] - 56:12
white [11] - 31:25, 34:6, 34:13, 38:23, 46:18, 46:21, 55:19, 56:19, 64:13, 81:3, 81:10
widely [4] - 17:10, 18:10, 40:17
widespread [1] - 21:16
Witness [1] - 5:3
witness [6] - 4:13, 4:17, 5:3, 5:4, 5:9, 73:19
witnesses [2] - 73:22, 79:20

women [4] - 48:21, 73:4, 73:6, 73:8
words [5] - 12:12, 15:12, 18:1, 18:8, 32:21
Worker [1] - 2:6
worker [1] - 78:20
worried [1] - 54:13
worry [1] - 46:22
worst [1] - 80:19
worth [2] - 76:24, 76:25
would-be [2] - 14:4, 14:18
write [1] - 28:13
writer [2] - 8:16
writing [3] - 38:17, 62:8, 66:11
writings [1] - 7:24
written [6] - 7:24, 8:6, 8:8, 40:15, 69:6, 80:23
wrote [5] - 8:6, 29:15, 41:6, 45:12, 80:22

## Y

year [8] - 7:11, 49:6, 49:15, 53:3, 77:4, 78:1, 79:13, 81:24
years [35] - 7:9, 12:19, 22:18, 34:11, 34:20, 35:4, 35:24, 41:20, 41:24, 41:25, 42:9, 43:2, 46:12, 48:25, 49:2, 49:6, 49:7, 49:16, 55:7, 70:13, 70:25, 71:10, 71:11, 73:25, 74:2, 80:14, 81:7, 81:18, 81:19
YORK [2] - 1:1, 1:18
York [30] - 1:5, 1:14, 1:15, 1:20, 2:3, 2:4, 3:4, 6:24, 7:1, 7:3, 7:13, 13:13, 18:19, 22:20, 27:8, 27:9, 50:21, 51:25, 52:9, 52:22, 53:18, 54:1, 55:2, 65:5, 65:25, 68:4, 68:10, 78:15, 80:7
young [2] - 8:11, 35:7, 35:12, 35:20, 35:21, 36:3, 44:25, 48:19, 48:20, 49:3, 50:25, 51:3, 51:12, 51:15, 53:2, 53:14, 53:17, 53:21, 72:16, 78:7
yourself [3] - 25:19, 25:25, 55:23

## Z

zero [1] - 71:10
Zimmering [1] - 68:9

## §

§3553(a [2] - 24:8, 65:13
§922(g [1] - 41:19
§922(g) [1] - 41:20
§924(c [1] - 41:18